

FILED IN OPEN COURT

SEP - 2 2021

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:20-CR-239 |
| ALEXANDA AMON KOTEY, | |
| Defendant. | |

### STATEMENT OF FACTS

The United States and the defendant, ALEXANDA AMON KOTEY (hereinafter, "the defendant"), agree that at trial, the United States would have proven the following beyond a reasonable doubt with admissible and credible evidence:

**Charged Offenses**

1. From in or around November 2012 through on or about February 7, 2015, within the extraterritorial jurisdiction of the Eastern District of Virginia and elsewhere, the defendant did knowingly conspire with El Shafee Elsheikh, Mohamed Emwazi, and others, to commit hostage taking resulting in death in violation of 18 U.S.C. § 1203(a). The commission of this offense resulted in the deaths of American citizens James Wright Foley, Kayla Jean Mueller, Steven Joel Sotloff, and Peter Edward Kassig.

2. From on or about November 22, 2012, to on or about August 19, 2014, within the extraterritorial jurisdiction of the Eastern District of Virginia and elsewhere, and in violation of 18 U.S.C. §§ 1203(a) and 2, the defendant, along with El Shafee Elsheikh, Mohamed Emwazi, and others, did seize, detain and threaten to kill, injure and continue to detain James Wright Foley, a national of the United States of America traveling outside the United States, in order to compel James Wright Foley's parents and a governmental organization, including, but not limited to, the

United States of America and any part of its government, to pay a monetary ransom for the release of James Wright Foley and to do and abstain from doing any act as an explicit or implicit condition for the release of James Wright Foley. James Wright Foley's death resulted from the commission of this offense.

3. From on or about August 4, 2013 to on or about February 7, 2015, within the extraterritorial jurisdiction of the Eastern District of Virginia and elsewhere, and in violation of 18 U.S.C. §§ 1203(a) and 2, the defendant, along with El Shafee Elsheikh, Mohamed Emwazi, and others, did seize, detain and threaten to kill, injure and continue to detain Kayla Jean Mueller, a national of the United States of America traveling outside the United States, in order to compel Kayla Jean Mueller's parents and a governmental organization, including, but not limited to, the United States of America and any part of its government, to pay a monetary ransom for the release of Kayla Jean Mueller and to do and abstain from doing any act as an explicit or implicit condition for the release of Kayla Jean Mueller. Kayla Jean Mueller's death resulted from the commission of this offense.

4. From on or about August 4, 2013 to on or about September 2, 2014, within the extraterritorial jurisdiction of the Eastern District of Virginia and elsewhere, and in violation of 18 U.S.C. §§ 1203(a) and 2, the defendant, along with El Shafee Elsheikh, Mohamed Emwazi, and others, did seize, detain and threaten to kill, injure and continue to detain Steven Joel Sotloff, a national of the United States of America traveling outside the United States, in order to compel Steven Joel Sotloff's parents and a governmental organization, including, but not limited to, the United States of America and any part of its government, to pay a monetary ransom for the release of Steven Joel Sotloff and to do and abstain from doing any act as an explicit or implicit condition

for the release of Steven Joel Sotloff. Steven Joel Sotloff's death resulted from the commission of this offense.

5. From on or about October 2, 2013, to on or about November 16, 2014, within the extraterritorial jurisdiction of the Eastern District of Virginia and elsewhere, and in violation of 18 U.S.C. §§ 1203(a) and 2, the defendant, along with El Shafee Elsheikh, Mohamed Emwazi, and others, did seize, detain and threaten to kill, injure and continue to detain Peter Edward Kassig, a national of the United States of America traveling outside the United States, in order to compel Peter Edward Kassig's parents and a governmental organization, including, but not limited to, the United States of America and any part of its government, to pay a monetary ransom for the release of Peter Edward Kassig and to do and abstain from doing any act as an explicit or implicit condition for the release of Peter Edward Kassig. Peter Edward Kassig's death resulted from the commission of this offense.

6. From in or around November 2012 and continuing to on or about February 7, 2015, within the extraterritorial jurisdiction of the Eastern District of Virginia and elsewhere, the defendant, along with El Shafee Elsheikh, Mohamed Emwazi, and others, did conspire to murder United States citizens outside of the United States in violation of 18 U.S.C. § 2332(b)(2).

