IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal No.: 1:20-CR-239-TSE-2 |
| v. | ) | |
| | ) | |
| EL-SHAFEE ELSHEIKH | ) | |
| | ) | |
| Defendant. | ) | Hearings: November 17-18, 2021 |

**GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION IN
LIMINE TO ESTABLISH ADMISSIBILITY OF DEFENDANTS' STATEMENTS
<u>PURSUANT TO FEDERAL RULE OF EVIDENCE 104</u>**

**INTRODUCTION**

Between March 31, 2018, and July 23, 2019, defendant ElShafee Elsheikh, along with his co-defendant Alexanda Amon Kotey (who pleaded guilty before this Court on September 2, 2021), knowingly and voluntarily provided recorded statements to multiple media organizations. These statements admitted their involvement in the scheme to capture and kill American and other hostages charged in the indictment. Pursuant to Federal Rule of Evidence 104, the government therefore moves in limine for a preliminary hearing and determination that the recordings of these statements are admissible at a trial against Elsheikh. The threshold questions for admissibility likely include relevance, hearsay, authenticity, and voluntariness. As the proponent of the statements, the government must establish these threshold requirements by a preponderance of evidence but is not restricted by evidentiary rules other than privilege in doing so. *See* Fed. R. Evid. 104(a).

Unquestionably, statements by the defendants admitting their involvement in the offenses charged satisfy the minimal showing required for relevance. As to hearsay, Elsheikh's own admissions are admissible against him as non-hearsay statements of a party-opponent under Rule

801(d)(2)(A) and as exceptions to the hearsay rule because they are statements against penal interest under Rule 804(b)(3). Similarly, statements made by Kotey in Elsheikh's presence about their participation and which Elsheikh tacitly adopted are admissible against him as non-hearsay party-opponent statements under Rule 801(d)(2)(B). As to statements by both defendants that the government intends to prove were false exculpatory statements, they are also not hearsay because the government is not introducing them for their truth.[1] The government intends to present evidence at the hearing establishing the authenticity of the recorded interviews through federal agent testimony about the method of obtaining the recordings, testimony by at least one of the interviewers, and by the indicia of authenticity inherent in the recordings themselves.

Lastly, the government will demonstrate that these recorded statements were made knowingly and voluntarily, without coercion or improper influence. It will do so through evidence available from the face of the recordings themselves, as well as testimony by federal agents and a documentary filmmaker who interviewed defendants. Collectively, the evidence will demonstrate that the recorded statements were made voluntarily and without the presence of coercion or improper influence.

## BACKGROUND AND STATEMENT OF EVIDENCE

Kotey and Elsheikh were captured by the Syrian Defense Forces (SDF) on approximately January 4, 2018, and held in SDF custody in Kobani, Syria. As part of a routine screening of detainees, Department of Defense ("DOD") personnel questioned Kotey and Elsheikh about their identities and took their fingerprints on January 21, 2018. Kotey and Elsheikh gave false names, false national origins and claimed that they could not speak English. DOD was notified of a match

---

[1] *See, e.g.*, *Anderson v. United States*, 417 U.S. 211, 220 & n.8 (1974); *United States v. Ayala*, 601 F.3d 256, 272 (4th Cir. 2010); *United States v. Vidacak*, 553 F.3d 344, 353 (4th Cir. 2009).

to Elsheikh's prints on January 22, 2018. DOD personnel questioned Kotey and Elsheikh again on January 23, 2018, and Kotey and Elsheikh admitted their true identities.[2] The government received no reports of abuse from detainees being held at those facilities during the January – March 2018 timeframe.

## I.     The defendants are interviewed by the FBI in late March 2018.

After Kotey and Elsheikh had been in SDF custody for nearly three months, in late March 2018, special agents of the U.S. Federal Bureau of Investigation ("FBI") sought to interview them at the SDF prison in Kobani, Syria. On March 27, 2018, Elsheikh was brought into an interview room at the prison and spoke with the FBI. At the beginning of the interview, the FBI agents advised Elsheikh of his rights.[3] At one point he asked a clarifying question about the line in the rights advisement that said, "We are starting anew. You do not need to speak with us today just because you have spoken with others in the past." After getting that question answered and being advised of his rights, Elsheikh agreed to speak with the agents but refused to sign the advice of rights form. Instead, an agent signed the form affirming that they had read Elsheikh his rights and he had chosen to speak with them.

Elsheikh spoke to the agents in detail during this conversation. He described his time growing up in London before he traveled to Syria. He told them about how he traveled to Syria in 2012

---

[2]  Since the DOD interviews did not include *Miranda* warnings, the government is not seeking to use the vast majority of those statements as substantive evidence in its case-in-chief. However, the government does intend to offer the defendants' lies in response to DOD's initial booking questions and subsequent recantation as substantive evidence. *See, e.g., United States v. D'Anjou*, 16 F.3d 604, 608–09 (4th Cir. 1992). The government is filing a separate motion in limine to establish those statements' admissibility. It describes the DOD interviews in this pleading to give the Court more context about what occurred during those interactions as relevant to the issue of voluntariness.

[3]  The rights advisement form that was read to Elsheikh which he refused to sign is attached to this Memorandum as Attachment 1.

and joined the Islamic State of Iraq and al-Sham ("ISIS"). He described the weapons he used and the operations he took part in as a member of ISIS. He stated that he had been treated well while in SDF custody, and that he could wash clothes, work out, shower, play chess, drink tea and chat with the other prisoners. At the same time, Elsheikh also refused to answer certain questions put to him by the FBI. For example, Elsheikh told the agents that he knew that it was Mohammed Emwazi who was the masked figure in the beheading videos of US and UK citizens, and that Emwazi had told Elsheikh something about those videos. Yet Elsheikh refused to tell the agents what Emwazi had said to him, though he said that he might be willing to talk about it at a different time under different circumstances. When pressed, Elsheikh said that he would be willing to talk about it with an attorney present and when he knew the charges against him.[4]

Elsheikh was also critical of the US government in this interview. He told the agents that he did not have faith in the U.S. justice system because Aafia Siddiqui had recently received an 80-year sentence for nothing.[5] He described the DOD interrogators who had interviewed him previously as juvenile and condescending. The FBI interviewers will testify that Elsheikh appeared relaxed and comfortable in the interview and that he did not appear to be under any duress, and, in fact, he seemed comfortable in making the decision about which topics to speak, or not to speak, about. Therefore, while the FBI was very eager to question Elsheikh about the U.S. hostages and his role in that hostage-taking conspiracy, they were unable to explore those topics because

---

[4] Elsheikh repeatedly refused, with both the FBI and the media interviewers, to address certain topics. With the FBI, Elsheikh specifically refused to answer certain questions without a lawyer present and informed the agents that he knew American law, including that they were not permitted access to his DOD interviewers' notes.

