## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **FILED UNDER SEAL** |
| | ) | |
| v. | ) | No. 1:20-cr-239 |
| | ) | |
| | ) | Hon. T.S. Ellis, III |
| ALEXANDA AMON KOTEY | ) | |
| | ) | Sentencing: April 29, 2022 |

### DEFENDANT'S POSITION ON SENTENCING

Alexanda Kotey has accepted responsibility for his role in the Islamic State's hostage-taking scheme that resulted in the grisly deaths of four Americans, James Foley, Peter Kassig, Kayla Mueller, and Steven Sotloff, as well as a number of others. He cannot bring the victims back or restore their families to make them whole again. What he can do, he has done. Through his plea he agreed not only to provide information to the government, but to meet with victims and victims' families. He has done everything asked of him and actually quite a bit more, ███████████████████. It will not be enough to amend the damage done, but through his efforts and his acceptance of his own responsibility, Mr. Kotey has tried to bring some small amount of good from this gut-wrenching case.

For his offenses, he will spend the rest of his life in prison. There is no doubt about that. All this Court has discretion to do at Mr. Kotey's sentencing is to strongly recommend that Mr. Kotey be put in the most appropriate prison environment *for him*—as the sentencing statutes require, *see* 18 U.S.C. §§ 3553(a) & 3621. Unlike the Islamic State under Abu Bakr al-Baghdadi, the U.S. justice

system is not intended to exact vengeance for vengeance's sake—it considers each defendant individually and punishes only to the extent sufficient but not more than necessary. Mr. Kotey's federal prison placement should not be based solely on his crimes and their notoriety, but also should take account of ███████████████████ ████████████████████████████████████████████, his 18 months of compliance with the Special Administrative Measures that severely restrict his human contact, and the unduly harsh and mentally debilitating conditions of the Bureau of Prisons' ("BOP") administrative maximum facility in Florence, Colorado ("Florence ADX"), which condemns inmates to near-permanent solitary confinement and where Mr. Kotey may be reflexively placed without a strong recommendation to the contrary from this Court.

Accordingly, the defense respectfully asks this Court to direct the BOP to evaluate Mr. Kotey for designation to a Communications Management Unit or other alternative placement short of condemning him to solitary confinement at Florence ADX.

## I. Legal Standard

This Court's task now is to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing based on the statutory factors laid out in 18 U.S.C. § 3553(a).[1] The laws of sentencing require a Court to fashion

---

[1] Those factors include: (a) the nature and circumstances of the offense and the history and characteristics of the defendant, (b) the kinds of sentences available, (c) the guideline range, (d) the need to avoid unwarranted sentencing disparities, (e) the need for restitution, and (f) the need for the sentence to reflect the following: the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense, to afford adequate deterrence, to protect the public from

an appropriate sentence "for the individual defendant." *Nelson v. United States*, 555 U.S. 350, 351 (2009). In this particular case, however, the Court's sentencing discretion is limited by the statutorily mandatory life sentences required for Counts 1 through 5. *See* 18 U.S.C. § 1203. The Court has discretion to impose up to life for Counts 6 through 8. *See* 18 U.S.C. §§ 2332(b)(2), 2339A & 2339B.

But the Court does have the discretion and legal authority to make recommendations regarding a defendant's placement within the Bureau of Prisons system. *See, e.g.*, 18 U.S.C. § 3621(b)(4)(B) (BOP can designate any facility determined to be "appropriate and suitable, considering," *inter alia*, "any statement by the court that imposed the sentence . . . recommending a type of penal or correctional facility as appropriate").

The BOP's stated goal in designating where a person will serve his time is "to place each inmate in the most appropriate facility for service of sentence." BOP, Program Statement 5100.08 (Inmate Security Designation and Custody Classification), Ch. 3, at 3, available at https://www.bop.gov/policy/progstat/5100_008cn.pdf. Although a judicial recommendation is not binding, the BOP must consider it and can be asked to provide an explanation if its ultimate decision is contrary to the recommendation. *See, e.g.*, BOP, Program Statement 5070.10 (Judicial Recommendations and US Attorney Reports), available at https://www.bop.gov/policy/progstat/5070_010.pdf.

---

further crimes of the defendant and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. *See* 18 U.S.C. § 3553(a).

*See also* Declaration of Jack Donson ("Donson Declaration"), at ¶ 22 (citing and attaching Joyce K. Conley, Memo for Chief Executive Officers, Program Statement 5070.10 (July 27, 2007)), attached as Exhibit A.

## II.      Objection to the Presentence Report

The defense has one objection to the Presentence Report's offense-level calculation, which is reflected in the Objections portion of the PSR.  *See* PSR at 32. The defense here adopts the objection it made during the PSR process.  The defense notes that the government has agreed with the defense's position on this issue, and further acknowledges that the final offense-level calculation would be unaffected regardless of the outcome on the objection.

## III.      The Offense Conduct

In 2012, Mr. Kotey traveled to Syria with the intention of helping fellow Muslims in distress.  He had converted to Islam in his late teens while in the United Kingdom and had become fiercely observant about 6 years earlier, having been steeped in jihadist-Salafi doctrines that he had distilled through his studies. He believed in the broad concept of jihad, taking up arms in defense of fellow Muslims.  In Mr. Kotey's view, in those early 2000s years when his faith was crystallizing, his fellow Muslims were under withering attack on multiple fronts. *See* Ltr. of Alexanda Kotey, attached as Exhibit B.

In 2011, following the Arab Spring, civilians in Syria had taken up arms against the dictatorship of President Bashar al-Assad.  The civil war was still in its early stages, and the Islamic State in Syria had not yet coalesced.  To an outsider, as Mr. Kotey was, the conflict appeared to pit poorly armed civilians against a

ruthless dictator. Mr. Kotey sought to join what he viewed as an unfair fight. In early 2012, along with Mohammed Emwazi, Mr. Kotey left London, following a circuitous, clandestine route overland to the Syrian border. Although Mr. Kotey initially fought the Assad regime with a different faction, he ultimately joined the Islamic State ("IS"), which was designated a foreign terrorist organization by several Western nations, including the United States.

From 2013 to 2014, Mr. Kotey contributed to the efforts of the Islamic State, in part, by participating in a hostage-taking scheme designed to raise money to fund the organization's Syrian operations. Mr. Kotey's primary duty in the scheme was conducting negotiations to secure ransom payments. This role involved the creation of proof of life videos, obtaining information from the hostages, and drafting and sending ransom emails. But it also included violence directed at the hostages designed to keep them subdued and afraid, as well as to compel the United States and other third parties to pay a monetary ransom or refrain from certain actions as a predicate to the release of hostages. Mr. Kotey has admitted he was involved in the mistreatment of hostages and was aware the scheme could lead to or end with the killing of Western hostages.[2]

Mr. Kotey's involvement in sending communications regarding the hostages stopped around the time of the execution of James Foley in August 2014. At that

---

[2] Mr. Kotey himself was not present for the killings of Western hostages. This was not because he would have declined to participate, but because the killings were carried out with as few people present as necessary and typically the co-conspirators were not told where or precisely when they would occur.

point, Mr. Kotey transitioned to other roles within the Islamic State and was no longer involved in the hostage scheme. Thereafter, IS began losing ground, eventually entirely ceding the territory it once held. Its fighters, Mr. Kotey included, were forced to flee and hide out of fear of capture. That is exactly what happened. On January 4, 2018, Mr. Kotey and Mr. Elsheikh were captured in Syria by Syrian Democratic Forces ("SDF"). Mr. Kotey remained in SDF custody until approximately October 2019 when he was transferred to U.S. custody in Iraq. Finally, Mr. Kotey was transferred to the Eastern District of Virginia on October 7, 2020, pursuant to an eight-count criminal indictment.

On September 2, 2021, Mr. Kotey pleaded guilty to all counts pursuant to a written plea agreement with the U.S. Attorney's Office for the Eastern District of Virginia. Key provisions of the plea agreement include Mr. Kotey's cooperation and the U.S. government's promise to use all reasonable efforts to effect Mr. Kotey's transfer to British custody to serve out the remainder of his life sentence after 15 years. The offenses of conviction are undoubtedly among the most serious in the U.S. criminal code. As such, the corresponding penalties, mandatory life sentences for five counts, are among the most severe. Mr. Kotey has accepted responsibility for his role in the crimes and is prepared to spend the remainder of his life incarcerated.

## IV.     Mr. Kotey's Personal History

Alexanda Amon Kotey was born 38 years ago in London, England, as the second of two boys, to a mother of Greek descent and a father of Ghanian descent. Pre-Sentence Investigation Report ("PSR") ¶¶ 143, 145. His parents struggled to

make ends meet while working blue-collar jobs, and shortly after Mr. Kotey's birth, the household began to experience tumult as ████████████████████ ████████████████████████ . ████████████████████ ████████████████████████████████████ ████████████████ ████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████

After his father's death, Mr. Kotey's mother worked tirelessly to provide for her two young sons. While she had the support of her parents and Mr. Kotey's paternal grandparents, they were not always available to assist, and she lived alone for a period of time as a single mother with her sons.

The family settled in a section of London known for a multitude of cultures, but also crime and street violence. PSR ¶ 147. Lacking a father figure, Mr. Kotey gravitated towards his paternal uncle, who was deeply embedded in the community as a well-known drug trafficker. PSR ¶ 148. The combination of the dangerous neighborhood environment and the relationship with his criminally-inclined uncle initiated a teenage Mr. Kotey in drug dealing and related criminal activity. *Id*.

While Mr. Kotey consistently attended school and received average grades, he struggled behaviorally and often got into fights in school. PSR ¶¶ 147, 153. He was referred intermittently for counseling as an adolescent and early teenager.

Attendant to his drug-dealing lifestyle, teenage Mr. Kotey smoked marijuana, experimented with cocaine and ecstasy, and drank alcohol socially. PSR ¶ 155. Despite the distractions of the street and his gradually increasing use of marijuana, he graduated on time with a General Certificate of Secondary Education from Westminster City School in 2000. PSR ¶ 157.

In his late teens, Mr. Kotey began to question his lifestyle with its flashy accessories, substance abuse, and transient relationships. After one particularly hectic and dangerous evening at a night club, Mr. Kotey realized that he wanted something better for his life. Raised Greek Orthodox, but without consistent religious practices or church attendance, he began to explore other religions and cultures. PSR ¶ 147. As he writes in his letter to this Court, he had observed that the Muslims he interacted with had close bonds with others in their faith that he admired, along with other positive qualities, that he perhaps missed in his own life. *See* A. Kotey Letter, at 2 (Exhibit B).

At age 19, Mr. Kotey found a religious home in Islam and converted. PSR ¶ 147. It would be a while still before his newfound faith really took hold and started to change his ways. *See* A. Kotey Letter at 4. By 2006, though, Mr. Kotey had ceased his criminal conduct and his drug use, and abstained from alcohol. *See id*; PSR ¶ 156. As Mr. Kotey describes it, once he dove deep into his personal view of Islam, he found himself influenced by the Salafi school of thought and the jihadists he encountered who had returned from the battlefields of Afghanistan during the Soviet invasion. *See id*. 5-7. In the years that followed, as he studied Islamic

practices and teachings, he became increasingly observant and motivated to join what he viewed as an unjust assault on Muslims around the world. After fits and starts, in 2012, he left London for Syria to do just that.

Mr. Kotey has an 18-year-old daughter, who resides in the United Kingdom, and three young daughters, ███████████, with his wife, whom he met in Syria. PSR ¶¶ 149-150. He maintains regular contact with his wife and young children, endeavoring to maintain a fatherly role in their lives despite his circumstances. He also maintains regular contact with his mother and step-father, who reside in London, and from whom he enjoys invaluable emotional support.

While at the Alexandria Detention Center, under strict DOJ-imposed Special Administrative Measures, Mr. Kotey has never had a behavioral or disciplinary incident, though he lives under far more stringent restrictions than most other inmates. He is confined to a single-person cell 23 hours a day, passing the time reading anything he can get his hands on, exercising, writing, drawing and listening to the radio. He has a limitless capacity for news and an eagerness to discuss and digest complex issues of politics and religion.

**V.** ███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████



- ████████████████████████████████████████████
  ████████████

- ████████████████████████████████████████████
  ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████

## VI.    The Special Administrative Measures

Once Mr. Kotey was brought to the United States for prosecution, the Department of Justice implemented a set of special restrictions on his contact with other people. These are referred to as Special Administrative Measures, or SAMs, a copy of which is attached as Exhibit C.

Under the SAMs, Mr. Kotey may not have contact with anyone who is not a member of his legal defense team or a member of his immediate family, or law enforcement. Those with whom he is permitted to have contact first must be approved for such contact, including Mr. Kotey's lawyers and their employees and his immediate family. Those who are approved must follow a set of rules governing their contact with Mr. Kotey. All of his communications are monitored. Every letter he wishes to send is read and approved before it reaches its intended recipient. Every phone call he wishes to make to an approved recipient must—with narrow exceptions—be live-monitored, even when it would otherwise be recorded as are all non-legal inmate calls from the jail.

Mr. Kotey may not have contact with other inmates at the jail (or any jail).[3] He is held in isolation in a single cell and has been for 18 months now—and the

---

[3] This provision in particular is problematic for Mr. Kotey's future placement within the BOP system. If Mr. Kotey is forbidden to have any contact with other inmates, it may follow that the BOP has no choice but to put him in solitary confinement at Florence ADX. As discussed in greater detail below, such a result is at odds with

better part of four years since his capture.  When he is given recreation time, it is to watch TV by himself, or walk circles in the jail's small gym, again, by himself.  Mr. Kotey has remained compliant with these rules for the duration.

The SAMs are administered by the DOJ.  Although they may be modified at any time, in reality the DOJ has rejected efforts to amend these draconian provisions other than at their yearly renewal mark.  Even at that point, the DOJ was willing to make only nominal amendments—notwithstanding that the FBI agents ████████████████ and the prosecutors handling this case and debriefing him have all expressed support for loosening the restrictions.