7. From in and around November 2012 and continuing to on or about February 7, 2015, within the extraterritorial jurisdiction of the Eastern District of Virginia and elsewhere, the defendant, along with El Shafee Elsheikh, Mohamed Emwazi, and others, did conspire to provide material support or resources to terrorists resulting in death in violation of 18 U.S.C. § 2339A.

8. From in or about November 2012 and continuing to in or about January 2018, within the extraterritorial jurisdiction of the Eastern District of Virginia and elsewhere, the defendant, along with El Shafee Elsheikh, Mohamed Emwazi, and others, did conspire to provide

material support or resources to a designated foreign terrorist organization resulting in death in violation of 18 U.S.C. § 2339B. The defendant knew and understood at all times material to this indictment that he intended to support a designated terrorist organization that engages in terrorism.

*Defendant and El Shafee Elsheikh Captured by the Syrian Democratic Forces on or about January 4, 2018, in Syria.*

9. The defendant and Elsheikh were captured together by the Syrian Democratic Forces (SDF) on or about January 4, 2018. The defendant made statements after his capture admitting that he and Abu Muharib (Mohamed Emwazi) agreed to travel to Syria to fight against the Syrian regime. The defendant further admitted that he became directly responsible for the European prisoners held by jihadist forces in Syria.

*Defendant's London Origin, Association with Mohamed Emwazi and El Shafee Elsheikh, and Migration to Syria to Engage in Terrorist Activity*

10. The defendant and Elsheikh were raised in London and both speak with a British accent. Both served as military cadets in their youth, but they also engaged in street level criminal activity including theft and illicit drug sales. As he matured the defendant was physically active and trained as a boxer and in the martial arts. Elsheikh also trained as a boxer. Elsheikh made statements to the hostages under their control describing himself with this foregoing background.

11. The defendant met Emwazi and Elsheikh as a young man in London. Later, the defendant knew that Emwazi was also known as "Abu Muharib al-Muhajir" and Elsheikh was known as "Abu Thabit."

12. On June 2, 2010, Emwazi attempted to travel to Kuwait but was prevented from traveling by British port authorities at London's Heathrow Airport. Emwazi was carrying, among other things, a book titled, "Afghan Guerilla Warfare in the Words of the Mujahideen Fighters," and a pair of boxing gloves.

13. On or about September 11, 2011, the defendant and Elsheikh were arrested together on Edgeware Road in West London on their way to confront the English Defense League. On that same day, a Muslims Against Crusaders demonstration occurred near the United States Embassy in London. The Muslims Against Crusaders were protesting a memorial service honoring British citizens who were killed by al-Qaeda during the September 11, 2001, terrorist attacks on the United States. The defendant and Elsheikh were detained together by London police as a result of disturbances arising from the demonstrations.

14. On February 17, 2012, the defendant left the United Kingdom via the Channel Tunnel in the company of Conspirator-1, and two other London-based friends who died as foreign fighters in Syria. British port authorities examined documents in the defendant's possession, locating a business card for a mixed martial arts studio with the word "submit" imposed across an image of two fists. The men traveled to Turkey, but the defendant was denied entry and returned to the United Kingdom. The defendant returned to the U.K. alone and was stopped at St. Pancras station on March 7, 2012. The defendant was carrying a ticket stub for a flight from Barcelona to Turkey dated March 4, 2012, and an itinerary showing a reservation for a hotel in Turkey from March 4 to March 11, 2012. The defendant also had a canceled Turkish visa in his passport. The defendant was carrying a lock-blade knife on March 7, 2012, and was arrested for possession of the knife in a public place, which was considered illegal in the United Kingdom. In a 2016 tribute to Emwazi published in an Islamic State of Iraq and al-Sham ("ISIS") online propaganda magazine Dar al-Islam (described further below), the defendant made statements concerning the difficulty traveling to Syria and the importance of preparation. The defendant stated, "[T]he second problem was that, four months before our hijrah (emigration), I had been refused entry to Turkey and sent back to the U.K."