[5] Aafia Siddiqui was sentenced to 86 years in prison in 2010 following a conviction at trial where she was charged with attempted murder and assaulting U.S. service members in Afghanistan. Elsheikh's reference to Aafia Siddiqui is compelling because the ransom demand emails sent to the families of Kayla Mueller and James Foley make repeated reference to Aafia Siddiqui.

Elsheikh refused to talk about them.

The FBI attempted to interview Kotey two days later on March 29. In an encounter that lasted less than ten minutes, Kotey refused to speak with the agents after being advised that the prison commander had determined that he would not be allowed to make phone calls or visit with an attorney at the prison.

The agents also attempted to interview Elsheikh a second time on March 29. Once again, Elsheikh agreed to speak with them, though he remained selective about the topics that he would discuss. For example, he told the agents that he remembered being captured by SDF forces, but he would not go into detail. In addition, he refused to look at any photographs, or to talk about Kotey, Aafia Siddiqui, the Islamic State's attacks in western Europe, or the western hostages held and executed by ISIS. At the end of the interview, Elsheikh grew confrontational with the agents and asked if he was compelled to speak with them. Upon being told that he was not, he stood up and asked to go back to his cell. Before being escorted back to his cell, Elsheikh told the agents that he saw their true colors.

With regards to the FBI interviews in March 2018, the FBI interviewers will testify that there appeared to be no evidence that Elsheikh or Kotey were under any duress. The defendants understood that they did not have to speak to the FBI, and, in fact, Kotey refused to speak to them entirely. And while Elsheikh agreed to speak about certain topics, he determined which ones to talk about and eventually terminated their second interview. Some information that was of critical importance to the FBI, such as information about the western hostages, was not covered because Elsheikh refused to discuss it.

## II. The defendants are interviewed by various media organizations between March 2018 and July 2019.

Beginning in March 2018, various media organizations were allowed to travel to the SDF

prison in Kobani to attempt to interview Kotey and Elsheikh. In some instances, they were able to interview them; however, as with the FBI interviews, Kotey and Elsheikh were selective about whether they would agree to be interviewed and about which questions they would answer.

A.      The Moussa Interview

In April 2018, a journalist from the United Arab Emirates named Jenan Moussa interviewed Elsheikh on camera.[6] *See* Attachment 4. In the course of this ten-minute interview, Elsheikh said that he had been interviewed by DOD and the FBI, and he described the FBI as being less respectable than DOD, which is consistent with his prior comment to the FBI agents that he saw their true colors.  When Moussa pressed him about being involved in mistreating the hostages, Elsheikh refused to answer her question, instead telling her that there was an "ongoing legal process" and he would talk about any accusations made against him when that process began.

At a later point in the interview, Moussa again attempted to press Elsheikh about the hostages who had been murdered. Elsheikh was contemptuous in his answer, telling Moussa that she needed to be "nonbiased in how you conduct your interview."  He said that any accusations against him needed to be proven and that he was not on trial.  Elsheikh then turned to someone off-camera, presumably his SDF guards, and told them, "I think we're done…*Khalas* [Arabic for "Done"]." After saying "done" in Arabic, Elsheikh ends the interview. Elsheikh appears fully comfortable in doing so. Indeed, throughout the interview, Elsheikh looks relaxed and in control of his answers, exhibiting a hostile or defensive attitude on occasion in response to questions he disliked.[7]

---

[6] Where recorded media interviews are referenced in this pleading, a disc with the particular recording has been provided to the Court along with a verbatim transcript. Words in Arabic have been translated into English in these transcripts.

[7]  It is also noteworthy that Elsheikh rudely and abruptly ended the interview after a mere ten minutes. As one of the government witnesses will testify, it took significant effort to obtain interviews with Elsheikh and Kotey. That Elsheikh shut the interview down so quickly belies the notion

### B.     The CNN Interviews

In May 2019, while still in SDF custody, Kotey and Elsheikh were interviewed together by Nick Patton Walsh from CNN. *See* Attachment 5. The interview began with them telling Walsh that they did not want to talk to him because they did not have legal advice and it was not in their interest. Elsheikh then tells him that they do not want to waste his time, and they are sure he has a long flight back. They appear ready to end the interview, though they continue talking. Kotey's primary concern seems to be that the camera is rolling while they are speaking. He angrily tells the cameraman to turn off the camera, and then Elsheikh says in Arabic to someone out of the frame, "*Awas, Haji*. Start the car, let's go." As he does this, he smiles and pantomimes driving a car.

Kotey, appearing angrier, says to someone out of the frame in Arabic, "Irfan, I told him to cutoff the camera, talk to him, man." Kotey tells him that he is "very childish" and calls him an "a\*\*hole." Elsheikh then tells Walsh, that as to the media, "[t]hey don't give a sh\*t about justice."

Kotey and Elsheikh appear confident to the point of arrogance once they agree to continue the interview. At one point Walsh asked about things that troubled them, and Kotey gave a visible smirk and told Walsh about "these lice in my clothes uh in the place I'm sleeping." When Walsh told him that viewers could be offended that he made a joke about that question, Kotey turned the premise around and talked about seeing the effects of the western bombing campaign on ISIS. *See* Attachment 6.