In short, the DOJ has exercised essentially unilateral control over Mr. Kotey's communications and human contact since he arrived in the U.S. and will continue to do so for the foreseeable future, despite his efforts to demonstrate █ ██████ and the well-understood effects of isolation on the human psyche. Decades worth of research on solitary confinement demonstrates that the social isolation caused by such conditions increases the prevalence of depression, anxiety, psychosis, paranoia and suicidal behavior.  *See* Craig Haney, The Science of Solitary:  Expanding the Harmfulness Narrative, 115 NW. U. L. Rev. 211 (2020). *See also* Stuart Grassian, Psychiatric Effects of Solitary Confinement, 22 J. Law & Policy 325, 331 (2006) ("Indeed, even a few days of solitary confinement will predictably shift the electroencephalogram (EEG) pattern toward an abnormal pattern characteristic of stupor and delirium.").  These restrictions are a punitive

Mr. Kotey's record of cooperation and compliance, not to mention his ongoing obligations to the U.S. government.

measure above and beyond any sentence this Court can or must impose—and they appear to be largely immune from scrutiny.

**VII.    A Recommendation to the BOP to Strongly Consider Placing Mr. Kotey in a Communications Management Unit Rather Than Florence ADX is Warranted in this Case.**

This Court's task at sentencing is a foregone conclusion in this case. There is no discretion for the Court to impose anything other than five life sentences for Counts 1 through 5.[4] But this Court does have the ability to make a recommendation to the BOP about Mr. Kotey's placement within its system. The defense urges this Court to do so to dissuade the BOP from reflexively placing Mr. Kotey at Florence ADX because doing so is unwarranted by the BOP's own standards and Mr. Kotey's demonstrated record of ███████████ compliance.

The defense has consulted with former BOP administrator Jack Donson as to the specific conditions of Florence ADX. *See* Donson Declaration (Exhibit A). Florence ADX's H unit, which has housed, for example, the Boston Marathon bomber, Dzhokhar Tsarnaev, is specifically designed to minimize any opportunity for human contact. Inmates are confined to their single-man cells. Even programming and classes are conducted from inside the cell using closed circuit television. When they are permitted to exit their cell for recreation, that recreation takes place alone inside a caged space. *See id.* ¶¶ 12-13.

---

[4] The defense submits that a sentence less than life is appropriate on Counts 7 and 8. This Court already will have imposed life sentences for the conduct of hostage-taking and the deaths that resulted, as required for Counts 1-5. Thus, the sanctions imposed for the material support counts should consider conduct and reflect a sanction *distinct from* that meted out for the hostage-taking conspiracy.

This is an environment intended for inmates considered too dangerous to even interact with other humans. *See id.* ¶ 10 (maximum custody is "for individuals who, by their behavior, have been identified as assaultive, predacious, riotous, serious escape risks, or seriously disruptive to the orderly running of an institution"). Mr. Kotey has demonstrated that he does not belong in this top-tier of dangerous inmates. Even by the BOP's own objective metric for classifying inmates, Mr. Kotey is not a risk that merits solitary confinement in the BOP's most restrictive prison. Rather, were BOP classification based on objective measures alone, Mr. Kotey would likely qualify for minimum security. *See id.* ¶ 11 (attaching classification worksheet showing application of BRAVO system to Mr. Kotey). Thus, a judicial recommendation to the BOP to consider alternatives to solitary confinement at Florence ADX, including specifically the BOP's communications management housing units, is warranted for at least the following reasons:

First, as discussed, Mr. Kotey has demonstrated that he is not disruptive nor a security risk. He has done this by maintaining a clear record in custody for the past 18 months and through his consistent compliance with the SAMs requirements. He also was in United States custody in Iraq prior to his extradition, again without incident.

██████████  ████████████████████████████████████████

████████████████████████████████████  By the BOP's own

standards, sending Mr. Kotey to solitary confinement at Florence ADX is simply not

warranted on security grounds.

███████████████████████████████████████████████████

███████████████████████████  Incarcerating Mr. Kotey in solitary confinement

will almost certainly have a significant deleterious effect on Mr. Kotey's mental

health.  Even the Department of Justice's own Inspector General has found that the

over-use of solitary confinement contributes to inmates' mental decline, often to an

upsetting degree.  *See id.* ¶ 16.  *See also infra* Section VI.

Third, a reasonable alternative exists.  The Bureau of Prisons operates two

units specifically designed for inmates whose activities or offenses trigger a need for

tightly monitored communications with the outside world: the communications

management units (CMUs) at USP Marion, Illinois, and USP Terre Haute, Indiana.

The *stated purpose* of the CMUs "is to provide an inmate housing unit environment

that enables [BOP] staff to more effectively monitor communication between

inmates in CMUs and persons in the community."  *See* BOP, Program Statement

5214.02 (Communications Management Units), at 1, available at

https://www.bop.gov/policy/progstat/5214_002.pdf.  For example, written

communications with the outside world may be limited in number or by recipient

and are reviewed before they are sent or delivered.  Telephone communications are

similarly limited and also are live monitored.[5]  *See id*. at 8-10.  However, inmates in the CMU at least may interact with one another inside the unit and are not confined to their cells 23 hours a day, as those in solitary confinement at Florence ADX are.

The Department of Justice has demonstrated that its concerns with Mr. Kotey are focused on his communications with outsiders, which is the focus of his SAMs restrictions.  ██████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████  It is simply not credible now for the DOJ, acting through the BOP, to conclude that Mr. Kotey poses risks so grave that he must go to the harshest and most isolating environment the BOP has to offer: solitary confinement at Florence ADX.  Such a placement is far more restrictive than necessary in this case, and this Court should strongly recommend to the BOP and the DOJ to consider alternatives, including the CMUs at USP Marion and USP Terre Haute.

## VIII.　　Conclusion

Accordingly, for the foregoing reasons, the defense respectfully moves this Court to strongly recommend that the DOJ and the BOP consider alternatives to

---

[5] In contrast, the typical BOP inmate's phone calls to friends and family may be recorded, but not necessarily ever listened to and certainly not listened to as they are occurring.

incarcerating Mr. Kotey in solitary confinement at Florence ADX. The defense will submit a proposed order for the Court's consideration prior to sentencing.

Respectfully submitted,

ALEXANDA AMON KOTEY

By counsel,

Geremy C. Kamens
Federal Public Defender

Cadence A. Mertz
Va. Bar No. 89750
Brooke Sealy Rupert
Va. Bar No. 79729
Assistant Federal Public Defenders
Office of the Federal Public Defender
1650 King Street, Suite 500
Alexandria, VA 22314
(703) 600-0800 (Tel)
(703) 600-0880 (Fax)
Cadence_Mertz@fd.org


Marc Eisenstein
Barry Coburn
Coburn & Greenbaum, PLLC
1710 Rhode Island Avenue, N.W.
Second Floor
Washington, DC 20036
Phone: (202) 643-9572
Fax: (866) 561-9712
barry@coburngreenbaum.com
marc@coburngreenbaum.com

## CERTIFICATE OF SERVICE

I certify that on April 22, 2022, I will file the foregoing with the Clerk of the Court and will serve true and correct copies on counsel of record.

Cadence A. Mertz
Va. Bar No. 89750
Assistant Federal Public Defender
Office of the Federal Public Defender
1650 King Street, Suite 500
Alexandria, VA 22314
Phone: (703) 600-0800
Fax: (703) 600-0880
Cadence_Mertz@fd.org

# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Docket No. 1:20CR00239-001 |
| v. | HONORABLE T.S. ELLIS, III |
| Alexanda Kotey | **DECLARATION OF JACK T. DONSON** |
| Defendant | |

## STATEMENT OF EXPERTISE

1. I am the Founder and President of My Federal Prison Consultant, LLC which provides Continuing Legal Education (CLE), consulting, and expert testimony on matters regarding the Federal Bureau of Prisons (BOP). For the past ten years I have testified in federal district courts throughout the country regarding federal prison issues.

2. I worked in the field of corrections for more than thirty-three years, with twenty-three years in BOP security classification, correctional programs, treatment, and re-entry. Since retirement, I actively follow policy initiatives and have attended conferences, including the annual U.S. Sentencing Commission conference. I serve on the ABA and National Association of Criminal Defense Lawyers' (NACDL) Corrections Committees advising on Federal prison issues. In my capacity as Director of Programs and Case Management Services for FedCURE, I have had regular contact with BOP central office administrators regarding inmate and policy issues.

3. During my career, I managed a caseload of approximately 150 inmates as a Correctional Treatment Specialist. In that capacity, I was responsible for the development and monitoring of inmate correctional treatment plans, inmate counseling, security classification, program monitoring and re-entry. I held assignments as a Case Management Coordinator (CMC) and Correctional Programs Officer (Unit Manager) and had many collateral administrative

responsibilities including training staff, writing local policy, conducting facility audits, and monitoring institutional programs including the screening of new designations. I have experience working with international terrorists and have had inmates on my caseload who served time in the Florence ADX. In addition, my general correctional experience is comprehensive having worked with Minimum (camp), Low, Medium, Administrative (pre-trial and high security), and Witness Security populations. I hold a bachelor's degree in Sociology/Anthropology and a Master of Science Degree in Criminal Justice. Aside from consulting, I have been a Lecturer at Marywood University where I taught several Criminal Justice courses including a course entitled The American Prison. A true and correct copy of my curriculum vitae is attached.

## CASE EVALUATION

4. I was retained by the Federal Defender's Office on behalf of Alexanda Kotey to explain the living conditions within the Florence ADX (Administrative Maximum) facility and offer my professional opinion on his classification and suggestions of an alternate designation aside from the ADX, which can accommodate his security needs and Special Administrative Measures (SAMs) requirements. This information can provide context from a correctional treatment perspective to assist in the sentencing phase of his case. I have consulted with counsel and reviewed case information including the draft Presentence Report (PSR).

## BOP CLASSIFICATION SYSTEM (BRAVO)

5. The BOP classifies facilities into several categories including Minimum (Camp), Low FCI, Medium FCI, and High Security (USP). There are also administrative facilities such as the Metropolitan Correctional Centers (MCC), Metropolitan Detention Centers (MDC), and Federal Medical Centers (FMC), which house all security levels, as well as facilities with specialized missions such as the Florence ADX, USP Thompson (Special Management Unit), and several reintegration and communications management units.

6. After sentencing, defendants are assigned a security classification using a system referred to as BRAVO (Bureau Risk Assessment Verification and Observation) to determine the appropriate degree of control and supervision required for facility designation. The tool is an

objective assessment based on a number of readily assessable criteria which include age, history of violence, escape, criminal history score, and severity of the instant offense. Each factor has a corresponding security point value that, when totaled, determine a security level. Below is a chart indicating the breakdown of the security points in the BOP classification manual (CPD/CPB, Number P5100.08, Inmate Security Designation and Custody Classification):

| Security Level | Male | Female |
|:---:|:---:|:---:|
| **MINIMUM** | **0-11 Points** | **0-15 Points** |
| LOW | 12-15 Points | 16-30 Points |
| MEDIUM | 16-23 Points | N/A |
| HIGH | 24+ Points | 31+ Points |

7. It should be noted that in my professional opinion in scoring thousands of inmate classifications, Mr. Kotey has only <u>nine security points</u> which is actually commensurate with minimum security inmates housed in camp environments. (See Exhibit One- BP-337, <u>Inmate Load and Security Designation</u> form).

8. However, security points alone do not determine a security level as the classification manual also includes subjective factors, which are referred to as "<u>Public Safety Factors</u>" (PSF) that can enhance the security scoring to increase a person's classification to a higher security level. For instance, a Life sentence will automatically assign a high security classification.

9. Aside from a person's security level classification, the BOP also assigns a "custody level classification" defined in the classification manual as:

"<u>Custody Classification</u>: *The review process to assign a custody level based on an inmate's criminal history, instant offense, and institutional adjustment. A custody level (i.e., COMMUNITY, OUT, IN, and MAXIMUM) dictates the degree of staff supervision required for an individual inmate.*"

10. A custody level is discretionary unlike the security classification which is

determined by the input of the classification factors into BRAVO. Custody levels are assigned based on the mission of the designated facility and ordinarily inmates designated to the Florence ADX are assigned "Maximum" custody. The classification manual defines maximum custody as:

"Maximum Custody: *This classification is for individuals who, by their behavior, have been identified as assaultive, predacious, riotous, serious escape risks, or seriously disruptive to the orderly running of an institution.*"

The BOP considers all people with life sentences to be an escape risk.

11. Here, based on the objective BRAVO system, Mr. Kotey could end up with security points commensurate with minimum security because he is void of the typical classification factors that elevate a person's classification such as a serious history of violence or escape and predatory prison behavior. (See Exhibit One, BP-337 classification worksheet, attached). However, in my professional opinion, Mr. Kotey will be classified as High security only due to the "sentence length" PSF because he will receive a sentence of over thirty years to be served.

## CONDITIONS IN ISOLATION AT THE FLORENCE ADX

12. ADX Florence, referred to as a "super-max," is the only one of its kind in the federal system. Upon activation, it replaced the mission of the former Marion, Illinois Control Unit which was created after the brutal murders of two BOP staff members by the Aryan Brotherhood in separate incidents on the same day in 1983. The super-max concept involves total isolation, which is the true meaning of "Solitary Confinement." The purpose is to incapacitate, isolate, and eliminate contact between inmates while limiting the contact with staff. Inmates are locked in a small cell (approximately 75 Sq. Ft.) twenty-three hours a day aside from being shackled in handcuffs and leg irons to be moved to a caged-in shower area. The cell, desk, and mattress platform are made of concrete and food is delivered to the cell where inmates eat near an open toilet. Recreation is offered one hour daily based on the availability of staff and is conducted a small caged in area. All programming is done through a closed-circuit TV.

13. Amnesty International has obtained pictures of some of the facilities at ADX, which

I am including here:



The inside of a cell in a General Population Unit at ADX © Private



An outdoor recreation cage for prisoners in the Step Down Program at ADX © Private

14. A review of the BOP website on April 14, 2022, indicated there were 342 inmates housed at the ADX. The facility is subdivided into separate units with specialized missions but there is no official public policy outlining the details of the individual mission. My opinions on the ADX are based on experience working for the agency, reading court declarations, reports from organizations such as the Department of Justice (IG), the BOP website and Amnesty International. The government has acknowledged that international terrorists are housed in the "Special Security Unit" known as "H Unit." Most, if not all prisoners in H Unit, are under SAMs for reasons related to national security.