15. Emwazi attempted to fly to Kuwait again on August 20, 2012 and was stopped by British port authorities. Emwazi was traveling to Kuwait with his father, who initially denied Emwazi was his son and claimed Emwazi was a friend. Emwazi was carrying a document showing he had changed his name to Mohammed al-Elayan. Emwazi was stopped and not allowed to travel to Kuwait. Within 10 days after this failed effort to leave London, the defendant and Emwazi left London for the last time and successfully traveled to Syria to provide personnel and services to Islamic jihadist causes. Their trip from London to Syria lasted two months.

16. Emwazi was killed in a US military airstrike on or about November 12, 2015. As a result of that event, the defendant narrated a tribute to Emwazi that ISIS published in Dar al-Islam, a French online propaganda publication produced by the Islamic State (see also ¶ 14 above). The Dar al-Islam narration is an accurate history of the defendant's emigration to Syria with Emwazi (abu Muharib). For instance, the defendant narrates:

> *Abu Muharib and I only made the decision to leave after having achieved all we could in terms of preparation. From our point of view, our main problem was being able to leave the United Kingdom without being detected by the border police, given that our names had been passed to them and that we would be arrested at the point of leaving the country. We therefore had to avoid the airports, railway stations, ports and every other official mode of transport ...*

17. Further, the defendant narrated, "[W]e were now starting to get tired, my asthma started and Abu Muharib's old knee injury was starting to hurt him, especially after walking for hours in rocky mountains." In fact, the defendant has an asthma condition which he reported to the U.S. military in October 2019.

18. ISIS also eulogized Emwazi in issue 13 of Dabiq, the English language version of the terrorist organization's online propaganda operation. The narration refers to Emwazi's "companion in hijrah." This companion is the defendant as reflected in this passage:

> *Abu Muharib together with his companion in hijrah carefully and secretly made their departure, utilizing every means available to them. Depending upon Allah alone for*

*success, Abu Muharib with his companion embarked on a long and strenuous journey that totaled approximately two months and involved trekking the mountain ranges of Europe and its marshy farmlands, sneaking across borders, and being detained by authorities of various nations on at least two occasions.*

19. On or about December 11, 2012, a criminal search warrant was executed at the home of the defendant's parents in London, England by British law enforcement. Among the items seized in the search was a laptop belonging to the defendant. A forensic review of this laptop revealed that on August 20, 2012, this laptop was used to perform a Google search for "nhs doctor in Syria." A later search on August 28, 2012, resulted in a Mail Online article entitled "John Cantlie: NHS doctor led Syrian terror cell that took British journalist hostage." In fact, British citizen John Cantlie had been abducted for one week in late July 2012 before being released. John Cantlie and American citizen James Foley were later abducted together in Syria on November 22, 2012.

20. In addition, a review of the defendant's laptop also revealed that an on-line search had been conducted for "Justice for Afia Siddiqui." The defendant's email collection also had multiple emails from a group called "Justice for Aafia Coalition." Subsequent ransom demand emails sent to the family of Kayla Mueller in 2014 demanded the release of Aafia Siddiqi as a condition of Kayla Mueller's release.

### The Hostage Taking Scheme

21. Within months after arrival in Syria the defendant and Emwazi joined Jabhat al-Nusra (JaN), also known as the al-Nusra Front, a designated foreign terrorist organization operating in Syria and elsewhere at that time. The defendant was aware that Elsheikh had already left London in April 2012 and joined a foreign fighting faction in Syria. Soon after joining JaN, many JaN fighters, including the defendant, Emwazi, and Elsheikh, turned their allegiance to ISIS and the Islamic State. The defendant, Elsheikh and Emwazi all knew that JaN and ISIS engaged

7

in terrorist activity. Soon after the defendant and Emwazi arrived in Syria, the defendant, Emwazi and Elsheikh became directly responsible for the European and American hostages being held by JaN and later ISIS. The defendant worked with Emwazi, Elsheikh and others on behalf of ISIS in all aspects of the American and European hostage taking scheme described below.

22. Throughout the captivity of the American and European hostages, the defendant, Elsheikh, and Emwazi supervised jails and detention facilities holding the hostages and were responsible for transferring hostages between detention facilities, in addition to engaging in a prolonged pattern of physical and psychological violence against hostages. The defendant later explained the violence as an effort at "controlling" the hostages.