For his part, when asked about Mohammed Emwazi, the masked be-header in the ISIS execution videos, Elsheikh continued to proclaim his allegiance to his friend. Elsheikh told Walsh that Emwazi was "a friend of mine" whom he described as "one of the most loyal friends I've had.

---

that he was being mistreated by SDF and forced to answer questions against his will.

Trustworthy, honest, upstanding."[8]  *See* Attachment 7.

Soon after the interview, a CNN article appeared online about the defendants. *See* "ISIS fighters known as 'the Beatles' demand fair trial," CNN.com (Apr. 9, 2018).[9] The article was listed as being by Nick Patton Walsh and three other individuals. It described how Kotey and Elsheikh made "comments during a wide-ranging interview with CNN, which they consented to, from inside a detention facility in northern Syria where they are being held by US-backed Syrian Kurds." Notably, the article stated: "[T]he pair seemed relaxed and comfortable as they sipped Pepsi and debated for 90 minutes whether they wanted to speak, before talking on camera for 54 minutes, often directly addressing the legal limbo they now find themselves in."

### C.    The Vice News Interviews

In some interviews, Kotey and Elsheikh continued to praise ISIS, to maintain their allegiance to it, and to criticize Western countries, including the United States specifically. For example, Kotey stated in an interview with Vice News that he was not going to "allow uh any journalist or any press to use me as a dagger to take stabs at the Islamic State."  Kotey went on to proclaim

---

[8] Like Elsheikh, Kotey had no qualms about defending Mohammed Emwazi in an interview with a journalist named Quentin Somerville. *See* Attachment 8:

> Kotey:  Yeah, he's a friend of mine.
>
> Quentin Somerville:  Jihadi John?
>
> Kotey:  He was nicknamed that, yeah.
>
> Quentin Somerville:  The Emwazi, the Jihadi John that the rest of the world knows is an executioner. […] Somebody who's been called a psychopath. […] Somebody who's, who will be remembered for his cruelty and his brutality.
>
> Kotey:  That's their, that's their way to choose to remember him. I chose to remember him differently.

[9]    *See* https://edition.cnn.com/2018/04/09/middleeast/isis-beatles-interview-intl/index.html?form=MY01SV&OCID=MY01SV.

that he shared good times and met some of the best people he might ever meet while with ISIS,and that people who cannot understand that is due to "a lack of actually knowing the reality" of being a member of the Islamic State.  *See* Attachment 9.

### D.    The Sky News Interviews

In 2018, a journalist from Sky News named Stuart Ramsey interviewed Kotey and Elsheikh together. While they spoke with him about a number of topics, they avoided saying anything too incriminating. They made it clear that they understood their rights and that there were certain topics that were off-limits. At one point Ramsey asked about atrocities committed by ISIS and Elsheikh bantered with him, telling him that he was "just confusing the issue of conscription."  As Ramsey tried to press his point, Kotey then cut him off saying that "if you want to talk about specifics I would prefer not to engage in specific condemnations, uh, not considering my current disposition." *See* Attachment 10. Similarly, when he was asked a question about ISIS execution videos show-ing people being murdered, Kotey tried to pass it off as mere propaganda. When Ramsey asked what he thought about the execution videos, Kotey told him, "I have my own personal views about it, probably not something I wish to share on, on the media."  *See* Attachment 11. Again, as the recording demonstrates, Kotey determined which questions he was going to answer or not answer as he and Elsheikh participated in an interview with a Western journalist.

Elsheikh also sparred with Ramsey and refused to accept the premise of some questions. At one point Ramsey accused Elsheikh of being complicit in what ISIS was doing because he refused to speak out:

> Stuart Ramsay:  Yeah, but I get that point, but people do make com-
> plaints about that in the UK. The point of the matter is, if you were
> against what Islamic State were doing, you weren't going to be able
> to complain, you couldn't start and stop it, you chose not to. There-
> for you are complicit in whatever was going on.

> Elsheikh: That is a, unacceptable notion, that because somebody didn't speak out that they were complacent. Complacent or complicit?
>
> Stuart Ramsey:  Complicit.
>
> Elsheikh:  Complicit. Uh, because not every person who didn't say no to the Iraq war, or the invasion of Afghanistan, or the atrocities in Abu Ghraib, or we say that they're complicit as well?

*See* Attachment 12.

### E.    The Langan Interviews

In 2018, Sean Langan, a documentary filmmaker from the United Kingdom, received permission to interview Kotey and Elsheikh. The government intends to call Langan to testify as to the circumstances of these interviews. To set up the interviews, Langan was told that he had to submit a formal application and to send letters to both Kotey and Elsheikh requesting an interview. He understood the person with whom he dealt to set up these interviews was the Kurdish head of intelligence. In 2018, Langan wrote letters to both Kotey and Elsheikh requesting an interview, but he was later told by the Kurdish individual that they had declined his offer. Accordingly, Langan was not able to interview Kotey and Elsheikh in 2018. As discussed in more detail below, when Langan was eventually able to interview Kotey and Elsheikh, they not only continued their habit of rejecting questions and premises with which they disagreed, things got so heated that Kotey began to taunt Langan and then eventually angrily cut off the interview. This conduct during the eventual interviews—and their decision to terminate them—strongly corroborates the SDF's initial explanation for the refusal: that Kotey and Elsheikh were the ones making the decisions about when to be interviewed and by whom.

The following year, Langan again attempted to interview Kotey and Elsheikh. As in 2018, he went through the Kurdish media team, and he wrote a personal letter requesting the interviews. Langan obtained visas, brought a cameraman, and traveled into Syria. Langan met with a senior

Kurdish officialand asked to interview Kotey and Elsheikh separately in multiple sessions. Soon thereafter he was granted approval to conduct the interviews, which occurred in mid-July 2019.