15. The isolation of solitary confinement for prolonged periods has been a controversial subject for decades. In 2012, eleven inmates filed a federal class-action against the BOP in *Cunningham v. Federal Bureau of Prisons*. The suit alleged chronic abuse and failure to accurately diagnose prisoners who were mentally ill. The case included seven inmates who allegedly died by suicide while housed in the ADX.

16. In 2017, the DOJ-Inspector General issued a report entitled <u>Review of the Federal Bureau of Prison's Use of Restrictive Housing of Inmate with Mental Illness</u>. The results of the review determined the BOP was not forthcoming about its practices of solitary confinement and the detrimental impact isolation has on a person's mental health. Attorney General Horowitz released a video regarding the findings of the report which were critical of the BOP's significant inadequacy in the implementation of mental health policy. https://youtu.be/bnKcpO40eeU

17. Prolonged isolation directly impacts mental health and was prohibited by the United Nations General Assembly in a resolution adopted in December of 2015 referred to as "The Mandella Rules" regarding the minimum rules for the treatment of prisoners. According to an article in The Journal of the American Academy of Psychiatry and the Law, "solitary confinement is recognized as difficult to withstand; indeed, psychological stressors such as isolation can be as clinically distressing as physical torture."

18. On many occasions while working in the federal system, I personally noticed a drastic deterioration in the inmates on my caseload when isolated for as little as four months in the special housing unit. When I worked in a federal pre-trial facility, I was responsible for the

case management of inmates pending authorization into the federal witness protection program referred to as "WITSEC." The inmates were placed in single cells within the special housing unit until the BOP Central Office and DOJ Office of Enforcement Operations (OEO) authorized placement into one of the BOP Protective Custody Units. This required an FBI Polygraph examination, U.S. Marshals Interview, and U.S. Attorney threat assessment. After prolonged isolation, I made numerous referrals to the psychology services department due to deteriorating mental health issues which manifested in incident report behavior, anger, and overall frustration and hopelessness.

## COMMUNICATIONS MANAGEMENT UNIT (CMU)

19. Program Statement 5214.02, <u>Communications Management Units</u> is the governing BOP policy on CMUs. These are described as units where inmates reside, eat, and participate in <u>all</u> educational, recreational, religious, visiting, unit management, and work programming, within the confines of the CMU. The purpose of a CMU "*is to provide an inmate housing unit environment that enables staff to more effectively monitor communication between inmates in CMUs and persons in the community.*" In addition, the Program Statement describes several sources for CMU referrals two of which are:

      (i) The BOP Counter Terrorism Unit (CTU)

      (ii) Recommendations from law enforcement agencies or the court

20. Unlike the Florence ADX, CMUs allow programming and some human interaction in an administrative (high security) environment. It does not involve the isolation issues of solitary confinement that negatively impact a person's mental health and sanity. It can accomplish the goals for SAMs in an environment that is more commensurate with Mr. Kotey's security needs. I am aware of international terrorists being housed in CMUs which is also supported by the DOJ audit report entitled <u>Audit of the Federal Bureau of Prisons' Monitoring of Inmate Communications to Prevent Radicalization</u> # 20-042 - March 2020. It was clear from this audit that the BOP has been housing SAMs inmates in facilities other than the ADX. It was equally clear from the audit that international terrorists were also housed in units throughout the country. While working in a protective custody unit, I even had a SAMs inmate on my case load who was involved

with Osama bin Laden and other al-Qaeda members.

## POLICY AND CLASSIFICATION CONSIDERATIONS

21. The BOP has almost unlimited discretion regarding facility designation. The agency's historical philosophy has been to place an offender in the least restrictive setting to meet their security and correctional program needs. Their discretion is outlined in the classification manual which allows them to designate offenders both above and below the scored security level. When I worked for the BOP, on more than one occasion I had terrorists on my caseload relative to the first World Trade Center bombing in a pre-trial facility and I am also aware that the BOP does house inmates with terrorism convictions in medium security general population settings when appropriate. I recently have worked with several inmates sentenced to Life who were housed in medium, Federal Correctional Institution (FCI) environments. There is simply no technical policy requirement for Mr. Kotey to be housed in the Florence ADX. He has the security classification points commensurate with minimum security (or threshold of low/medium) .

22. The BOP attempts to comply with judicial recommendations regarding defendant placement and tracks its compliance at approximately 74%. The BOP historically responded in writing to the court when it was not able to comply, however, that practice was discontinued in what the agency referred to as REDMAP (Reduction and Elimination in Duties Management Assessment Project) initiatives. At the time of REDMAP, the BOP circulated a memorandum that it would continue to provide responses to the court for non-compliance upon request from the sentencing judge; a copy of this memo is attached.

## CONCLUSION & RECOMMENDATIONS

23. Mr. Kotey faces the potential for initial designation to the Florence ADX based on his status as an international terrorist in combination with his SAMs. From a classification perspective, he does not have a violent and predatory *prior* criminal history as the instant offense

appears to be his first conviction. The potential short and long-term negative effects from prolonged isolation should far outweigh the need for ADX placement simply due to SAMs requirements. From a correctional treatment perspective, the BOP has other placement options available aside from ADX Florence which can restrict communication and provide for his security needs. Such placement options could be best facilitated by a strongly worded judicial recommendation. The court's input would cause the BOP to consider other designation options more deliberately within the policy parameters and exercise its discretion accordingly.

24. Therefore, I recommend that the Court consider a recommendation for placement as follows:

*The court strongly recommends initial designation to a facility other than the Florence ADX. The court's recommendation is based on the determination that a CMU can provide programming and limited interaction in a setting that still provides for communications monitoring and that total isolation is unnecessary considering the characteristics of the defendant when weighed against the needs of the government. If the BOP is unable to comply with this placement recommendation, the court requests a written justification regarding the non-compliance.*

I state under penalty of perjury that the foregoing is true and correct.

_____

Jack T. Donson, Founder and President
April 22, 2022

**INMATE LOAD AND SECURITY DESIGNATION** CDFRM

**FEDERAL BUREAU OF PRISONS**

| INMATE LOAD DATA |
|---|

**1. REGISTER NUMBER: 11685-509**

| 2. LAST NAME | 3. FIRST NAME | 4. MIDDLE | 5. SUFFIX |
|---|---|---|---|
| Kotey | Alexanda | | |

| 6. RACE | 7. SEX | 8.ETHNIC ORIGIN | 9. DATE OF BIRTH |
|---|---|---|---|
| B | M | NH | |

**10. OFFENSE/SENTENCE**
Conspiracy to Commit Hostage Taking Resulting in Death, etc. (multiple counts )

| 11. FBI NUMBER | 12. SSN NUMBER |
|---|---|
| | |

| 13. STATE OF BIRTH | 14. OR COUNTRY OF BIRTH | 15. CITIZENSHIP |
|---|---|---|
| N/A | U.K. | None |

**16. ADDRESS-STREET**
London

| 17. CITY | 18. STATE | 19. ZIP | 20. OR FOREIGN COUNTRY |
|---|---|---|---|
| X | X | X | X |

| 21. HEIGHT | | 22. WEIGHT | | 23. HAIR COLOR | 24. EYE COLOR |
|---|---|---|---|---|---|
| FT | IN | | LBS | | |

**25. ARS ASSIGNMENT: A-HLD**

| SECURITY DESIGNATION DATA |
|---|

| 1. JUDGE | 2. REC FACILITY | 3. REC PROGRAM | 4. USM OFFICE |
|---|---|---|---|
| Honarable T. S. Ellis, III | TBD | CMU | ED/VA |

| 5. VOLUNTARY SURRENDER STATUS | 0 = NO | (-3) = YES | |
|---|---|---|---|
| IF YES, MUST INDICATE: | 5a. VOLUNTARY SURRENDER DATE: | | 0 |
| | 5b. VOLUNTARY SURRENDER LOCATION: | | |

| 6. MONTHS TO RELEASE : | N/A | | | |
|---|---|---|---|---|
| **7. SEVERITY OF CURRENT OFFENSE** | 0 = LOWEST<br>1 = LOW MODERATE | 3 = MODERATE<br>5 = HIGH | 7 = GREATEST | 7 |
| **8. CRIMINAL HISTORY SCORE** | 0 = 0-1<br>2 = 2-3 | 4 = 4-6<br>6 = 7-9 | 8 = 10-12<br>10= 13 + | 0 |
| 8a. SOURCE OF DOCUMENTED | - PRESENTENCE INVESTIGATION REPORT or | | - NCIC III | |

| 9. HISTORY OF VIOLENCE | | NONE | >15 YEARS | 10-15 YEARS | 5-10 YEARS | <5 YEARS | |
|---|---|---|---|---|---|---|---|
| | MINOR | 0 | 1 | 1 | 3 | 5 | 0 |
| | SERIOUS | 0 | 2 | 4 | 6 | 7 | |

| 10. HISTORY OF ESCAPE OR ATTEMPTS | | NONE | >15 YEARS | >10 YEARS | 5-10 YEARS | <5 YEARS | |
|---|---|---|---|---|---|---|---|
| | MINOR | 0 | 1 | 1 | 2 | 3 | 0 |
| | SERIOUS | 0 | 3(3) | 3(6) | 3(6) | 3(8) | |

| 11. TYPE OF DETAINER | 0 = NONE<br>1 = LOWEST/LOW MODERATE | 3 = MODERATE<br>5 = HIGH | 7 = GREATEST | 0 |
|---|---|---|---|---|

| 12. AGE | 0 = 55 and over<br>2 = 36 through 54 | 4 = 25 through 35<br>8 = 24 or less | 2 |
|---|---|---|---|

| 13. EDUCATION LEVEL | 0 = Verified High School Degree or GED<br>1 = Enrolled in and making satisfactory progress in GED Program<br>2 = No verified High School Degree/GED and not participating in GED Program | 0 |
|---|---|---|
| 13.a HIGHEST GRADE COMPLETED | | 0 |

| 14. DRUG/ALCOHOL ABUSE | 0 = NEVER/>5 Years | 1 = <5 Years | 0 |
|---|---|---|---|

| 15. SECURITY POINT TOTAL | 9 |
|---|---|

| 16. PUBLIC SAFETY FACTORS | A-NONE<br>B-DISRUPTIVE GROUP (males only)<br>C-GREATEST SEVERITY OFFENSE (males only)<br>F-SEX OFFENDER<br>G-THREAT TO GOVERNMENT OFFICIALS<br>H-DEPORTABLE ALIEN | I-SENTENCE LENGTH (males only)<br>K-VIOLENT BEHAVIOR (females only)<br>L-SERIOUS ESCAPE<br>M-PRISON DISTURBANCE<br>N-JUVENILE VIOLENCE<br>O-SERIOUS TELEPHONE ABUSE | C<br><br>h<br><br>I |
|---|---|---|---|

**17. REMARKS**
Projected for Life Sentence, High security with security points commensurate with Minimum (9), SAMS issue,
appropriate for CMU

| 18. OMDT REFERRAL (YES/NO) | no |
|---|---|

**FILE IN SECTION 2 UNLESS APPROPRIATE FOR PRIVACY FOLDER**

# SECTION 2

Prescribed by P5100

Replaces BP-S337 of FEB 02

Exhibit One



U. S. Department of Justice

Federal Bureau of Prisons



_Washington, D.C. 20534_

July 27, 2007

MEMORANDUM FOR CHIEF EXECUTIVE OFFICERS

FROM:           Joyce K. Conley, Assistant Director
                Correctional Programs Division

SUBJECT:        Program Statement 5070.10, Judicial
                Recommendations and United States Attorney
                Reports, Responses to

This notifies you of an upcoming cancellation of Bureau of Prisons
(Bureau) program statement governing responses to Judicial and U.S.
Attorney recommendations.   As of July 2, 2007, the Bureau no longer
provides written responses to judges in cases where we are unable to
comply with these types of sentencing recommendations.

The Bureau will continue to maintain statistics as to our nationwide
compliance rate with all judicial recommendations.  Additionally, we
will continue to respond and provide the reasons why we could not
comply with sentencing recommendations in a specific case upon request
from sentencing judges.  Recent data reflects the Bureau complies with
these types of judicial sentencing recommendations in 72 percent of
initial designations.

This change is part of the Bureau's Reduction and Elimination of
Duties Management Assessment Project (REDMAP).  Through REDMAP, the
Bureau is responding to budget constraints by implementing various
cost-savings practices, with the goal of reducing the workload on
staff by decreasing paperwork, eliminating redundancy, and removing
unnecessary duties.

Should there be any questions or concerns regarding this change,
please contact Delbert G. Sauers, Chief, Designation & Sentence
Computation Center at (972) 352-4400.

cc:   Regional Counsel
      Chief, Designation & Sentence Computation Center
      Administrator, Correctional Programs Branch, CPD



Jack Thomas Donson
Email: jack@mfpcllc.com
Telephone (212) 461-2252

**Personal Information**
Education: BS-Sociology/Anthropology, MS-Criminal Justice
Offices in New York & Pennsylvania

**Personal Statement**

I have worked directly with justice involved individuals for over 35 years at the county, state and federal levels. I educate justice professionals on federal prison system policy and process to obtain better outcomes in representation and legislation. Most of my career, I managed a caseload within the trenches of the federal prison system as a Correctional Treatment Specialist. I also served in administrative capacities conducting facility audits, involvement in local and national policy writing work groups, program oversight and the training of institutional staff in classification and correctional programs. My unique perspective on justice issues is derived from applying policy in diverse prison environments including Pre-trial ( administrative/high security), Minimum, Low, Medium, & Witness Security units.  I received three national awards during my federal service and over thirty other monetary performance awards for my performance  and other accomplishments. I continue to have a pulse on the agency and my understanding of BOP policy, nuances and culture is extraordinary.

In 2011, I founded "*My Federal Prison Consultant*", LLC, after witnessing people being taken advantage of by high priced, predatory and uninformed prison consultants.

In 2014, I co-founded a company with Walt Pavlo of Forbes called *"Prisonology"* which provides training on federal prison topics to Federal Defenders and CJA Panel Attorneys. We have also conducted several training sessions with federal judges and probation officers.

I serve pro bono on several non-profit organizations helping marginalized populations and their families navigate the prison system. (FedCURE/Out4Good/Choosing Integrity)

I am a member of the Corrections Committees of the National Association of Criminal Defense Lawyers (NACDL) and the American Bar Association (ABA) where I serve as the chair of a sub-committee on federal prison policy.