23. Beginning on or about November 26, 2013, and continuing to in or around February 2015, the defendant, Elsheikh and Emwazi coordinated the Western-hostage ransom negotiations conducted by email. Both the defendant and Elsheikh were responsible for getting emails from the hostages that could be used to initiate negotiations with their families. The defendant knew and understood that the release of American and other hostages was conditioned on the transfer of large sums of money or concessions from the U.S. government, such as the release of "Muslim prisoners." The email communications to the families of the American victims were written with clear English using British phrases and idioms, as well as other phrases and language used by the defendant.

24. On December 2, 2013, the family of James Wright Foley received an email stating, in part, "James Wright Foley is being detained by us . . . . James was detained whilst operating as a 'Journalist.' Our Muslim prisoners are extremely valuable to us for verily those who are honored most . . . ." In a December 27, 2013, email demanding 100,000,000 euros for the release

8

of James Wright Foley, the captors taunted the Foley family, stating the U.S government treated the Foleys "like worthless insects."

25. On or about December 4, 2013, the family of Steven Joel Sotloff received an email demanding, "in return for Stevens [sic] release the release of all of our Muslim prisoners that have been detained directly or indirectly by your government."

26. On or about February 9, 2014, the family of Peter Edward Kassig received an email demanding that the U.S. government release "our Muslims prisoners in exchange for Peter." The demand email stated, in part, "Peter was acting as a 'MEDIC' when captured. We have no doubt that these 'MEDIC's' are nothing but another front in the battles between the Muslims and the imperial west and its allies . . . ." The email demand continued, "[I]ndeed they [medics] travel all over the world, mainly to Muslim conflict regions such as Iraq, Syria, Lebanon and other similar countries secretly secularizing and democratizing the poor and displaced Muslim populations whilst offering material gain to those who adopt their ideologies and principles . . . . [W]e adopt a strict policy of 'an eye for an eye, A tooth for a tooth' giving the enemies of Islam a drink from their own bitter cup."

27. On or about May 29, 2014, the family of Kayla Jean Mueller received an email demanding the release of Afia Siddiqui or a cash payment of five million euros for Ms. Mueller's release. Kayla Jean Mueller's captors forced her to make an audio recording, which the captors attached to the May 29, 2014, email to the Mueller family, repeating the demands for Siddiqui's release or a cash payment of five million euros for Ms. Mueller's release. In 2010, Siddiqui was convicted in the United States for the attempted murder and assault of U.S. nationals and U.S. officers and employees in Afghanistan, and sentenced to serve a lengthy period of incarceration. The demand was repeated in a June 3, 2014, email in which the captors stated, "The objectives are

clear: the release of Dr. Afia Siddiqui in exchange for Kaya Mueller is our MAIN demand . . . . If however, you have fully given up all hope of an exchange, We will accept NOTHING LESS THAN 5 MILLION EUROS CASH for the release of Kayla! . . . . This is NON-NEGOTIABLE as it is more beloved to us to put a bullet in her head than release her for ANYTHNG LESS!!"

### *Murder of the Russian Hostage and Syrian Prisoner*

28. In or about February 2014, a Russian hostage who was held with the American, British and European hostages was removed from the hostages' cell. Shortly after, the defendant and Elsheikh showed pictures of the Russian hostage to the other hostages on a laptop computer. The image that the defendant and Elsheikh showed to the Western hostages depicted the Russian with a fatal gunshot wound to the head. The Russian hostage had been murdered. The photograph of the Russian hostage was emailed to the family of at least one of the European hostages as part of the hostage negotiations.

29. On or about April 25, 2014, the defendant, Elsheikh and Emwazi forcibly moved the Italian, Danish, and German citizens, along with two other European humanitarian aid workers, to an isolated area approximately two miles from their prison near Raqqa, Syria, to witness the execution of a Syrian prisoner. The defendant knew and understood this execution was part of the hostage negotiation process. The defendant and Emwazi coordinated the scene before the Syrian prisoner was executed. Elsheikh videotaped the execution of the Syrian hostage, who could be seen falling into a pit in front of the five European hostages who held hand-written messages pleading for their lives and urging their governments to pay large sums of money for their release. After the execution, the defendant, Elsheikh and Emwazi returned the European hostages to the prison with the American and British hostages.