The first day of interviews took place in what appeared to be some sort of military base. Langan was shown into an office where Kotey and Elsheikh were present. They seemed very relaxed. There were only one or two Kurdish guards, but they did not stay for the interview. Once the interviews commenced, there was one Kurdish individual who set up a video camera to record the interview, and one Kurdish official in plain clothes. On the first day, Langan interviewed Kotey for about an hour-and-a-half and Elsheikh for slightly over two hours. There was a lunch break in the middle.

Langan will testify, and the recordings will demonstrate, that throughout the interviews Kotey and Elsheikh appeared very comfortable, continuing to dispute any questions with which they disagreed. While they made some very self-incriminating admissions, they also often minimized their roles. In fact, at one point, Kotey felt the need to assure Langan that he was not holding things back for fear of implicating himself.  He went on to say that if that were the case, Langan never would have seen "the ITV interviews and the CNN." *See* Attachment 13. At different points in the interviews, Langan pressed Kotey and Elsheikh very hard about whether they were the ones who wrote the demand emails that were sent to the families of the hostages, but they both categorically denied it.  Elsheikh told him that "I had nothing to do with the writing or sending of emails." *See* Attachment 14.  Kotey, for his part, told Langan that he could not have been the one who wrote the emails because the spelling was so poor in them and he knew the "difference between 'there' and 'their.'" [10]  *See* Attachment 15.

---

[10]  Kotey was correct about the poor spelling in a number of the hostage demand emails.  The first emails to the Mueller and Kassig families contained an identical phrase, "we will except [sic] three

11

Langan also pressed Kotey and Elsheikh about mistreating the prisoners. At times they admitted doing so, but there were other points where they had no qualms about disputing those accusations. When Langan asked Kotey about subjecting the hostages to "real violence" he countered that perhaps the released hostages were "talking about a period of time when they was being detained uh in other locations." *See* Attachment 16.  As for Elsheikh, he simply denied the charge outright:

<blockquote>
.....

Langan:  And the hostages have all said, according to a Danish paper, or French, Spanish, [Unintelligible] get their story right about being made to fight. And that you and Alexe, Alex and Emwazi were making them have fights and if they didn't fight tough enough you said we're going to torture you, or beat you up. So you made them fight each other. You made Jim, James Foley punch and fight John Cantlie.

Elsheikh:  No, that's, that's not true.

Langan:  Okay.
</blockquote>

*See* Attachment 17. As with other interviews, the recordings demonstrate that Kotey and Elsheikh regularly disputed Langan's questions and defended their conduct. Langan will testify their demeanor was consistent with the relaxed atmosphere when he went to the military base to do the interviews.

A week passed following the first set of interviews. The same Kurdish official that Langan had dealt with previously approved a second session. Langan interviewed Kotey. At one point, Langan asked Kotey about an incident where a Syrian fighter was killed. In responding, Kotey made it clear that he and Elsheikh had compared notes after the previous sessions and Kotey felt

---

questions of a personal nature…". Other emails contained spelling errors such as "if you want coperation [sic] we have rules," and "How long will the sheep follow the blind sheppard [sic]."

that Langan was trying to trick them:

> Kotey:  Sorry, Sean, to burst your bubble, but, um, I've had oppor-
> tunity to speak to Shafee after last interview and uh that's not what
> was mentioned.
>
> Langan:  Okay.
>
> Kotey:  And that's not what he said. Uh, I don't know if it's like
> attempt [Overlapping voices] to entrap, entrap, entrap me. And I
> wouldn't, without me even speaking… [Overlapping voices]
>
> Langan: I won't, if I try I apologize.
>
> Kotey:  ….Without me even speaking to him, I would, I wouldn't,
> uh, I wouldn't have to doubt that anyway. I wouldn't have had to
> [Overlapping voices] because it wasn't how it occurred.

*See* Attachment 18. This exchange demonstrates that Kotey and Elsheikh were permitted to get

together and compare notes about their interviews while in SDF custody and then to tell Langan

about it. As the interview with Kotey progressed, he grew increasingly angry and confrontational.

When Langan accused Kotey of hitting a hostage named Daniel Ottosen with a stick, he reacted

angrily, telling Langan that the accusation was "Bullsh*t." He then went on to say if any of the

hostages claimed such a thing then "he's a liar."  *See* Attachment 19.  At another point in the

interview (*See* Attachment 20), Langan grew emotional when discussing Ottosen, and Kotey ap-

pears to relish being able to toy with him, asking, "Why are you upset?  Why are you upset?" The

interview with Kotey devolved into a shouting match:

> Kotey: Why don't you just f*ck off?  If you don't want to speak to
> me [Overlapping voices].
>
> Langan: I'll shut up. Give me one example of human decency?
>
> Kotey: [Speaking off-camera in Arabic]. *Ah-ah-I think, listen—ah-
> ah…This man, you know, is disrespectful. Ah, And I do not want,
> you know, to t-transgress, this man is talking in a way—you know…*
>
> Langan: Yeah, that's enough. You've had enough. I'm sorry. I got
> hard on you. Yeah, yeah. Yeah, do you want to hit me now?  Do you

> want to hit me? Yeah, I'm sorry. What, I'm being…what's my,
> what's your problem Alex? I've asked you, show me one bit of kind-
> …

*See* Attachment 21. Once again, the recordings demonstrate that Kotey exercised autonomy and independence in these interviews, including by angrily telling an interviewer to "f*ck off." The recordings also show Kotey telling the SDF personnel present that Langan was being "disrespectful."

Langan will further testify that, when the blowup with Kotey happened, Langan got the impression that the two plainclothes Kurdish officials there were worried that Kotey might use a glass ashtray on the table as a weapon, and they were uncomfortable because such a confrontational display was not part of their culture. Very soon after that, the Kurdish official who had helped facilitate the interviews came and spoke to Langan in the interview room. He told Langan that Kotey and Elsheikh were SDF's responsibility and that Langan had become too emotional. Langan was also told that he should leave the country, which he did soon after despite the fact that he had hoped to get a second interview with Elsheikh. Langan's fixer also recommended that they leave the country promptly as he described how upset the SDF officials were. As a result of this blowup, the second interview with Elsheikh never took place.