I have testified in federal district courts throughout the United States and the United Kingdom. I was a lecturer at the University level and have taught several courses including "The American Prison."

My passion is prison reform and my mantra in that many proactive prison reforms can be accomplished under the existing policy and statutory framework through leadership, accountability and transparency. My analytical ability in combination with my practical experience provides me with insights into prison policy and culture which is advantageous for clients, attorneys, legislators, the media and reform organizations. I have appeared on CNN, Fox News, CNBC and have been quoted by numerous national media outlets relative to federal prison issues. I have authored chapters in two ABA Books and have had Op Eds published in The Hill as a "Opinion Contributor" and Bloomberg Law Insights as an "Outside Editor."

**Current Work Experience**

***My Federal Prison Consultant***, *LLC*- President& Founder, supports counsel, clients and families on both technical policy issues and general prison support on all areas of the BOP. I testify around the country on BOP issues relevant to mitigation. July 2011-Present www.mfpcllc.com

***Prisonology***, VP- Operations & co-founder, Develop CLE's which are conducted with federal defenders, judges and CJA panel attorneys. September 2014-2022, www.prisonolgy.com

***FedCURE***, Director of Programs and Case Management Services, Assist the incarcerated and their families relative to federal prison issues, pro bono via a designated BOP liaison in the central office. July 2011-present, www.fedcure.org

***Out4Good,*** *LTD,* Executive Director- In charge of developing the "Correcting Corrections in America initiative", April 2013-present (initiatives on hold pending funding & Africa CLODS project) www.out4good.org

***Marywood University,*** Lecturer PA- Criminal Justice Professor- courses entitled: "Community Corrections," "Shadow and Service" and "The American Prison." January 2013-January 2019

***Choosing Integrity,*** Board Member – CI staff have been visiting federal prisons and local jails for the past 10 years pro-bono offering classes in Forgiveness and mentoring the incarcerated. We recently were tasked with coordinating the Pike County, PA commissioners' re-entry task force. https://www.choosingintegrity.org/about/

**Prior Work Experience*:*

***Federal Bureau of Prisons***, Correctional Treatment Specialist & Case Mgt. Coordinator- I was responsible for the counseling, classification and re-entry preparation. I coordinated several institution programs and trained staff in classification & correctional programs related areas.
- Special expertise with high profile Organized crime figures, the Witness Protection (WITSEC) program & White-Collar Crime offenders
- Alternate Case Management Coordinator 1991 to 2011

- Assignments (TDY) in the Regional Office, Philadelphia, PA. (CIM Coordinator/Correctional Programs), New York City Community Corrections Office (processing designations and halfway house referrals) & several National (DC) policy writing work groups
- <u>Annual Training Instructor</u> in the areas of security designation and classification, Central Inmate Monitoring (CIM,), FOIA/Privacy Act & Victim Witness program.
- Member of Hostage Negotiations Team in the capacity of <u>Lead Negotiator</u>.
- Received 3 **National** Awards for <u>Excellence in Administration & Detention Procedures National Correctional Treatment Specialist of the Year & Excellence in Training Award</u>.
- Taught Institution familiarization orientation to new staff & was assigned as a mentor and trainer for college interns and newly appointed case managers and counselors
- Held assignments as <u>Camp Administrator</u>, <u>Case Management Coordinator</u>, <u>Unit Manager</u> and held the position of <u>Assistant Case Management Coordinator</u>.
- Liaison for US Parole Commission, US Marshals, FBI and ICE
- Worked in <u>minimum</u>, <u>low</u>, <u>medium</u>, <u>administrative</u> (including high security) & <u>Witness Security</u> (WITSEC) units

***Federal Bureau of Prisons*** <u>Correctional Officer</u>- Responsible for working various corrections posts throughout the prison including inmate housing units, compound and perimeter patrol. (Medium facility-FCI)

***Commonwealth of Pennsylvania,*** <u>Probation and Parole Officer</u>- Supervised a caseload of adults and juveniles. Appeared in court on a weekly basis, prepared pre-sentence reports, submitted parole recommendations to the court, provided community supervision of offenders and managed the work release and ARD programs. Also Interned with Scranton District Office of the PA Board of Probation and Parole.

: **<u>Army National Guard,</u>** SGT, Easton, PA 1986-1995 (Trained in Germany & Holland)

- **<u>Military Police</u>** (MP-95 Bravo), Ft. McClellan, AL
- **<u>Stinger Missile Gunner</u>** (16 Sierra), Ft. Gordon, Ga.

**Education**

Marywood University, Scranton, Pennsylvania
- **<u>Master of Science in Criminal Justice</u>** 1997 (Concentration in Public Administration)

East Stroudsburg University, East Stroudsburg, Pennsylvania
- **<u>Bachelor's Degree in Sociology/Anthropology</u>** 1985

**Awards**
- 1998 National Community Corrections Award
- 1990 National Correctional Treatment Specialist of the Year
- 1991 National Excellence in Annual Training Award
- Received thirty-two other monetary personal achievement awards

**Other Activities/memberships**

- Testified on Capitol Hill to the <u>Colson Task Force on Federal Corrections</u>
- <u>AOUSC Instructor</u> 2019 Austin, Tx (Winning Strategies Seminar-BOP Mental Health)
- Published an Article on BOP Restrictive Housing in the <u>Federal Sentencing Reporter</u>
- Authored Chapter's in Elizabeth Kelly's books on Autism Spectrum Disorders (2019) & Suicide and Its Impact on the Criminal Justice System (2021)- (ABA)
- Provide training on Federal prison issues to federal defenders & CJA Panel
- Developed and provided federal prison training to federal judges and USPO's
- Numerous media appearances for commentary on CNN and Fox News
- <u>NACDL Corrections Committee</u> since 2011
- <u>ABA Corrections Committee</u> 2012- Chair of Standing sub-committee on BOP Policy
- Monthly contributor to the <u>Sentencing Partners Newsletter</u> from Joaquin & Duncan
- Authored articles published in the "News & Views" (AO) and "The Debt Beat"
- Member of the U.S. Ombudsman Association (USOA)
- Member of the PA Prison Society
- Overall offender advocacy & general Federal prison & legislative reform efforts
- Hiking, Fishing, Leisure Travel

## References, testimonials and award letters available upon request and at [www.mfpcllc.com](http://www.mfpcllc.com)

# EXHIBIT B

Dear Judge Ellis

The very broad scope and nature of this case, and my own mixed feelings with regards to its particulars, has certainly challenged my ability to address the subject in a satisfactory way, especially when compounded with some of my constraints. These include, but are not limited to, the challenge of providing a perspective that is accurate and objective, — relative to my personal experiences — in a way that is both comprehensive and yet concise, and while trying to convey that in a manner that is both candid but considerate.

While the content of this letter may be lacking the comprehensiveness that I would have ideally desired — and that it is truly deserving, given the gravity of the matter — I hope that it will be able to provide that additional insight, and context, that I feel is much needed.

I can certainly respect and appreciate the victims and their families' possible desire to want to centre the focus of this case to those areas they felt particularly impacted by — and I, of course, do not fault them for that. Anyone having been on the receiving end of an injustice would indeed feel entirely the same way, and — honestly speaking — it is not a sentiment that I can say I haven't shared in and experienced myself. However, I would like to invite a similar consideration and appreciation for some of the broader issues to which I myself, and those whom I was once alongside — and those, perhaps, having stood where I stand today — have been exposed and come to be embroiled, irrespective of ones position to those broader issues.

My early childhood was typical of that of most children growing up

in a working-class household in the West, with the only real exceptions being my mixed-race heritage and the passing of my father when I was two years of age, which required that my mother raise my older brother and I on her own.

I was raised a Christian, however, as I transitioned into early adolescence I became more conscious of, and began frequently interacting with, people of other faith backgrounds within west London's diverse area of Notting Hill — most notably those of its North African Muslim community. I was immediately struck by their natural attachment to their religiously influenced, and indeed admirable, cultural traditions and norms, which were observable even amongst the youth and those Muslims who themselves were not particularly religiously observant.

Amongst practicing Muslims I would notice an aura of humility, and upon my first visit to a mosque, as a non-Muslim, I was humbled by the manifestation of that humility reflected in the manner with which they conducted their collective prayer, and the general atmosphere of calm and serenity that seemed to permeate throughout such a place of worship.

I was often warmed, and at times overwhelmed, by the widespread custom of hospitality practiced by the Muslim community as a whole, and I was further taken aback by the genuine bond of brotherhood existing between them — a fraternity that seemed neither to distinguish between colour nor that of language or ethnicity, but rather, instead, unifying residents of the globe, those stretching from the farthest East unto the utmost West.

Most striking to me of all, however, was their clarity of belief and their unwavering adherence to the concept of strict monotheism (the belief in

the one, single, and eternal Creator, distinct and incomparable to His creation), a simple, yet fundimental, belief to which I was in absolute agreement, and one that I had already affirmed internally.

Upon closer study I discovered that present within the Islamic faith were those Biblical Prophets of whose traditions I was already familiar with, due to those Christian influences growing up — with the only notable distinctions being; an emphasis, within the Islamic narrative, on the exceptional and impeccable character and conduct of all the Prophets alike, and their uncompromising belief and unrelenting persistence in inviting towards the worship of the One God.

Convinced of Islam's authenticity, the only reasonable choice for me was to embrace the conclusion of my findings, hence — at the age of nineteen — I verbally pronounced the Muslim testimony of faith, the 'Shahādah' (the bearing witness that; 'There is none worthy of worship except God alone, and that Muhammad is indeed His servant and messenger). I would view my conversion to Islam, not as an abandonment of Christianity — at least not as embodied in the actual words of Christ himself, as I had come to learn them — but rather a renewal of commitment to the traditional understanding of the Prophets of old, and an acceptance of, what I determined to be, the divine continuation of its original message. I would later go on to read, listen to, and watch numerous scholarly debates on some of the theological issues of contention between the two faiths of Islam and Christianity, and participate in many myself — which affirmed for me my own prior conclusions and served to solidify my conviction in Islam.

Although having formally accepted Islam at the age of nineteen, there was not an immediate lifestyle change, and I remained entrenched in criminal activities to which I had been drawn towards in my early

adolescence.

Criminality was very much prevalent within the area of London in which I grew up, and while, as a child, those social ills present within my community may have initially seemed alien to me — given my decent home upbringing and my mothers efforts, and ability, in providing a home atmosphere that was able to curtain some of the unpleasant and unfortunate realities of our surroundings — I would later be overwhelmed by the enticements of criminal life, and thus eventually succumbed unto its lures. Such a lifestyle led me on a downward spiral of criminality, violence, and an erosion of character and values. My early engagement in such activities began with very minor delinquency and then gradually escalated.

Throughout my involvement in criminal activity I continued to remain family oriented which — in turn — granted me a sense of scruple and kept me, somewhat, conscientious and grounded, as such family interactions would serve as regular reminders of those home instilled values.

In late 2005/early 2006 I arrived at the decision to abruptly abandon all of my criminal activity, along with the consumption of alcohol, my marijuana use, and what I then began to view as a decadent life. Although religion appeared to be the driving factor influencing this drastic reformation, it was also aided by a domino of significant events and almost two years of reflective and conscious decision making.

Despite my transformation there remained, undeniably, residual effects which — although, many of which, no longer impulsive characteristics causing harm — still held the potential of being summoned upon. There were those residual effects, however, that remained instinctive, and were more distinct when observing ones reaction to a threatening situation or hostile enviroment,

5.

whereby in such circumstances one might mechanically shift to a state of hypervigilance and combat readiness, or otherwise remain stoic and indifferent.

It became difficult to view these lingering traits entirely with contempt, as, for better or worse, such prior life experiences drilled in me a sense of vigilance that would keep me alert to danger and threats, and equipped me with a dexterousness that would ultimately assist in my survival — however, they also built up in me a certain degree of, undesirable, tolerance for violence that would later enable me to endure some of the more brutal aspects of war that I would come to be exposed to and later engage in.

When looking back retrospectively — not that I can truly say that this was lost on any of us at the time — it becomes quite clear that it was those very traits that would, for the most part, allow us to climatize to war alot faster than others, and render us more eligible for the roles that we would come to assume once within the Islamic State.

When beginning my new life as a practicing Muslim, in early 2006, I encountered a variety of schools of thought, however, the most prevalent amongst young Muslims of my generation was the Salafi school of thought — which, in fact, consists of a spectrum of trends. A growing trend in my part of London at the time — whilst, perhaps, spreading within communities across the wider Muslim world at an equal rate — was the Salafi-Jihadi trend. More significantly, its presence, appeal, and number of adherents was further beginning to increase with the proliferation of the net and the dawning of social media. Such platforms would go on to serve as mediums and outlets by which one could obtain the latest news and updates on the, previously underreported, ongoing wars that were being waged on Muslim soil — and

footage the likes of which mainstreme media would generally avoid showing out of fear of enciting Muslim anger, or as they sometimes would like to put it; out of fear that it "might help the terrorists".

The Salafi-Jihadi appeal was fairly evident in that, — despite some of its shortcomings in the realm of jurisprudence — it was able to offer practical, scripture based, solutions for confronting the difficulties facing the Muslim world; such as threats and hostilities from external entities, and the tyrannies of despotic domestic regimes. You would be unlikely to find much of alternative solutions anywhere else, as most religious leaders would typically remain silent on such issues; either out of embracement of an extreme secular thinking, that has always been alien to most Muslims and their faith; or from fear and discomfort to speak openly on such issues, due to a new climate of political correctness and self policing that would tend to discourage even peaceful activism.

Despite having turned towards Islam during a turbulent period in which Jihad was being practically criminalized around the world, I was able to catch the remnants of a different era. A time, not too long ago, — particularly from the early 80's, up until the late 90's — wherein able bodied Muslim men were granted free passage to leave, and return unhindered, from their respective, and even Western, countries in which they lived in order to travel and participate in armed Jihad in the theatres of Afghanistan, Chechnya and Bosnia. Particularly in the case of the Afghan Jihad against the Soviets, such individuals were oftentimes even championed, by Western leaders and media, as being heroes and freedom fighting mujahideen. Though that all came to an end with the subsequent shift in politics, Jihad, nonetheless, remained an integral part of the religion for Muslims.