30. Beginning in approximately March 2018, and continuing until approximately July 2019, while in SDF custody, the defendant voluntarily participated in a number of on-camera, media interviews with journalists from various media organizations. In July 2019, the defendant made statements in a recorded interview admitting that he participated in the execution of the Syrian prisoner in front of the European hostages. He admitted that the execution of the Syrian was part of the hostage negotiation process.

31. In July 2019, the defendant made statements in a recorded interview acknowledging that the European and American hostages had been beaten. The defendant admitted the purpose of the beatings was to exert control over the hostages. The defendant stated, "It's about control. … It's about controlling the prisoners so that they don't even think about trying to escape." The defendant further stated that he hit the hostages as part of the negotiation process.

32. In July 2019, the defendant made statements in a recorded interview about he and Emwazi moving Kayla Mueller from the women's cell to the men's cell so the men could observe Kayla. The defendant stated she was brought in "to address the men about her presence and who she is." The defendant also stated the purpose as seeing "if anyone can help in negotiating her release." The defendant admitted that Kayla Mueller told the male hostages, "I'm a prisoner here, if there's anyone who can help me …"

*Murder of U.S. and British Hostages*

33. On or about August 19, 2014, ISIS released "A Message to America," a video depicting Emwazi beheading American citizen and hostage James Wright Foley. At the conclusion of the video, American citizen and hostage Steven Joel Sotloff was forced to kneel before Emwazi while his life was threatened.

34. On or about September 2, 2014, ISIS released "A Second Message to America," a video depicting Emwazi beheading American citizen and hostage Steven Joel Sotloff. At the

11

conclusion of the video, British citizen and hostage David Haines was forced to kneel before Emwazi while Emwazi threatened his life.

35. On or about September 13, 2014, ISIS released "A Message to the Allies of America," a video depicting Emwazi beheading British citizen David Haines. At the conclusion of the video, British citizen Alan Henning was forced to kneel before Emwazi while Emwazi threatened his life.

36. On or about October 3, 2014, the ISIS media publication, al-Furqan, released "Another Message to America and its Allies," a video depicting Emwazi beheading British citizen Alan Henning. American citizen Peter Edward Kassig was forced to kneel before Emwazi at the conclusion of the video as Emwazi exclaims, "It's only right that we continue to strike at the necks of your people."

37. On or about November 16, 2014, ISIS released "Although the Disbelievers Dislike It," a video featuring Emwazi with the decapitated head of American citizen Peter Edward Kassig.

38. On or about February 7, 2015, the family of Kayla Jean Mueller received an email from FTO fighters confirming her death in Syria. The ISIS email address was the same email address used to communicate with the Mueller family beginning in May 2014. In the email, the FTO fighters attached three photos of a deceased Kayla Jean Mueller.

39. In a 2019 recorded interview, the defendant was asked to explain the killing of James Foley and others. He described the murder of James Foley and others as "collateral damage," and went on to state that, "In, basically, achieving your goal, your objective, is it acceptable to take of the life of an innocent person."

*Conclusion*

40. This Statement of Facts includes those facts necessary to support the Plea

12

Agreement between the defendant and the United States. It does not include each and every fact known to the defendant or to the United States, and it is not intended to be a full enumeration of all of the facts surrounding the defendant's case.

41. The actions of the defendant, as recounted above, were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason.

Respectfully submitted,

RAJ PAREKH
Acting United States Attorney

By: _____
Dennis M. Fitzpatrick
John T. Gibbs
Aidan Taft Grano-Mickelsen
Assistant United States Attorneys
Eastern District of Virginia
Alicia H. Cook, Trial Attorney
U.S. Department of Justice

Date:

After consulting with my attorneys and pursuant to the plea agreement entered into this day between the defendant, ALEXANDA AMON KOTEY, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
ALEXANDA AMON KOTEY

We, the undersigned, are defendant's attorneys. We have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
Cadence Mertz
Brooke Sealy Rupert
Sabrina Parvin Shroff
Office of the Federal Public Defender
Counsel for Alexanda Amon Kotey

Date: _____

_____
Barry Coburn
Marc Jason Eisenstein
Coburn & Greenbaum, PLLC
Counsel for Alexanda Amon Kotey

Date: 9/2/21

13