## III.    The FBI interview the defendants again when they are transferred to DOD custody.

In October 2019, approximately three months after the interviews with Sean Langan, Kotey and Elsheikh were transferred from SDF custody into U.S. DOD custody in Iraq. They were held in a DOD facility there until October 2020. Soon after being moved into the DOD facility, they were both visited by the FBI. On July 4, 2020, Kotey was interviewed by agents of the FBI. In the course of that interview, Kotey told the agents that he had done multiple media interviews between March 2018 and June 2019 and that he was tortured by his SDF guards to make statements. According to Kotey, he was advised by the SDF to make comments to the media promoting arguments

14

against the Turkish government.[11] Kotey did not define what his torture was. He also said that at one point he was visited by Japanese media who were looking for information about Japanese nationals who had been kidnapped.[12] Kotey advised that he voluntarily left that interview with the Japanese.

The following day Elsheikh was also interviewed by the FBI. In the course of that interview, Elsheikh stated that the media interviews that he had done with CNN, Sean Langan, and an Arabic-speaking journalist had been coerced. However, he declined to provide any details about the nature or circumstances of acts supporting his allegation.

## ARGUMENT

This Court may rule on preliminary questions of admissibility and, in the case of a defendant's confession or self-inculpatory statements, must do so outside the presence of the jury. *See* Fed. R. Evid. 104(a), (c)(1). In doing so, the Court is not bound by evidentiary rules other than privilege and may consider the content of the proffered evidence in making its admissibility determinations. *See, e.g.*, Fed. R. Evid 1101; *Bourjaily v. United States*, 483 U.S. 171, 175–81 (1987). The Fourth Circuit has noted that preliminary determinations on such questions as authenticity may also be preferable, though it does not remove the requirement that the government present authenticating evidence at trial as well. *See, e.g.*, *United States v. Branch*, 970 F.2d 1368, 1371 (4th Cir. 1992); *cf. Luce v. United States*, 469 U.S. 38, 41 n.4 (1984) (noting district courts have inherent authority to rule on evidentiary issues before trial); *United States v. Valencia*, 826 F.2d 169, 171–72 (2d Cir. 1987) (similar). As another judge of this Court has noted, moving in limine

---

[11] Despite this claim, neither Kotey nor Elsheikh said anything in the numerous media interviews promoting arguments against the Turkish government.

[12] In January 2015, ISIS media released two videos showing a masked individual who appeared to be Mohammed Emwazi beheading Japanese citizens Kenji Goto and Haruna Yukawa.

on questions of admissibility "save[s] countless hours in trial avoiding protracted bench confer-ences over evidentiary questions." *United States v. Lentz*, 282 F. Supp. 2d 399, 408 n.1 (E.D. Va. 2002). In short, because the government believes pre-trial resolution of these evidentiary issues would benefit both parties, it respectfully moves the Court to hold a hearing and determine their admissibility prior to trial.[13]

## I.      The defendants' self-inculpatory statements made during the media interviews are relevant.

Relevant evidence is that which tends to make a consequential fact more or less probable than without the evidence and is presumptively admissible. *See* Fed. R. Evid. 401, 402. "[R]ele-vance typically presents a low barrier to admissibility." *United States v. Leftenant*, 341 F.3d 338, 346 (4th Cir. 2003). There can be no serious question that a defendant's self-inculpatory statements concerning the charged conduct satisfies that standard. *See, e.g.*, *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) ("[T]he defendant's own confession is probably the most probative and damaging evidence that can be admitted against him…."). *United States v. Rojas*, No. 2016 WL 6879599, at *2 (M.D. Pa. Nov. 22, 2016) ("A confession to the conduct that makes up the charges is clearly a proper non-propensity purpose at issue in the case and certainly relevant to that purpose."). Simi-larly, Kotey's self-inculpatory statements as a co-conspirator—particularly those made in the de-fendant's presence and tacitly adopted by him—are similarly probative, where the government must prove the existence of the conspiratorial agreement with at least one other person.

---

[13] The government notes that the media clips referenced in this memorandum and attached hereto do not represent the sum total of the media clips the government intends to introduce at trial. Nor is the recitation of facts and circumstances in this memorandum a full and exhaustive description of the evidence the government will adduce at the preliminary hearing. Rather, the statements and circumstances included here are provided as *prima facie* evidence of the showing the government will make to establish admissibility. Similarly, at trial, the government intends to introduce more directly inculpatory statements that may not be as relevant to the admissibility analysis.

## II.     The defendants' self-inculpatory statements made during the media interviews are admissible under the hearsay rules.

The government believes the Court need not make pre-trial determinations on the admissibility of every statement as to hearsay. Instead, the government briefly introduces some relevant hearsay rules as to categories of statements the government intends to introduce. First, as to all statements, the Court may consider the content of the statements in addition to all other circumstances in making threshold findings, without restriction by any evidentiary rule except privilege. *See Bourjaily*, 483 U.S. at 175. Second, because the government is not introducing the media interviewers' questions and statements during the interviews for their truth but only for their effect on the listener, these statements are not hearsay. *See United States v. Williams*, 445 F.3d 724, 736 (4th Cir. 2006); *see also United States v. Sinclair*, 301 F. App'x 251, 253 (4th Cir. 2008).

As to statements made by Elsheikh personally, the law squarely permits their introduction as non-hearsay admissions of a party-opponent. *See* Fed. R. Evid. 801(d)(2)(A); *United States v. Benson*, 957 F.3d 218, 229 (4th Cir. 2020). Kotey's statements may be admitted under either of two theories: (1) statements as to which Elsheikh manifested that he adopted or believed them to be true (Fed. R. Evid. 801(d)(2)(B)); and (2) corroborated statements against penal interest by an unavailable witness (Fed. R. Evid. 804(b)(3)).