The abundance of references and injunctions on Jihad in Islamic text made

it near impossible, for a Muslim, possessing even basic knowledge, to credibly refute or deny its general concept. Its application, however, — and particularly as it relates to its protocols, and determining what might be considered to constitute the legitimate use of force within the framework of modern warfare — has been, somewhat, a matter of contention in our current era.

Given my proximity and exposure towards the Salafi-Jihadi school of thought at the time, it was that particular trend that essentially defined my early understanding of Jihad, and I would tend to defer to the learned figures from amongst the Jihadi insurgent groups themselves, and their advocates, in order to understand their justifications for their tactics in light of religious text.

My approach to this school of thought would follow in the same method with which I generally approached faith, that is; that I would embrace it with conviction while avoiding fanatism. I would regularly engage in constructive dialogue and debate with those with whom I differed, and I would always be open and prepared to rectify my understanding in response to a sound argument — provided that it was evidence based.

Though my grasp of the Arabic language — the original language of Islam's sacred text — at the time was fairly primitive, I nonetheless felt reassured in the soundness of the particular understanding of the religion that I had arrived at and adopted, as I found it capable of withstanding the majority of arguments thrown its way.

My life as an observant Muslim began during the height of the U.S. led military campaigns and occupations of Iraq and Afghanistan, and post 9/11 and 7/7 (London), whereby anti-Muslim sentiments in the West were at an unprecedented high.

My early perception of the U.S. was primarily shaped by the strong cultural influence it'd had upon my childhood years and young adult life — by way

of its media and arts.

The events of 9/11 — the precursor and justification for the two invasions, and the continued War on Terror — occurred prior to my conversion to Islam, and during a time when I still held a favorable view of the United States. Despite that, however, — and as shocked as I was by what had occurred — the events never seemed to invoke in me the same level of emotions of sadness and outrage that I would come to feel once having learnt of some of the consequences of the subsequent invasions. There is no doubt that those later sentiments would, primarily, spring from my devotion to my new faith, although adequately upsetting and galvanizing was the mere sight of U.S. military might being deployed, disproportionately, in an effort to subdue a rag-tag, yet determined, group of insurgents and their civilian populations. A spectacle that seemed, for me personally, more reminiscent of that of the playground or neighborhood bully strong-arming the weak and indefensive. I would be greatly affected by footage emerging from the conflicts — scenes of women, elderly, and children, many of whom already poverty stricken, weeping in front of bombed-out homes. One could read within the expressions on their faces their sense of indignation, impotence, and dispair. Who would provide them with arbitration and justice, while the perpetrators themselves were the world's policemen?

Instinctively, I began to harbor a feeling of affiliation, kinship, and intimacy with those fellow Muslims whose lands I was now seeing being bombarded and occupied. Their geographical distance was of little consequence or consolation to me, neither the fact that they spoke not my language, nor that our skin colours were of a different tone, instead the bond that I now shared with them seemed to, essentially, transcend and supersede all other cultural affiliations of which I had once identified and subscribed to.

Subsequently, the positive perception of the U.S. that I had generally once held very quickly began to diminish. This was exacerbated by the trends that were beginning to emerge from the two conflicts; such as the abuses that were occurring at U.S. run prison facilities and black-sites in various parts of the world, and in particular; those carried out against inmates at the U.S. run Abu Ghraib prison facility in Iraq, and the inhanced interrogations, torture and abuses occurring at Guantanamo Bay — some of whose victims, upon their release, I would later come to know and befriend. Likewise, there were the resulting effects of U.S. and allied airstrike campaigns, which were leaving tens of thousands of civilians killed and maimed, and destroying homes, livelihoods, and infrastructure in their wake — injury and destruction that would reverberate long after the invasions and eventual draw-downs, and would not be as easily forgotten by its victims (citizens of Afghanistan and Iraq alike, in addition to those veterans of the conflict on either side), as it would be by the bureaucrat decision makers and the rest of the world.

Busy celebrating the wars — whilst championing those invading as liberaters — mainstreme media tended to overlook the human cost of the invassions and how it was truly impacting the lives of the local civilian populations; those living outside of the artificially prosperous, green zone, bubbles. News outlets also became platforms in which demonizing and dehumanizing rhetoric was espoused, spewed from the mouths of prominent figures and senior politicians, towards the people of the region and those of the wider Muslim world — serving only to inflame animosities.

This was all occurring within a period in which I was experiencing a hightened sense of political awareness, — with a specific interest in what was happening in the Middle East — and while I was beginning to question the status-quo

of the current global order more generally, one that clearly seemed to favor the interests of some at the expense of others.

The consequential effect of such, consistantly Western, interventions into, predominantly Muslim, countries that were so geographically dispersed — on the grounds of fighting a War on Terror — left myself, and many others within the Islamic world, little room for doubt in concluding that it was, in fact, our religion that was under attack.

All of what I was observing, ultimately, led me to view much of U.S. and Western foreign policy, towards the Middle East and the greater Islamic world, with much disdain — and, evidently, it would be that same disdain and resentment that would galvanize me throughout my later involvement with the Western captives.

In spite of those feelings of mine love was not entirely lost, and the resentment and hostility that I began to harbor was not indiscriminate and blind, and it certainly did not extend to all Westerners or non-Muslims. I still felt some form of affiliation and connection to the country and city in which I was born and raised, and — while I may have been the only Muslim convert out of my predominantly Christian family — my deep love for all of my relatives never subsided, neither did my fondness and regard for non-Muslim neighbors and friends.

The state in which I found myself was one of a strong resolve to place myself amongst those whom I saw on the receiving end of an aggressive Western foreign policy, in order that I might share in their experiences first-hand and relieve myself of the guilt that I felt from inactively watching their suffering from afar. If that were unachievable, then I would travel anywhere else in the world wherein Muslims were resisting an existential threat, or where, perhaps, they were simply just trying to establish for

themselves a society founded upon Islamic principles and values.

I had lost a great deal of esteem and trust in many of the Imams and religious leaders in the West, — and thus balked at any idea of seeking their consultation or advice regarding my decisions — as it seemed that they had very little to ever say or offer in way of solutions to the challenges confronting the Muslim world.

After learning of the repression and atrocities carried out in Syria against fellow Sunni Muslims, at the hands of the sectarian led government, through its military and security apparatus, — in addition to losing two very close friends of mine from the U.K. to the conflict in March of 2012 — I became resolute on traveling to Syria.

The decision to leave my home in London weighed heavy on me for many reasons, but primarily it was the reality of being separated from Kith and Kin — and in particular my, then, only daughter who was merely eight years old at the time — that weighed heaviest of all. Despite the weight of this decision, I departed the U.K. for Syria in late 2012, in tribute to my two fallen companions and in aid of supporting fellow Muslims in what I saw as a worthy cause and a religious duty.

By my third day, upon arriving into Syria, I was set to see and experience my many firsts; my first military operation, whilst freelancing with a handful of friends from the U.K., some other Westerners, a group of Libyans and a Free Syrian Army unit; my first time holding and firing an assault rifle; my first time being shot at; my first time experiencing the piercing sound of a fighter-jet missile hurtling over my head; my first time having mortar rounds and artillery shells fired at my position; my first time seeing a dead body, two Syrian government soldiers whose bodies had been left in the sun to bloat and rot; my first time losing a close

friend to a military operation in which I was present — setting the tone for what coming days, months, and years were likely to bring, if I survived. Shortly after, I naturally sought out — from amongst the conflicts multitude of, diverse and incoherent, factions — those entities that held beliefs and aspirations that were closest in alignment to those of my own at the time. By late 2012 there existed countless fighting factions and groups within Syria, and their abundance soon gave way to feudal confrontations. Exhausted by the Syrian oppositions disunity, disarray, and partisan rivalries, I became convinced that the only, viable, way of unifying these entities — whilst consolidating our gains against the government, and salvaging that which could potentially be lost — was by way of a speedy return to the Islamic standard of a Khilafah (Caliphate) system.

Practically all of the major opposition factions in Syria at the time — both, quote-on-quote, moderate and otherwise — maintained that their end goal was, in fact, a return to the Khilafah model of rule, or minimally some form of Islamic governance. However, the only entity that appeared to be taking tangible, unapologetic, steps towards actualizing this goal was the Islamic State. Based on that conclusion, I eventually joined them, offering my formal pledge of allegiance in early 2013.

Born out of the insurgency which arose to confront the 2003 U.S. military invasion and occupation of Iraq, the Islamic States long simmering conflict with the United States military and intelligence, and their local allies, — upon the outbreak of civil war in Syria, and the Islamic States subsequent enterance into that arena — then spilled over into the neighboring country. It was in Syria where covert actions, conducted by both the U.S. and the Islamic State, gradually shifted towards a more overt form of confrontation, reigniting a conflict that had appeared, to most observers, to be slowly abating — especially

13.

after the Obama administrations decision to pull-out of Iraq in 2011. This renewal of hostilities, and expansion of the conflict across the border, invited into the fray all of those, like myself, who had joined the Islamic State while in Syria — and who had, thus far, been busily engaged in combating the Syrian regime of Bashar al-Assad. It also left many outside spectators bewildered as to how — within the midst of a local civil war in Syria — the U.S. had come to be engaged, once again, militarily with the Islamic State. The insistent reluctance, and even outright dismissiveness, in offering to provide an honest and comprehensive depiction of the Islamic State, the causes for its rise, and life within its territory — in addition to some of the stereotypical portrayals of its leadership, fighters, and staff — has done little in way of providing any meaningful insight. In fact, the absence of such an insight has, instead, given way to inaccurate depictions that do not seem to always entirely correspond with the lived experiences of many of those having once resided within Islamic State territory.

A more crucial consequence of lack of insight, is the failure to answer some very basic, yet fundimental, questions; such as the question of how, or why, multitudes from Muslim communities worldwide, — from various walks of life — in addition to large segments of the populations of both Iraq and Syria, came to join, support and loyally embrace the Islamic State as a government, in spite of its propagation of violence (a reality, perhaps, reflected in the sobering contrast presented by a well-known British author and columnist, when he stated that; "...by 2015, more British Muslims were fighting for ISIS than for the British armed forces.").

In a Harvard Kennedy School, Shorenstein Center discussion paper series, published in 2016 on a related topic, its author wrote; "One sided journalism has its risks. After Paris [the 2015 Paris attacks], much

coverage presented a caricature; ISIS was mad or bad. Perhaps ISIS is both but such reporting does not tell you, for instance, why ISIS still has support in Mosul or Ramadi.... A failure to understand and to empathize with the enemy — which comes from a lack of honest reporting — leads to terrible mistakes by governments and nations. We need more not fewer voices from the other side of the frontline." Similar reflections have been expressed in the past, such as that of the statement of Ronald Spiers, a former U.S. ambassador to Turkey and Pakistan, who said; "Robotic repetition of 'because they hate freedom' does not do as an explanation." Others, like former CIA man — and author of the book 'Imperial Hubris' — Michael Scheuer, have been less subtle and reserved in their criticisms of the perpetuation of such wholesale caricatures.

If the proclivity for violence of portions of the Islamic States senior leadership, and its media departments aggressive pursuit in projecting an image of ruthlessness, was expected to have been sufficient grounds to have spurred its adherents to desert its ranks and abandon its territory and cause, then allow me to affirm; that those of us having spent enough time in the Syrian conflict — or that of Iraq — recognized, and understood, that the Islamic State certainly held no monopoly over the use of violence. The widespread brutality, to which every party to the conflict was engaged, was plain for all of us to see who had eyes — in a war whose major component appeared to consist of each party's ability to outdo the other in ruthlessness and savagery.

Moderate estimates have suggested that the U.S. led coalition, alone, launched at least 112,000 bombs and missiles against the Islamic State and its governed territory, during a five year period of combat missions, dating between 2014 and 2019. To put that into some

perspective; that equates to roughly 61 shrapneled explosions a day, or 2.5 shrapneled explosions per hour, daily, over a five year duration. Of course that figure does not account the number of Russian cluster and vacuum bombs, guided missiles, and other ammunitions — in concert with Syrian Armed Forces' infamous barrel bombs, MIG fighter jet bombs and 30mm machine gun rounds, and Iraqi, Iranian and Turkish drone rockets, artillery shells, and ballistic missiles — launched and fired indiscriminately upon villages, towns, and cities across Syria and Iraq throughout the entire duration of the conflict.

What those bombs did to the human body one could not dream of achieving with a knife or medium-light weapon. They would level multi-storey buildings, leaving residents and relatives to dig and ply the mangled limbs, and strewn bits of flesh and meat, of their loved ones from smoldering concrete and twisted beams of steel.

The war from its very onset saw the massacre and slaughter of civilians, — in which even children were not spared — sadistic executions, and the torture, rape, and mutilation of captives, all carried out by Syrian government forces, it allies, and some of the conflicts various actors. Such brutal aggressions were never irrelevant or inconsequential for those living through them, and as for those of us fighting in Syria or Iraq under the Islamic States banner, these events would ultimately have implications and factor into our own decision making and actions — and those subsequent decisions of our leadership and their commands.

Essentially, no matter how deplorable some of our own actions may have seemed in isolation, they would not seem so greatly disproportionate to those carried out by our adversaries. Meanwhile, those gut wrenching scenes that we were being bombarded with on the ground, would consequently

diminish and destroy any prior aversion or apprehension that we might have had towards engaging in certain such actions, had we otherwise been in a normal peacetime setting.

Allow me also to affirm clearly that; while I could not, and would not, claim that I was opposed to all that I was engaged in while in Syria, and operating within the Islamic State, it would be likewise wrong to assume, or claim, that I was in agreement with all of its decisions and policies. There were always matters to which I had my own personal opinions and reservations, and even objections and disapprovals — some of which even pertaining to the foreign captives, despite my own respective roll with them. For those reasons I am at times slightly reluctant to use such terms like; remorse, so broadly or generally, as I recognize that it can, in some ways, denote that one was perhaps once approving of those things that one may have naturally objected to out of principle, — and even inadvertently give the impression of ones actual involvement in instances for which one was neither present nor participant to — while simultaneously suggesting a condemnation that would infringe to encompass some of those things which one may have partook in out of conviction.