When considering adoptive admissions, "the primary inquiry is whether the statement was such that, under the circumstances, an innocent defendant would normally be induced to respond, and whether there are sufficient foundational facts from which the jury could infer that the defendant heard, understood, and acquiesced in the statement." *United States v. Williams*, 445 F.3d 724, 735 (4th Cir. 2006). A party may manifest this adoption by "words, conduct, or silence." *Ibid.* A sufficiently accusatory question, for example, may contain an implicit statement that, by failure to

17

respond, a defendant might manifest acquiescence in its truth. *See ibid.* Similarly, *Williams* recognizes that even where silence may not be an adoptive admission, it may nonetheless be relevant admissible conduct, and the prompting question or statement may be introduced not for its truth but to show its effect on the defendant. *Id.* at 736. The government intends to introduce statements made by Kotey during their joint interviews where Elsheikh's surrounding conduct establishes that he adopted Kotey's words.

Alternately, Kotey's self-inculpatory statements may be admitted under the hearsay exception for corroborated statements against interest. *See, e.g.*, *Benson*, 957 F.3d at 227, 230 & n.10. A co-defendant who has pleaded guilty but not been sentenced yet retains his right to invoke the Fifth Amendment as to conduct that could conceivably expose him to additional liability or punishment.[14] *See, e.g.*, *Mitchell v. United States*, 526 U.S. 314 (1999); *United States v Stewart*, 129 F. App'x 758 (4th Cir. 2005) (holding co-defendant properly invoked after pleading guilty but pre-sentencing). If the court sustains the invocation of privilege as proper, the co-defendant is deemed unavailable, and the exceptions in subsection (d) apply. *See* Fed. R. Evid. 804(a)(1); *United States v. MacCloskey*, 682 F.3d 468, 477–78 (4th Cir. 1982). Should Kotey properly invoke this privilege, the government would then be entitled to introduce Kotey's corroborated, self-inculpatory statements as statements against penal interest under Rule 804(b)(3).

III.   **The government has sufficient evidence of the authenticity of the media interview recordings to present them to the jury.**

Under Federal Rule of Evidence 901, the offering party must provide "evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a); *accord United States v. Vidacak*, 553 F.3d 344, 349 (4th Cir. 2009). The ultimate determination of

---

[14] As the Court is aware, the government's plea agreement with Kotey does not require him to testify against Elsheikh as a condition of his cooperation.

authenticity is a jury question. *Vidacak*, 553 F.3d at 349. Therefore, "at the motion *in limine* stage, '[t]he district court's role is to serve as gatekeeper in assessing whether the proponent has offered a satisfactory foundation from which the jury could reasonably find that the evidence is authentic.'" *United States v. Habteyes*, 356 F. Supp. 3d 573, 581 (E.D. Va. 2018) (quoting *Vidacak*, 553 F.3d at 349)). In other words, the burden for admissibility purposes "is not high—only a *prima facie* showing is required." *Ibid.*

Proponents of evidence "need not establish a perfect chain of custody or documentary evidence to support their admissibility." *Vidacak*, 553 F.3d at 350; *accord United States v. Jones*, 356 F.3d 529, 535–36 (4th Cir. 2004) (holding that a "missing link" in the chain of custody does not prevent admission of evidence, so long as there is sufficient proof that evidence is what it purports to be and has not been altered). Instead, a party may meet its burden "largely by offering circumstantial evidence," including for example that the evidence was found "in a place where they would be expected to be found," had identifying characteristics, and the opponent offered no basis for inferring that the evidence had been forged or altered. *Id.* at 350–51. Similarly, Rule 901(b)(4) permits proponents to authenticate an item of evidence by identifying its "appearance, contents, substance, internal patterns, or other distinctive characteristics, taken together with all of the circumstances." Fed. R. Evid. 901(b)(4).

The government can establish that the recorded statements it seeks to admit were made between March 2018 and July 2019 while the defendants were in the custody of the SDF at prisons in Kobani, Syria. The government will put on evidence that they were captured by SDF on January

19

4, 2018, along with a number of other ISIS fighters. As described above, DOD personnel biometrically enrolled Elsheikh and Kotey.[15] Though they both claimed to be known by other names, and to be unable to speak English, Elsheikh's fingerprints resulted in a hit on the name Elshafee Elsheikh. Upon being subsequently questioned, he easily lapsed into English and admitted who he and Kotey were.

Approximately three months after their capture, FBI agents Julius Nutter and John Chiappone interviewed Elsheikh and attempted to interview Kotey, at the SDF facility where they were being held. Nutter and Chiappone can testify to how they looked and acted when they interviewed them. They can also testify that they recognize the people in the various media interviews as Elshafee Elsheikh and Alexanda Kotey from having spent time speaking to them in Syria.

Sean Langan will testify about interviewing Elsheikh and Kotey for a number of hours in July 2019. He can authenticate the recordings that he made, and he can confirm that the people in those interviews are Elsheikh and Kotey.

In addition, the FBI agents who interviewed Elsheikh and Kotey in July 2020 at the DOD facility where they were being held can testify that the two people they met in that DOD facility are the same people that can be seen in the various media interviews. The government will also present evidence showing that it obtained a number of the recordings of the media interviews through formal mechanisms from British law enforcement. Specifically, British law enforcement obtained a judicial order in the United Kingdom requiring a number of media companies to provide complete copies of the interviews conducted with Kotey and Elsheikh, including the interviews conducted by Sean Langan and Nick Patton Walsh. Those interviews were provided to the U.S.

---

[15] Biometric enrollment is a process of taking unique identifying information such as fingerprints and photographs.

20

government under a Mutual Legal Assistance Treaty, and the government has provided them to the defense in discovery. The attachments listed in this pleading contain interview excerpts from that material.

## IV.    The defendants' self-inculpatory statements made during the media interviews were made knowingly and voluntarily.