Contrary to what might have been perceived, no malice was harbored, personally, towards the captives, nor their families. There was, undoubtedly, an element of indifference to their plight, which perhaps was amplified and reenforced by a war environment in which indifference proved to be a necessary coping tool. Despite that, however, one could not help, at times, but find oneself moved by the pleas and emotions communicated by the relatives of the captives — or those of the captives directed to their families. Similarly there was — beyond the rough treatment and harsh rhetoric — a feeling of sympathy for those held captive; who, themselves, were not the intended target

of our hostilities but rather had found themselves dragged, involuntarily, into a conflict of which they probably understood little of its broader implications. Such sentiments, however, were often brief and momentary, and rarely ever manifested themselves by way of expressions. This was due to a number of reasons, the principal of which being that; ultimately I, much like those alongside me, viewed things from the perspective of a soldier executing his duties for which he'd been tasked. Thus the majority of our actions and conduct, concerning the captives, were intentional in the aim of advancing the negotiation objectives — a task which we had formally been assigned. Those objectives were, evidently, political in nature and approached as a stratagem of war, whereby we — the less advanced party to the conflict militarily — sought to influence U.S. and Western hostile policies towards the Islamic world. The asymmetrical disposition of the conflict lead to pragmatic and unconventional tactics being deployed, such as the capture and detention of non-combatant Westerners and holding them for political ransom. The general perception amongst us at the time was that only through such means were we able to confront a militarily superior adversary; one that was well fortified, who fought us through air campaigns and proxies, and had itself demonstrated the capacity to be as equally ruthless — the only distinction, in our view, was its internationally recognized mandate to do so. In retrospect I can say that; throughout our endeavors, there were actions that we took that demanded moral compromises — which, in essence, stemmed from our ocasional, yet convenient, neglect of religious injunctions on general conduct and combat etiquettes. This was, somewhat, rationalized as being the natural consequence and inevitable cost of duty within the confines of a harsh and imbalanced war.

One might rightly call out the carelessness of our actions, and certainly it can

be argued how they served to harm, not benefit our cause. However such logic, while far from the thick of battle and all its turmoils, is far too easily proposed, and even easier when there is no invested interest in the conflict — nor the safety and survival of loved ones resting upon its outcome. While I may fairly easily proclaim here, with full conviction, that there should never be any rationalization for the abandonment of principles — regardless of the cruelty and unfairness of the actions of others, and irrespective of the transient gains to be acquired through such compromise — I must also acknowledge the difficulty in arriving at such a clear-headed realization, whilst engulfed by the hardships, challenges, and complexities that typically accompany theatres of war.

The Syrian War — I guess much like many a war — was one that showed little mercy. Its tragedies and fierce hostilities, and the bitterness that those produced, were often imposing, overwhelming and unrelenting. A conflict that was able to transform a once beautifully scenic and historical land — one in which Prophets once resided and humbly traversed — into a raging furnace of a war environ that would go on to consume the lives of thousands, thus one can only wonder as to the extent of its effects upon the souls and psyche of its people.

It was where local, regional, and competing global powers were drawn, thereby cultivating an environment in which there would be; the demonstration of strength of force and the display, through practical use, of advanced military hardware and technology — the brunt of which being bore by our families, friends and neighbors from amongst the civilian population.

Its frontlines symbolized carnage, with conventional, trench, and urban warfare the likes not seen since some of the great wars of the past. Wherein funerals and formal burials for fallen comrades was a luxury, as retrieving the bodies

of those killed was oftentimes a near impossible task, and whenever those who — perhaps driven by emotion — ventured to dare, in most cases perished themselves.

It was where tragedies, usually, wound up being eclipsed by ones greater in magnitude and severity, leaving no time to amply digest events. Where one lost friends in quick succession and where crying became fatiguing, thus tears were reserved for those extremely close and dear. Therein a soldier might return home having survived battle, only to discover upon his arrival that his wife and child — though far from the battle fronts — were not as fortunate as he, as his residence had been reduced to rubble by a precision missile airstrike. It was an environ unlike any other, in that ones morning stroll through the city, after a round of night air raids, could be brought to a halt by rescue efforts and the disturbing surreal sight of the, immaculate, severed arm of an infant girl set neatly asside alone on the sidewalk, while the search to find what remained of her continued. A place whereby, at one moment, one might be bouncing a child on ones knee to the sound of their joyful giggles, whilst in the next; pulling that same childs lifeless body from beneath rubble. It was a place wherein those differences that one might have once been able to debate with civility, were now being settled with artillery shells, ammunition rounds and bombs. This was not solely out of militancy or the easy accessibility of weapons, but rather it was the high stakes that ultimately prevailed in cultivating an atmosphere furtile for escalation.

It was where the lines between justified and unjustified got constantly blurred within the commotion of the conflict, and where divisions and rivalries evolved into disputes and hostilities that thrust one into armed and bloody engagements with former friends, allies and co-religionists, — at times with scarce opportunity to debate the religious legality — thus how much less

was our concern for an outsider and those who shared not our faith.
Thus in light of all that, unfortunately, little-to-no-time was spent dwelling
upon certain such sentiments towards the captives or their families — at least not
in any deep or meaningful way that perhaps might have prompted me to
reconsider some of my actions. We hadn't the luxury of investigating and
assessing how we felt at given times, or how the conflict may have been
influencing or effecting us mentally or emotionally. Our lives were simply
humming along to the drum beat of war, as it continued in a perpetual motion
— intensifying, but never abating. We were living our lives day-by-day,
uncertain of what the next hour would bring, thus there were always more
pressing issues and immediate concerns demanding our attention.

It wouldn't have been unreasonable to have summarily described us as
a people brutalized by war, led by a cadre of individuals who, themselves,
had been brutalized and scarred by years of conflict, captivity and
combat. However, were it to be asked; if we had, perhaps, lost some of
our humanity? I would have to say with all honesty that I could not
decisively answer that question with such simplicity. My own experiences
taught me to avoid any attempt to provide sweeping diagnostics to real human
issues, and any short flat answer to such a question would likely ignore
those relevant factors and necessary considerations. War, even with the
most noblest of intentions; such as aiding the oppressed, entailed humans
killing and being killed, thus — in war — humanity had its own unique
understanding, as conditions denied the impartial application of ones
humanity in such an environment. Of course one could not simply stop
caring anymore, however, caring 'too hard' — and about; too much — in
such a relentless place, could become tiresome upon the soul. The
frequent endurance of disturbing scenes and distressing situations made one

wearisome when constantly absorbed. So we, instinctively, conditioned ourselves to suppress feelings — slowly dampening our emotions — until we developed a layer of numbness that would cussion against the impact of trauma and the pain of tragedy and loss.

No words seem to quite suffice when attempting to articulate the realities of the war in Syria. What might one say of a war having claimed the lives of over half-a-million people? However much ones conveyance might sound sensationalized, it would never quite parallel the actual experiences of those having lived through the conflict.

While the civilian nature of this court setting, and its mandatory life statute, has denied the opportunity for any consideration as to the proportion of my actions within the context of their circumstances, I nonetheless felt it necessary and appropriate to share that context, in that it may, perhaps, offer just a glimpse into the kind of enviroment and atmosphere unto which the events of this case unfolded.

When addressing injustices having occurred in Syria — particularly those of which I was party or participant to — there is a natural tendency to want to retort with words of reflection likely to be construed and typified as; 'whataboutism'. However true any such characterization, it does nothing to denigrate that deep sense that; any admission of wrongdoing in the absence of such a reflection would be to almost ignore — and, perhaps, even validate and justify — those actions of Western governments that resulted in similar disruption and violence, and the unwarranted killing of civilians. That is not to diminish my own wrongdoings, nor out of a show of defiance intended to shame anyone else, but rather it is born out of my own strong feelings towards the inequity with which the lives of non-Westerners are treated. Such disparity is something that I have always found unsettling, and it has

been a reality that I have lived and that has, tragically, struck home for me on more than just one occasion, causing me to have to shoulder the burdensome responsibility of those peoples memory. Thus to entirely abstain from their mention — whilst acknowledging the sanctity of others lives — would be, for me personally, tantamount to a betrayal of those individuals, and a depreciation of their memory and their, equally, valued right to existence. Perhaps it is the mere misfortune of being a victim of Western actions and policy — whilst not being a Westerner oneself — what deprives one of that privilege of advocacy that would tend to grant that similar courtesy; of having ones life acknowledged, or ones death investigated and prosecuted, in the same manner of respect in which others would typically be dignified.

One finds validity in these reflections when contemplating the likes of the Navy Seal, Eddie Gallagher, who — within the same conflict to which the events of this case transpired — was able to walk away free from a military tribunal of his peers, after being accused and tried for war crimes; which included the slaughter of an Islamic State captive of war and the intentional sniping of elderly and child civilians, during the 2017 military campaign to capture the city of Mosul in Iraq. Or the likes of the Blackwater, contracted security, employees whom were found guilty, on Federal charges, for their, deliberate, targeted killing of unarmed civilians in Iraq, only to receive a presidential pardon after serving a mere few years of their sentence.

My, somewhat, discomfort with open admission of wrongdoing has never been more as acutely felt, than whilst in the presence and forum of an entity (the U.S. government) who itself has yet to openly recognize any culpability in its role in the perpetuation of a conflict that has, objectively speaking, been a catalyst for such incidents as those with which I was involved and have plead guilty to. There have been rare instances in which such recognitions

were publicly announced. However, the obscurity of the source outlets, and the subtlety with which those admissions are communicated, very much narrows the chance of that message ever being received by the wider public — thereby hindering any real prospect for serious debate or discussion as to the cause and effect of actions and policies taken by government in the name of its citizens. One such example is what the Pentagon concluded in its November 2004 Defense Science Board (DSB) report, where it stated; "... Muslims do not hate our freedoms, but rather they hate our policies. ... American actions and the flow of events have elevated the authority of the Jihadi insurgents and tended to ratify their legitimacy among Muslims."

Whilst reading a book on the subject of 'The Troubles' in Northern Ireland, — the conflict between the British government and its Loyalist forces, and that of the armed Irish separatist movement of the IRA — by the author Patrick Radden Keefe, I stumbled upon a paragraph that seemed to captivate some of what I felt regarding the broader issues surrounding my case, it reads; "People in Northern Ireland talked about the danger of a 'hierarchy of victims'. Outrage is conditioned not by the nature of the atrocity but by the affiliation of the victim and the perpetrator. Should the state be accorded more leniency because, legally speaking, it has a monopoly on the legitimate use of force? Or conversely, should we hold soldiers and cops to a higher standard than paramilitaries?"

If we were to require an impartial and critical reflection on those entities, or individuals, party to the conflict, and all their deeds, — whomever they were and whatever their affiliations — one would be hard pressed to clearly identify those unblemished goodies and badies, heroes and villains, or those evil devoid of good and those good possessing no evil. Media depictions

24.

offering such narratives, from my experience, rarely held true in real life.
One might find causes more nobler than others — however even that would
depend on where you stood ideologically. There were, however, those whom
might simply be defined as, unfortunate victims; those who were not directly
party to the conflict, but were nonetheless subject to its whims and those of
its leaders and participants.

War, in and of itself, can be a somewhat sobering experience, although — once in
the thick of it — it rarely offers its participants that valuable opportunity to
pause and reflect. My removal from such a fast paced conflict has allowed me time
to scrutinize my years spent in its engagement. Upon my reflections I have
dwelt on both the good — and, certainly, even amidst the ugliness one found
good — and the bad. My mistakes, and their lessons. I can say now, with
hindsight, that there were many things that I would have done differently.
However, such is hindsight!

I do not profess to having undergone a dramatic transformation of thought,
although I would like to emphasize that I have found most characterizations
of my thinking — thus far — to be speculative, lacking comprehensiveness, and
seemingly catered to satisfy a desired narrative.

My views on some issues have altered over the years, — out of principle —
having gained a better understanding of my faith and its jurisprudence, and due
to some of my own experiences over the years. I would like to believe that
I have wisened as a man, particularly after marrying in Syria, and having
children, and establishing a family of my own. Family life provided — as well
as an escape and a refuge from all of the chaos — an increased sense of conscious
responsibility and duty, and an amplified appreciation for life. It also
sharpened my ability to manifest empathy and compassion — emotions and
feelings of which my engagement in war strove to blunt.

25.

My capture and subsequent imprisonment, and the torture and abuse that I was later subjected to, caused me to contemplate more reflectively over the ordeal of those held captive by the Islamic State — those of whose treatment I once held a shared responsibility.

To conclude, I declare full responsibility for all of my decisions and actions, therefore I cannot complain over that which has befallen me as of consequence. My life ahead will evidently be more limited and restrictive, in terms of freedoms, however it is a life that I — despite those limitations — intend on making the most of.

I remain committed to meeting with the victims and their families, and even welcome and invite any such engagements. Prior to any decision to transfer us into U.S. custody, — whilst in captivity — I had resolved that, if given the opportunity; I would voluntarily engage with any of those affected by the Islamic States foreign captives scheme, and perhaps my actions in particular. I held no expectations, neither was I entirely sure myself of what exactly might result through such engagements. I am, however, always optimistic with regards to dialogue and recognize its merits and remedial potential, as I have personally not experienced a situation whereby genuine, open, and respectful dialogue has ever resulted in anything less than; increased understanding, and a general betterment to that which had preceded it.

Sincerely,

Alexanda A. Kotey

# EXHIBIT C

**U.S. Department of Justice**

Criminal Division

*Office of the Assistant Attorney General*          *Washington, D.C.  20530*

LIMITED OFFICIAL USE

## MEMORANDUM

TO:                Ronald L. Davis
                         Director
                         United States Marshals Service

FROM:          Jennifer A.H. Hodge
                         Deputy Assistant Attorney General

SUBJECT:     Extension of Special Administrative Measures Pursuant to 28 C.F.R. § 501.3
                         for Federal Inmate Alexanda Amon Kotey

## SUMMARY

The current Special Administrative Measures (SAM) for federal inmate Alexanda Amon Kotey expire on November 24, 2021.  Based upon the information provided by the United States Attorney for the Eastern District of Virginia (USA/EDVA) and the Federal Bureau of Investigation (FBI), pursuant to 28 C.F.R. § 501.3, there continues to be a substantial risk that Kotey's communications or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of serious bodily injury to persons.  Therefore, I am requesting that you continue to implement the SAM to restrict Kotey's access to the mail, the telephone, visitors, other inmates, and the media.  The SAM will commence immediately upon expiration of the prior SAM authorization period and will be in effect for a period of one year, subject to my further direction.  The FBI and Counterterrorism Section of the National Security Division (CTS/NSD) also concur in this request.