An involuntary confession or self-inculpatory statement procured by coercive police activity is inadmissible under the Due Process Clause. *See, e.g.*, *Colorado v. Connolly*, 479 U.S. 157, 167 (1986). A confession is involuntary if it is "extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence." *Connolly*, 479 U.S. at 167 (quoting *Hutto v. Ross*, 429 U.S. 28, 30 (1976)); *accord United States v. Nguyen*, 313 F. Supp. 2d 579, 587 (E.D. Va. 2004) (Ellis, J.).[16] "The mere existence of threats, violence, implied promises, improper influence, or other coercive police activity,

---

[16]  It is not clear that the Due Process Clause considers foreign governmental conduct, without attribution to a U.S. federal or state official, to be a sufficient basis to exclude a confession as involuntary. *See, e.g.*, *United States v. Salameh*, 152 F.3d 88, 117 (2d Cir. 1998) (holding that defendant could not suppress statements given after alleged coercion by Egyptian officials "unless there is an allegation that agents of the United States engaged in some type of coercion"); *cf. Connolly*, 479 U.S. at 165–66 (analogizing to the "state action" requirement of the Fourteenth Amendment and reasoning that coercion by private parties is not covered and that the exclusionary rule is "to substantially deter future violations of the Constitution"). In *United States v. Abu Ali*, 528 F.3d 210, 232 (4th Cir. 2008), both the parties and the Fourth Circuit appeared to assume that conduct by foreign officials was subject to the same voluntariness analysis as conduct by federal officers. *See also* Evan Ezray, Note, *The Admissibility of Foreign Coerced Confessions in United States Courts: A Comparative Analysis*, 52 Colum. J. Transn'l L. 851, 863 (2014) (noting circuit split and *Abu Ali*'s treatment "in dicta"). While such assumptions are not binding precedent (*see United States v. Norman*, 935 F.3d 232, 241 (4th Cir. 2019)), the government believes it prudent here to address the factual issues of voluntariness without conceding the Due Process Clause's applicability to foreign governmental conduct. In other words, because the government believes the evidence will demonstrate that there was no coercive influence by any governmental actor, foreign or domestic, the Court need not address this issue. Only if the Court were to find that defendant's will was, in fact, overborne by foreign conduct without U.S. government involvement would it need

however, does not automatically render a confession involuntary." *Connolly*, 479 U.S. at 167. Instead, such conduct renders a confession "involuntary" and inadmissible only when "the defendant's will has been overborne or his or her capacity for self-determination critically impaired" by such means. *United States v. Ayesh*, 702 F.3d 162, 168 (4th Cir. 2012).

In making this determination, "a court must consider the totality of the circumstances, including [the] defendant's characteristics and the nature of the interview." *Nguyen*, 313 F. Supp. 2d at 587. The court thus considers the circumstances of the confession—including the length of questioning, any promises or threats made, or deprivation of essentials—and the "defendant's personal attributes, such as his age, education, intelligence, and mental state." *Ayesh*, 702 F.3d at 168; *see also United States v. Abu Ali*, 528 F.3d 210, 233 (4th Cir. 2010) (relying on defendant's intelligence, familiarity with culture of detaining authority, and lack of evidence of coercive detention conditions). A defendant's familiarity with the criminal justice system is evidence that decisions to admit or make inculpatory statements is voluntary and knowing. *See Correll v. Thompson*, 63 F.3d 1279, 1288 (4th Cir. 1995) (noting that a suspect's intelligence, education, age, and familiarity with the criminal justice system are relevant factors for voluntariness). If the government meets its burden of demonstrating by a preponderance of the evidence that a statement was given freely and voluntarily, it must not be suppressed. *See United States v. Braxton*, 112 F.3d 777, 781 (4th Cir. 1997) (en banc). Notably, "courts in this circuit grant motions to suppress statements on the grounds of involuntariness only in rare and exceptional circumstances." *Nguyen*, 313 F. Supp. 2d at 587 n.15.

---

to address whether the Due Process Clause requires the exclusion of a resulting confession.

After looking at the totality of the circumstances in this case, including the defendants' characteristics and the nature of the media interviews, it is clear that the statements made in those interviews were voluntary and did not result from any coercion or improper influence. As a threshold matter, the government relies in significant part on the audio-video recordings themselves, which demonstrate—on camera—that the defendants exercised free will when they spoke to representatives of the media. *See, e.g.*, *United States v. Haak*, 884 F.3d 400, 408–09, 414–16 (2d Cir. 2018) (relying on the court's observations of recorded interview to determine statements were voluntary); *United States v. Kelsey*, 917 F.3d 740, 751 (D.C. Cir. 2019) (similar). The defendants speak clearly and thoughtfully on matters they wish to speak about, often in detail and with added relevant context. Critically, in several instances the defendants decline to speak about certain subjects or even terminate the interview. The defendants also correct the interviewers when they believe they have been asked a question or presented with a fact that is incorrect. In fact, throughout their time in SDF custody, both defendants exhibited an understanding of the circumstances of their detention, of their legal rights and of their ability to refuse to be interviewed, and to reject the premise of the questions being put to them.

Both Kotey and Elsheikh were very familiar with the criminal justice system in the United Kingdom as they had both been arrested for a number of offenses before they left the UK in 2012. Kotey's prior arrests were for unlawful possession of cannabis and theft of a moped. Kotey was also arrested on March 7, 2012, as he returned to England following an unsuccessful attempt to travel to Turkey for possession of an illegal knife. Kotey and Elsheikh were arrested together on September 11, 2011, at a Muslims Against Crusaders rally where they were protesting against a gathering in support of the British 9/11 victims. They were arrested on suspicion of being involved in a stabbing, though they were ultimately not charged for that offense. During the FBI interviews

in March 2018, Elsheikh told the agents that, while living in the UK, he participated in criminal activities such as robberies, drugs, physical assaults and knife fights. During the FBI interviews in 2020, Elsheikh told the agents that while living in London he had frequent run-ins with the law to include stealing motorcycles and XBOX live passes and getting into frequent fights. Likewise, during these *Mirandized* interviews with the FBI, Elsheikh refused to speak about certain topics without an attorney present, consistent with his repeated refusal to address certain topics with several media interviewers. *See* Attachment 2, Attachment 3 and Attachment 4 *infra.* He clearly understood the British and American legal rights to refuse to answer questions at a minimum, and he relied on his right to counsel to avoid certain topics when he chose to do so. That Elsheikh directly refused to answer certain questions in law enforcement interviews—both before and after giving the relevant media interviews—is compelling evidence that his conduct was voluntary. And, in fact, during those March 2018 interviews with the FBI, Elsheikh explicitly told the agents that he knew the law and that they should not have access to information he provided to other Americans.