## PROCEDURAL HISTORY

On October 6, 2020, Kotey was indicted in the Eastern District of Virginia on the following terrorism-related counts for his actions on behalf of Islamic State of Iraq and al-Sham (ISIS): (1) one count of conspiracy to commit hostage-taking resulting in death in violation of Title 18, United States Code, § 1203; (2) four counts of hostage-taking resulting in death in violation of Title 18, United States Code, §§ 1203 and 2; (3) one count of conspiracy to murder United States citizens outside of the United States in violation of Title 18, United States Code, § 2332(b)(2); (4) one count of conspiracy to provide material support to terrorists – hostage-taking and murder – resulting in death in violation of Title 18, United States Code, § 2339A; and,

LIMITED OFFICIAL USE

(5) one count of conspiracy to provide material support to a designated foreign terrorist organization resulting in death in violation of Title 18, United States Code, § 2339B.

On September 2, 2021, Kotey pleaded guilty to all counts in the indictment, and he faces a potential sentence of life imprisonment. Because of Kotey's proclivity for violence, the Attorney General authorized SAM on November 24, 2020. Kotey is currently being held by the United States Marshals Service at the Alexandria Detention Center (ADC) in Alexandria, Virginia. His sentencing hearing is scheduled for March 4, 2022.

## FACTUAL BACKGROUND

### A.    Kotey's Criminal Conduct

Kotey is a former fighter for ISIS who participated in a hostage-taking scheme that resulted in the deaths of several captives, including American citizens. Beginning in November 2012, and continuing until February 2015, Kotey, El Shafee Elsheikh (Elsheikh), Mohamed Emwazi (Emwazi), along with others, in consultation with senior ISIS leadership, supervised and committed physical and psychological abuse against hostages. The captives, who included citizens of the United States, the United Kingdom, Italy, Denmark, Germany, France, New Zealand, Russia, and Japan, were subjected by ISIS to deadly and harmful acts, including murder, being forced to witness the murders of other captives, mock executions, electric shocks, and being forced to fight one another.

Four Americans - James Wright Foley (Foley), Peter Edward Kassig (Kassig), Kayla Jean Mueller, and Steven Joel Sotloff (Sotloff) – were abducted as part of the hostage-taking scheme, and all four were killed while held captive by ISIS. Between August and October 2014, ISIS released videos of Emwazi beheading Foley, Sotloff, and other hostages. In November 2014, ISIS released video depicting Kassig's severed head.

Kotey, Elsheikh, and Emwazi (now deceased) were responsible for supervising the detention facilities at which the hostages were held, the transfer of hostages between facilities, and the abusive treatment of those hostages. For example, on April 25, 2014, Kotey, Elsheikh, and Emwazi transferred several European hostages to an isolated location in order for the hostages to witness Emwazi execute a Syrian prisoner. Per the indictment, Elsheikh videotaped the execution while Kotey instructed the hostages, who held signs pleading for their release, to kneel and observe the prisoner's death. From November 2013 to February 2015, Kotey and Elsheikh allegedly coordinated ransom negotiations via email. As a result of Kotey's active participation in the ransom scheme, the USA/EDVA believes that Kotey had knowledge that the release of the hostages was predicated on ISIS' receipt of large sums of money or concessions from the United States government, such as the release of Muslim prisoners.

LIMITED OFFICIAL USE

### B.    Continued Need for SAM

As the basis for continuing to impose SAM, the USA/EDVA cites Kotey's role as a committed member of ISIS who engaged in terrorism-related activities, which included hostage-taking and the commission of harmful physical and psychological abuse against those hostages. The USA/EDVA further believes that if he were permitted to have unfettered communications with others outside of prison, Kotey could continue to further ISIS' propaganda aims by encouraging violence, recruiting others to join or support ISIS, as well as to interfere with the administration of legal proceedings.

### CONCLUSION

Based upon information provided to me of Kotey's proclivity for violence, I find that there is a substantial risk that his communications or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of serious bodily injury to persons. Accordingly, I request that you continue to implement the SAM set forth below in order to restrict Kotey's access to the mail, the telephone, visitors, other inmates, and the media.

1.     **General Provisions**

   a.    **Adherence to Usual United States Marshals Service (USMS), BOP, and Detention Facility (DF) Policy Requirements -** In addition to the below-listed SAM, the inmate must comply with all usual USMS, BOP, and non-BOP DF policies regarding restrictions, activities, privileges, communications, etc. If there is a conflict between USMS/BOP/DF policies and the SAM, as set forth herein, where the SAM are more restrictive than usual USMS/BOP/DF policies, then the SAM shall control. If usual USMS/BOP/DF policies are more restrictive than the SAM, then USMS/BOP/DF policies shall control.

   b.    **Interim SAM Modification Authority -** During the term of this directive, the Director, Office of Enforcement Operations (OEO), Criminal Division, may modify the inmate's SAM as long as any SAM modification authorized by OEO:

      i.     Does not create a more restrictive SAM;

      ii.    Is not in conflict with the request of the USA/EDVA, FBI, USMS/BOP/DF, or applicable regulations; and

      iii.   Is not objected to by the USA/EDVA, FBI, or USMS/BOP/DF.

   c.    **Inmate Communications Prohibitions -** The inmate is limited, within the USMS/BOP/DF's reasonable efforts and existing confinement conditions, from

having contact (including passing or receiving any oral, written, or recorded communications) with any other inmate, visitor, attorney, or anyone else, except as outlined and allowed by this document, that could reasonably foreseeably result in the inmate communicating (sending or receiving) information that could circumvent the SAM's intent of significantly limiting the inmate's ability to communicate (send or receive) threatening or other terrorism-related information.

d.    **Use of Interpreters/Translators by the USMS/BOP/DF -** Interpreter/Translator approval requirement:

  i.    The USMS/BOP/DF may use Department of Justice (DOJ) approved interpreters/translators as necessary for the purpose of facilitating communication with the inmate.

  ii.   No person shall act as an interpreter/translator without prior written clearance/approval from the USMS/BOP/DF, which shall only be granted after consultation with the FBI and USA/EDVA.

  iii.  Interpreters/translators utilized by the USMS/BOP/DF shall not be allowed to engage in, or overhear, unmonitored conversations with the inmate. Interpreters/translators shall not be alone with the inmate, either in a room or on a telephone or other communications medium.

2.    **Attorney-Client Provisions**

  a.    **Attorney[1] Affirmation of Receipt of the SAM Restrictions Document -** The inmate's attorney (or counsel) -- individually by each if more than one -- must sign an affirmation acknowledging receipt of the SAM restrictions document. By signing the affirmation, the attorney acknowledges his or her awareness and understanding of the SAM provisions and his or her agreement to abide by these provisions, particularly those that relate to contact between the inmate and his attorney and the attorney's staff. The signing of the affirmation does not serve as

---

[1] The term "attorney" refers to the inmate's attorney of record, who has been verified and documented by the USA/EDVA, and who has received and acknowledged receipt of the SAM restrictions document. As used in this document, "attorney" also refers to more than one attorney where the inmate is represented by two or more attorneys, and the provisions of this document shall be fully applicable to each such attorney in his or her individual capacity.

an endorsement of the SAM or the conditions of confinement, and does not serve to attest to any of the factors set forth in the conclusions supporting the SAM. However, in signing the affirmation, the inmate's attorney and precleared staff[2] acknowledge the restriction that they will not forward third-party messages to or from the inmate.

      i.      The USA/EDVA shall present, or forward, the attorney affirmation of receipt of the SAM restrictions document to the inmate's attorney.

      ii.      After initiation of SAM and prior to the inmate's attorney being permitted to have attorney-client privileged contact with the inmate, the inmate's attorney shall execute a document affirming receipt of the SAM restrictions document and return the original to the USA/EDVA.

      iii.      The USA/EDVA shall maintain the original of the SAM acknowledgment document and forward a copy of the signed document to OEO in Washington, D.C., and the USMS/BOP/DF.

    b.    **Attorney-Client Privileged Visits -** Attorney-client privileged visits may be contact or non-contact, at the discretion of the USMS/BOP/DF.

    c.    **Attorney May Disseminate Inmate Conversations -** The inmate's attorney may disseminate the contents of the inmate's communication to third parties for the sole purpose of providing necessary legal services related to the inmate's defense or post-sentencing proceedings -- and not for any other reason -- on the understanding that any such dissemination shall be made solely by the inmate's attorney, and not by the attorney's staff.

---

[2] "Precleared," when used with regard to an attorney's staff, or "precleared staff member," refers to a co-counsel, paralegal, or investigator who is actively assisting the inmate's attorney with the inmate's defense or post-sentencing proceedings, who has submitted to a background check by the FBI and USA/EDVA, who has successfully been cleared by the FBI and USA/EDVA, and who has received a copy of the inmate's SAM and has agreed -- as evidenced by his or her signature -- to adhere to the SAM restrictions and requirements. As used in this document, "staff member" also refers to more than one staff member, and the provisions of this document shall be fully applicable to each such staff member in his or her individual capacity. A "paralegal" will also be governed by any additional DF rules and regulations concerning paralegals.

LIMITED OFFICIAL USE

d.      **Unaccompanied Attorney's Precleared Paralegal(s) May Meet With Client -**
The inmate's attorney's precleared paralegal(s) may meet with the inmate without
the need for the inmate's attorney to be present.  These meetings may be contact
or non-contact, at the discretion of the USMS/BOP/DF.

e.      **Simultaneous Multiple Legal Visitors -** The inmate may have multiple legal
visitors provided that at least one of the multiple legal visitors is the inmate's
attorney or precleared paralegal.  These meetings may be contact or non-contact,
at the discretion of the USMS/BOP/DF.  An investigator or interpreter/translator
may not meet alone with the inmate.

f.      **Legally Privileged Telephone Calls -** The following rules refer to all legally
privileged telephone calls or communications:

i.      **Inmate's Attorney's Precleared Staff May Participate in Inmate
Telephone Calls** - The inmate's attorney's precleared staff are permitted
to communicate directly with the inmate by telephone, provided that the
inmate's attorney is physically present and participating in the legal call as
well.

ii.     **Inmate's Initiation of Legally Privileged Telephone Calls** - Inmate-
initiated telephone communications with his attorney or precleared staff
are to be placed by a USMS/BOP/DF staff member and the telephone
handed over to the inmate only after the USMS/BOP/DF staff member
confirms that the person on the other end of the line is the inmate's
attorney.  This privilege is contingent upon the following additional
restrictions:

(1)     The inmate's attorney will not allow any non-precleared person to
communicate with the inmate, or to take part in and/or listen to or
overhear any communications with the inmate.

(2)     The inmate's attorney must instruct his or her staff that:

(a)     The inmate's attorney and precleared staff are the only
persons allowed to engage in communications with the
inmate.

        (b)      The attorney's staff (including the attorney) are not to patch through, forward, transmit, or send the inmate's calls, or any other communications, to third parties.

    (3)    No telephone call/communication, or portion thereof, except as specifically authorized by this document:

        (a)      Is to be overheard by a third party.[3]

        (b)      Will be patched through, or in any manner forwarded or transmitted, to a third party.

        (c)      Shall be divulged in any manner to a third party, except as otherwise provided in Section 2.d. above.

        (d)      Shall be in any manner recorded or preserved.[4]  The inmate's attorney may make written notes of attorney-client privileged communications.

    (4)    If the USMS/BOP/DF, FBI or USA/EDVA determines that the inmate has used or is using the opportunity to make a legal call to speak with another inmate or for any other non-legal reason that would circumvent the intent of the SAM, the inmate's ability to contact his attorney by telephone may be suspended or eliminated.

   g.    **Documents Provided by Attorney to Inmate -** During a visit, the inmate's attorney may provide the inmate with, or review with the inmate, documents related to his defense or post-sentencing proceedings and/or material prepared by the inmate's attorney related to such proceedings, so long as any of the foregoing documents are translated, if translation is necessary, by a precleared

---

[3] For purposes of the SAM, "third party" does not include officials of the USMS/BOP/DF, FBI, DOJ, or other duly authorized federal authorities when acting in connection with their official duties.  This section does not allow monitoring of attorney-client privileged communications.

[4] Except by the USMS/BOP/DF, FBI, DOJ, or other duly authorized federal authorities. This section does not allow monitoring of attorney-client privileged communications.

LIMITED OFFICIAL USE

interpreter/translator.  Any documents not related to the inmate's defense or post-sentencing proceedings must be sent to the inmate via general correspondence and will be subject to the mail provisions of subparagraphs 2.i. and 3.g.  Documents previously reviewed and cleared for receipt by the inmate, and already in the inmate's possession at the outset of the visit, may be discussed or reviewed by the inmate and the inmate's attorney during the visit.

    i.      None of the materials provided may include inflammatory materials, materials inciting violence, military training materials, or materials that may be used to pass messages from inmate to inmate, unless such materials have been precleared by the USA/EDVA and FBI.

    ii.     The USA/EDVA may authorize additional documents to be presented to the inmate.  If any document not listed or described above needs to be transmitted to the inmate, consent for the transmission of the document may be obtained from the USA/EDVA without the need to formally seek approval for an amendment to the SAM.

h.      **Legal Mail**[5] **-** The inmate's attorney may not send, communicate, distribute, or divulge the inmate's mail (legal or otherwise), or any portion of its contents, to third parties, except when disclosure of the contents is necessary for the sole purpose of providing necessary legal services related to the inmate's defense or post-sentencing proceedings -- and not for any other reason.

In signing the SAM acknowledgment document, the inmate's attorney and precleared staff will acknowledge the restriction that only inmate case-related documents will be presented to the inmate, and that the attorney and his or her staff are strictly prohibited from forwarding third-party mail to or from the inmate.

3.      **Inmate's Non-legal Contacts**

    a.      **Non-legally Privileged Telephone Contacts -**

---

[5] "Legal mail" is defined as properly marked correspondence (marked "Legal Mail") addressed to or from the inmate's attorney.  All other mail, including that otherwise defined by the USMS/BOP/DF as Special Mail, shall be processed as "non-legal mail."