The following describes some of the critical events during their detention. In certain instances, Elsheikh and Kotey expressly terminated their interviews—in the case of Elsheikh and Jenan Moussa, for example, after speaking to her for only ten minutes. If Elsheikh were truly being mistreated by his SDF jailers and compelled to speak with this journalist, it defies common sense that he would so casually insult her and end the interview—especially if, by ending the interview, he would be taken back to the same SDF facility where he was supposedly being mistreated. But Elsheikh's demeanor is consistent with the way he and Kotey behaved during many of these media interviews. In the CNN interviews, Elsheikh jokes with one of the SDF guards that he should get the car and pantomimes driving away from the interview. Such jocularity with one's torturers beg-

24

gars belief. And in the Langan interviews, Kotey engaged in open hostility with Langan and eventually terminated the interview by telling him to "f*ck off." The totality of circumstances surrounding these interviews and their internal characteristics all bear the hallmark of defendants exercising their free will.

Similarly, while the defendants certainly admitted to some culpable conduct, they also repeatedly attempted to minimize their participation and pushed back against their interviewers' suggestions of guilt—all contrary to the idea that they were being coerced into making confessions. In some cases, they expressly declined to say too much out of a concern for potentially incriminating themselves. For example, with Stuart Ramsey, Kotey openly acknowledged that given his "current disposition," the things he was saying could incriminate him, and at least as to these particular questions from Stuart Ramsey, expressly declines to be fully forthcoming about more details. Both Kotey and Elsheikh also argued with Langan about their culpability and describe others, including Mohammed Emwazi, as being the more culpable actors. Their combativeness and refusal to acquiesce to Langan's questions and implications is the hallmark of voluntariness. These interviews paint a picture not of men whose will had been overborne but of men eagerly—even arrogantly—attempting to enforce their will on their interviewers and to control the narrative surrounding their actions.

Kotey and Elsheikh's cursory and unsubstantiated claims of coercion to FBI agents in October 2020 do not withstand scrutiny. According to Kotey, he was tortured and told to make statements that promoted arguments against the Turkish government. Yet in more than two hours of being interviewed by Sean Langan, Kotey did not mention Turkey even once. Nor did he mention Turkey in the other interviews with CNN and other journalists. By contrast, Elsheikh never said he was told to mention Turkey, and presumably, if those were SDF's marching orders, Elsheikh

25

would also have been told to do the same. Yet once again, in the many hours of recorded media interviews—where defendants routinely exercised control of the topics they addressed—Elsheikh did not bring up Turkey either. Besides telling the FBI that the media interviews were coerced, Elsheikh also told the agents that he had been interviewed by the FBI while in Syrian custody and had refused to answer certain questions without advice of counsel. Here again, Elsheikh is demonstrating free will. That Elsheikh acknowledges that he was in SDF custody in March 2018 but was still willing to withhold cooperation makes it plain that his statements to the media (or anyone else for that matter) were not the product of coercion.

Similarly, Kotey's explanation is internally inconsistent and defies common sense. While claiming to have been tortured into consenting to interviews, he also claimed that he "voluntarily" left the interview with the Japanese journalists. If he was being mistreated by SDF to make incriminating statements to the world's media, it seems unlikely that he would be able to do anything voluntarily. And walking out of an interview that SDF was determined to have him participate in seems like a very dangerous approach. Yet the act of walking out of that interview was in keeping with the way both he and Elsheikh treated the interviews with CNN, Sean Langan, Jenan Moussa, and others.

Everything about the demeanor of Kotey and Elsheikh in these recorded interviews reflects the fact that they were freely and voluntarily speaking to the journalists. They appeared relaxed and at ease. They did not simply agree with whatever question was put to them. And as Elsheikh acknowledged when he said that "people in the Western world are not gonna want to hear this," the things that they were saying were controversial precisely because they refused to disavow their allegiance to ISIS. SDF was in the process of fighting for its very survival against ISIS. The United States was a critical ally in that fight, and here, the SDF had in custody two individuals who had

26

participated in a brutal hostage-taking conspiracy that resulted in the deaths of four Americans. It is contrary to all common sense to believe that if the SDF had coerced Kotey and Elsheikh into making inculpatory statements during these interviews, that it would have also permitted Kotey and Elsheikh to praise ISIS, defend Mohammed Emwazi, and attack the conduct of the SDF's own allies. Elsheikh and Kotey made the conscious and voluntary decision to take these interviews in an effort to disseminate their preferred narratives and terminated them when interviewers did not cooperate with that strategy. Having decided to take this strategy, the defendants must now accept the consequences of that voluntary choice.

Respectfully submitted,

Raj Parekh
Acting United States Attorney

By:     /s/   John T. Gibbs
        Dennis M. Fitzpatrick
        Aidan Taft Grano
        Assistant United States Attorneys
        United States Attorney's Office for the
        Eastern District of Virginia
        2100 Jamieson Avenue
        Alexandria, Virginia 22314
        703-299-3700

27

## CERTIFICATE OF SERVICE

I hereby certify that on October 1, 2021, I electronically filed this motion with the Clerk of Court using the CM/ECF system, which will transmit a Notice of Electronic Filing to all counsel of record in this case.

                /s/    John T. Gibbs

John T. Gibbs
Assistant United States Attorney
United States Attorney's Office for the
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel: 703-299-3700
Fax: 703-299-3981
Email: john.gibbs@usdoj.gov

28