LIMITED OFFICIAL USE

     i.       The inmate is only authorized to have non-legally privileged telephone calls with his immediate family members.[6]

     ii.      The quantity and duration of the inmate's non-legally privileged telephone calls with his immediate family members shall be set by the USMS/BOP/DF, with a minimum of one call per month.[7]

b.     **Rules for Telephone Calls -** For all non-legally privileged telephone calls or communications, no telephone call/communication, or portion thereof:

     i.       Is to be overheard by a third party.

     ii.      Is to be patched through, or in any manner forwarded or transmitted, to a third party.

     iii.     Shall be divulged in any manner to a third party.

     iv.     Shall be in any manner recorded or preserved.[8]

All telephone calls shall be in English unless a fluent USMS/BOP/DF- or FBI-approved interpreter/translator is available to contemporaneously monitor the telephone call. Arranging for an interpreter/translator may require at least fourteen (14) days' advance notice.

---

[6] The inmate's "immediate family members" are defined as the inmate's (USMS/BOP/DF- or FBI-verifiable) spouse, children, parents, and siblings. Requests for additional non-legal contacts may be submitted and will be considered on a case-by-case basis.

[7] Section 3.a.ii. permits the inmate to conduct a minimum of one non-legally privileged call per month with immediate family and, if applicable, other specified non-legally privileged telephone contacts approved by the Department of Justice. The SAM does not establish a maximum number of non-legally privileged calls the inmate may conduct per month as the quantity and duration of such calls are to be set by the custodial agency (USMS/BOP/DF). However, Section 3.a.ii. does not override the powers granted to the USMS/BOP/DF as set forth in Section 3.e. of the inmate's SAM.

[8] Except by the USMS/BOP/DF, FBI, DOJ, or other duly authorized federal authorities.

<u>LIMITED OFFICIAL USE</u>

    c.    **Telephone SAM Restriction Notifications -** For all non-legally privileged telephone calls to the inmate's immediate family member(s):

        i.    The USMS/BOP/DF shall inform the inmate of the telephone SAM restrictions prior to each telephone call.

        ii.    The USMS/BOP/DF shall verbally inform the inmate's immediate family member(s) on the opposite end of the inmate's telephone communication of the SAM restrictions. The USMS/BOP/DF is only required to notify the inmate's communication recipient in English.

        iii.    The USMS/BOP/DF shall document each such telephone notification.

    d.    **Family Call Monitoring -** All calls with the inmate's immediate family member(s) shall be:

        i.    Contemporaneously monitored by the FBI.

        ii.    Contemporaneously recorded (as directed by the FBI) in a manner that allows such telephone calls to be analyzed for indications the call is being used to pass messages soliciting or encouraging acts of violence or other crimes, or to otherwise attempt to circumvent the SAM.

        iii.    A copy of each telephone call recording involving an inmate/immediate family member shall be provided to the FBI by the USMS/BOP/DF. These recordings shall be forwarded on a call-by-call basis as soon as practicable.

    e.    **Improper Communications -** If telephone call monitoring or analysis reveals that any call or portion of a call involving the inmate contains any indication of a discussion of illegal activity, the soliciting of or encouraging of acts of violence or terrorism, or actual or attempted circumvention of the SAM, the inmate shall not be permitted any further calls to his immediate family members for a period of time to be determined by the USMS/BOP/DF. If contemporaneous monitoring reveals such inappropriate activity, the telephone call may be immediately terminated.

<u>LIMITED OFFICIAL USE</u>

f.      **Non-legal Visits -**

  i.     **Limited Visitors -** The inmate shall be permitted to visit only with his immediate family members.  The visitor's identity and family member relationship to the inmate will be confirmed by the USMS/BOP/DF and FBI in advance.

  ii.    **English Requirement -** All communications during non-legal inmate visits will be in English unless a fluent USMS/BOP/DF- or FBI-approved interpreter/translator is readily available to contemporaneously monitor the communication/visit.  Arranging for an interpreter/translator may require at least fourteen (14) days' advance notice.

  iii.   **Visit Criteria -** All non-legal visits shall be:

    (1)    Contemporaneously monitored by the USMS/BOP/DF and/or FBI, in a manner that allows such visits to be analyzed for indications the visit is being used to pass messages soliciting or encouraging acts of violence or other crimes, or to otherwise attempt to circumvent the SAM.

    (2)    Permitted only with a minimum of fourteen (14) calendar days' advance written notice to the USMS/BOP/DF facility where the inmate is housed.

    (3)    Without any physical contact.  All such meetings shall be non-contact to protect against harm to visitors or staff.

    (4)    Limited to one adult visitor at a time.  However, the FBI-verified children of the inmate may visit with a pre-approved adult visitor.

g.   **Non-legal Mail** - Non-legal mail is any mail not clearly and properly addressed to/from the inmate's attorney and marked "Legal Mail" (incoming or outgoing). In addition to non-legal mail from the inmate's attorney, as discussed in subparagraph 2.h., non-legal mail is only authorized with the inmate's immediate family, U.S. courts, federal judges, U.S. Attorneys' Offices, members of U.S. Congress, the BOP, or other federal law enforcement entities.

LIMITED OFFICIAL USE

i.   **General correspondence with limitations -** Correspondence is only
     authorized with immediate family members. The volume and frequency
     of outgoing general correspondence with immediate family members may
     be limited to three pieces of paper (not larger than 8 ½" x 11"), double-
     sided, once per calendar week to a single recipient, at the discretion of the
     USMS/BOP/DF. The identity and family member relationship to the
     inmate will be confirmed by the USMS/BOP/DF and FBI.

ii.  **General correspondence without limitations -** There is no volume or
     frequency limitation on correspondence to/from U.S. courts, federal
     judges, U.S. Attorneys' Offices, members of U.S. Congress, the BOP, and
     other federal law enforcement entities, unless there is evidence of abuse of
     these privileges, threatening correspondence is detected, circumvention of
     the SAM is detected, or the quantity to be processed becomes
     unreasonable to the extent that efficient processing to protect the security,
     good order, or discipline of the institution, the public or national security
     may be jeopardized.

iii. All non-legal mail shall be -

     (1)  **Copied -** Shall be copied (including the surface of the envelope)
          by the warden, or his or her designee, of the facility in which the
          inmate is housed.

     (2)  **Forwarded -** Shall be forwarded, in copy form, to the location
          designated by the FBI.

     (3)  **Analyzed -** After government analysis and approval, if
          appropriate, the inmate's incoming/outgoing non-legal mail shall
          be forwarded to the USMS/BOP/DF for delivery to the inmate
          (incoming), or directly to the addressee (outgoing).

iv.  The federal government shall forward the inmate's non-legal mail to the
     USMS/BOP/DF for delivery to the inmate or directly to the addressee
     after a review and analysis period of:

     (1)  A reasonable time not to exceed fourteen (14) business days for
          mail that is written entirely in the English language.

LIMITED OFFICIAL USE

      (2)    A reasonable time not to exceed sixty (60) business days for any mail that includes writing in any language other than English, to allow for translation.

      (3)    A reasonable time not to exceed sixty (60) business days for any mail where the federal government has reasonable suspicion to believe that a code was used, to allow for decoding.

   v.    **Mail Seizure -** If outgoing/incoming mail is determined by the USMS/BOP/DF or FBI to contain overt or covert discussions of or requests for illegal activities, the soliciting or encouraging of acts of violence or terrorism, or actual or attempted circumvention of the SAM, the mail shall not be delivered/forwarded to the intended recipient but referred to the FBI for appropriate action. The inmate shall be notified in writing of the seizure of any mail.

4.    <u>**Communication With News Media**</u>

The inmate shall not be permitted to speak, meet, correspond, or otherwise communicate with any member or representative of the news media in person; by telephone; by furnishing a recorded message; through the mail, his attorney, or a third party; or otherwise.

5.    <u>**Religious Visitation**</u>

   a.    If a USMS/BOP/DF- and/or FBI-approved religious representative is to be present for prayer with the inmate, the prayer shall be conducted as part of a contact or non-contact visit, at the discretion of the USMS/BOP/DF.

6.    <u>**No Communal Cells and No Communication Between Cells**</u>

   a.    The inmate shall not be allowed to share a cell with another inmate.

   b.    The inmate shall be limited within the USMS/BOP/DF's reasonable efforts and existing confinement conditions, from communicating with any other inmate by making statements audible to other inmates or by sending notes to other inmates, except as permitted in Section 1.c., above.

7.    **Cellblock Procedures**

   a.    The inmate shall be kept separated from other inmates as much as possible while in the cellblock area.

   b.    The inmate shall be limited, within the USMS/BOP/DF's reasonable efforts and existing confinement conditions, from communicating with any other inmate while in the cellblock area.

8.    **Access to Mass Communications**

   To prevent the inmate from receiving and acting upon critically timed information or information coded in a potentially undetectable manner, the inmate's access to materials of mass communication is restricted as follows:

   a.    **Publications/Newspapers -**

      i.    The inmate may have access to publications determined not to facilitate criminal activity or be detrimental to national security; the security, good order, or discipline of the institution; or the protection of the public. This determination is to be made by the USMS/BOP/DF, in consultation with the USA/EDVA. The inmate may correspond with the publishing company regarding technical aspects of the publication, i.e., availability of particular volumes, billing questions, etc. The review of this correspondence will be in accordance with section 8(a)(iii), below.

      ii.    Sections of any publication/newspaper that offer a forum for information to be passed by unknown and/or unverified individuals, including but not limited to, classified advertisements and letters to the editor, should be removed from the publications/newspapers prior to distribution to the inmate.

      iii.    If restricted by the USMS/BOP/DF rules, access to a publication will be denied. If acceptable, upon delivery, the USMS/BOP/DF will review the publication and make the initial determination. If the FBI's expertise is required, the publication will be forwarded to the FBI for review. The USMS/BOP/DF will also forward the publication to the FBI if translations are needed to make that determination. (In these cases, the FBI shall respond to the USMS/BOP/DF within fourteen (14) business days.) The

inmate shall then have access to the remaining portions of the publications/newspapers deemed acceptable, in accordance with USMS/BOP/DF policy.

    iv.    In order to avoid passing messages/information from inmate to inmate, the inmate shall not be allowed to share the publication(s) with any other inmates.

    b.    **Television and Radio -** The inmate is authorized to have television and radio viewing and listening privileges, in accordance with standard and applicable USMS/BOP/DF policies and procedures.

    c.    **Termination or Limitation** - If the USMS/BOP/DF determines that mass communications are being used as a vehicle to send messages to the inmate relating to the furtherance of terrorist or criminal activities, the inmate's access may be limited or terminated for a period of time to be determined by the USMS/BOP/DF.

10.    **Access to Books**

The inmate may have access to all books that do not facilitate criminal activity or present a substantial threat to national security or the security, discipline, or good order of the institution.  This initial determination is to be made by the USMS/BOP/DF and, if the USMS/BOP/DF determines that the FBI's expertise is required, the book(s) will be forwarded to the FBI for review.  In conducting its analysis, the FBI will determine whether the book advocates or promotes acts of terrorism or violence and/or whether access to the book by this particular inmate would pose a substantial threat to national security.

In order to avoid passing messages/information from inmate to inmate, the inmate shall not be allowed to share books with any other inmates.

11.    **Transfer of Custody**

In the event that the inmate is transferred to or from the custody of the USMS, BOP, or any other DF, the SAM provisions authorized for this inmate shall continue in effect, without need for any additional DOJ authorization.

LIMITED OFFICIAL USE

12.    **Inmate's Consular Contacts**

The inmate shall be allowed Consular communications and visits, consistent with
USMS/BOP/DF policy.  The Consular contacts shall comply with the U.S. Department of
State (DOS) Consular notification and access requirements.[9]  Prior to permitting any
Consular contact, the FBI will verify the Consular representative's credentials with the
DOS.

**CONCLUSION**

The SAM set forth herein, especially as they relate to attorney-client privileged
communications and family contact, are reasonably necessary to prevent the inmate from
committing, soliciting, or conspiring to engage in additional criminal activity.  Moreover, these
measures are the least restrictive that can be tolerated in light of the ability of this inmate to aid,
knowingly or inadvertently, in plans that create a substantial risk that the inmate's
communications or contacts with persons could result in death or serious bodily injury to
persons.

With respect to telephone privileges, the SAM are reasonably necessary because of the
high probability of calls to co-conspirators to arrange terrorist or criminal activities.

With respect to mail privileges, the SAM are necessary to prevent the inmate from
receiving or passing along critically timed messages.  Accordingly, I have weighed the inmate's
interest in the timely receipt and/or submission of mail, with the possible danger the contents of
the mail may pose to others.  I have determined that delaying mail delivery to allow authorized
personnel to examine a copy of the mail is the least restrictive means available to ensure that the
mail is not being used to deliver requests for, or to assist in, violent threats, and/or criminal acts
against government witnesses or others.

---

[9] *See* U.S. Dep't of State, Consular Notification and Access: Instructions for Federal,
State, and Local Law Enforcement and Other Officials Regarding Foreign Nationals in the
United States and the Rights of Consular Officials to Assist Them (2018),
https://travel.state.gov/CNA.

For more information, please contact the Bureau of Consular Affairs in writing at:
Consular Notification & Access, U.S. Department of State, CA/P, SA-17 12th Floor, Washington,
D.C. 20522-1712; via telephone at (202) 485-7703 or by email at consnot@state.gov.

To the extent that the use of an interpreter/translator is necessary, the government has the right to ensure that the interpreter/translator given access to the inmate is worthy of trust.

The SAM's prohibition of contact with the media is reasonably necessary. Communication with the media could pose a substantial risk to public safety if the inmate advocates terrorist, criminal, and/or violent offenses, or if he makes statements designed to incite such acts. Based upon the inmate's past behavior, I believe that it would be unwise to wait until after the inmate solicits or attempts to arrange a violent or terrorist act to justify such media restrictions.

The SAM's limitations on access to mass communications are reasonably necessary to prevent the inmate from receiving and acting upon critically timed messages. Such messages may be placed in advertisements or communicated through other means, such as the television and/or radio. I believe that limiting and/or delaying media access may interrupt communication patterns the inmate may develop with the outside world, and ensure that the media is not used to communicate information that furthers terrorist, violent, and/or criminal activities.

## SAM CONTACT INFORMATION

Any questions that you or your staff may have about this memorandum or the SAM directed herein should be directed to the Office of Enforcement Operations, Criminal Division, U.S. Department of Justice, 1301 New York Avenue, N.W., JCK Building, Room 900, Washington, D.C. 20530-0001; and telephone (202) 514-6809.