```
 1                    UNITED STATES DISTRICT COURT
                   FOR THE EASTERN DISTRICT OF VIRGINIA
 2                         Alexandria Division

 3     UNITED STATES OF AMERICA,        :    Criminal Case
                                        :    No. 20-CR-00239-TSE
 4                   Plaintiff          :
              v.                        :
 5                                      :
       ALEXANDA AMON KOTEY,             :    April 29, 2022
 6     EL SHAFEE ELSHEIKH               :    9:00 a.m.
                                        :
 7                   Defendants         :
       ........................         .......................
 8
                      TRANSCRIPT OF SENTENCING HEARING FOR
 9                         ALEXANDA AMON KOTEY
                    BEFORE THE HONORABLE T.S. ELLIS, III
10                     UNITED STATES DISTRICT JUDGE

11
          APPEARANCES:
12        FOR THE PLAINTIFF:         DENNIS FITZPATRICK, AUSA
                                     RAJ PAREKH, AUSA
13                                   JOHN T. GIBBS, AUSA
                                     ALICIA H. COOK, AUSA
14                                   AIDEN GRANO-MICKELSEN, AUSA
                                     U.S. ATTORNEY'S OFFICE
15                                   2100 Jamieson Avenue
                                     Alexandria, VA  22314
16                                   703-299-3700

17        FOR THE DEFENDANT          MARC JASON EISENSTEIN, ESQ.
          ALEXANDA AMON KOTEY:       COBURN & GREENBAUM, PLLC
18                                   1710 Rhode Island Avenue, NW
                                     2nd Floor
19                                   Washington, DC  20036
                                     202-470-2695
20
                                     CADENCE MERTZ, ESQ.
21                                   BROOKE SEALY RUPERT, ESQ.
                                     OFFICE OF THE
22                                   FEDERAL PUBLIC DEFENDER
                                     1650 King Street
23                                   Suite 500
                                     Alexandria, VA  22314
24                                   703-600-0800

25                                   (Appearances continued on
                                     following page.)
```

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

```
1    FOR THE DEFENDANT              NINA J. GINSBERG, ESQ.
     EL SHAFEE ELSHEIKH:           ZACHARY ANDREW DEUBLER, ESQ.
2                                  DiMURO GINSBERG PC
                                   1101 King Street
3                                  Suite 610
                                   Alexandria, VA  22314
4                                  703-684-4333

5    OFFICIAL COURT REPORTER:      REBECCA STONESTREET, RPR, CRR
                                   U.S. District Court, 9th Floor
6                                  401 Courthouse Square
                                   Alexandria, Virginia  22314
7                                  (240) 426-7767

8
                                ( Pages 1 - 93)
9

10
               COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          **P R O C E E D I N G S**

2              THE COURT:  Good morning.  You may call the next

3     matter, please.

4              COURTROOM CLERK:  Court calls criminal case

5     United States of America versus Alexanda Amon Kotey and

6     El Shafee Elsheikh, Case Number 2020-CR-239.  May I have

7     appearances, please, first for the Government.

8              MR. FITZPATRICK:  Thank you.  Good morning, Your Honor.

9     Dennis Fitzpatrick, Raj Parekh, John Gibbs,

10    Aidan Grano-Mickelsen, Alicia Cook, Nicole Lopez, and

11    Jennifer Donnarumma on behalf of the United States.

12             THE COURT:  Good morning to all of you.  And for the

13    Defendant Kotey?

14             MR. EISENSTEIN:  Good morning, Your Honor.

15    Marc Eisenstein, Cadence Mertz, and Brooke Rupert.

16             THE COURT:  All right.  Good morning to you, and good

17    morning, Mr. Kotey.

18             Also here this morning, Ms. Ginsberg?

19             MS. GINSBERG:  Yes, sir.  Nina Ginsberg and

20    Zachary Deubler on behalf of Mr. Elsheikh.

21             THE COURT:  Yes, and the record should reflect -- good

22    morning to you and good morning, Mr. Elsheikh.  The record

23    should reflect that he's here only because he will be present

24    for the victim impact statements made by individuals, so that

25    they don't have to return for his sentencing on August 19th,

4

1   which is the scheduled date for his sentencing.

2        But first we're going to proceed as follows.  First I'm

3   going to ascertain whether there are any objections to the

4   presentence investigation report.  It's clear to me that the

5   parties have had an opportunity to review the report thoroughly.

6   And once I rule on any objections or changes or corrections and

7   adopt the findings, then we'll proceed.  And at that point we

8   will go to the victim impact statements.

9        The victim impact statements will be made to my right,

10  to your left.  And there's no limitation on these.  I've set

11  aside essentially the day for this so that we will do whatever

12  is necessary to hear the victim impact statements.

13       All right.  Let me begin, then -- oh, following the

14  victim impact statements, then Mr. Elsheikh will be excused and

15  his counsel will be excused.  Of course, there are members of

16  the public; they can remain if they wish to, but Mr. Elsheikh

17  will be returned to his place of confinement until his

18  sentencing on August 19th.  He's here only so that he will hear

19  the victim impact statements, so these people who have come from

20  all over, including the United Kingdom, I think, do not have to

21  return.  I think that's appropriate, and I've arranged it in

22  that way.

23       All right.  Let's begin.  Mr. Fitzpatrick, has the

24  Government had an adequate opportunity to review the presentence

25  investigation report?

          1                MR. FITZPATRICK:  We have, Your Honor.

          2                THE COURT:  And does the Government have any objections

          3      or corrections to the report?

          4                MR. FITZPATRICK:  No objections or corrections,

          5      Your Honor.  I can tell the Court that based on conversations

          6      with defense counsel, they're going to be raising an issue with

          7      the Court and we'll explain the Government's position.  The

          8      defense suggested that may want to do that on the headsets.

          9                THE COURT:  We don't have headsets.

         10                MR. FITZPATRICK:  That's fine, Your Honor.

         11                THE COURT:  It's that simple.  We have two other trials

         12      going on in this courthouse that involve the headsets, so we

         13      don't have those.

         14                All right.  Let me ask for the defendant.

         15      Mr. Eisenstein, does the defendant have any objections or

         16      corrections to the presentence report?

         17                MR. EISENSTEIN:  Just the one that Mr. Fitzpatrick

         18      mentioned.  Your Honor, would we be able to approach?

         19                THE COURT:  Yes, we can do it that way.  But if you're

         20      going to do it that way, you may find that I'm not in agreement

         21      that it ought to be under seal, in effect.

         22                MR. EISENSTEIN:  Understood, Your Honor.

         23                THE COURT:  So I think you should have the opportunity

         24      to tell me why you should have it at the bench, and I typically

         25      have the defendant here, but I won't do it on this occasion.

1    You don't need that, do you?

2         MR. EISENSTEIN:  No, Your Honor.

3         THE COURT:  If you need to consult with Mr. Kotey, you

4    may return and consult with him.

5         Any reason why both you and Ms. Mertz need to come

6    forward?  You can both come forward.  Two is beginning to become

7    too many, but not too many yet.

8         All right.  Mr. Fitzpatrick, you may bring one of your

9    colleagues.

10         MR. FITZPATRICK:  Thank you, Your Honor.  Mr. Parekh

11    will join us.

12         THE COURT:  And all of this is by way -- so that the

13    public is aware of this, the defendant wants to raise something

14    about the presentence investigation report that the defendant

15    believes should be under seal.  And we'll see.

16         MR. FITZPATRICK:  Your Honor, I would just note -- I'm

17    sorry for interrupting the Court.  I believe the phone line is

18    open, so if we can mute it during our conference.

19         THE COURT:  Yes.  Ms. Randall will take care of that.

20    But thank you for reminding me.  Come to the bench, please.

21         (BENCH CONFERENCE ON THE RECORD.)

22         THE COURT:  Mr. Eisenstein, what is it you wish to

23    raise?

24         MR. EISENSTEIN:  The issue relates to Kayla Mueller

25    being sexual assaulted.  I believe given the sensitive nature, I

1    think it's appropriate not to have that discussion in front of

2    open court.

3              THE COURT:  Why?  Let me get to the bottom of it

4    quickly.  I don't think the Government opposes that.  I think

5    for the other defendant there is evidence of it, but for this

6    defendant, we're limited to the presentence report.  I can't

7    use, and I won't use, anything having to do with the Elsheikh

8    trial, because Mr. Kotey has not had the opportunity to address

9    and object to that in particular.

10             It isn't material to my sentencing decision.  I've been

11   aware that you-all had this particular issue, and it doesn't

12   alter or have any material effect on my sentencing decision.

13             MR. EISENSTEIN:  We agree, Your Honor, it doesn't

14   change the guidelines.  But our concern is, the PSR follows

15   Mr. Kotey once it goes to BOP, and --

16             THE COURT:  Yes, I understand that.  But I think it has

17   to be on the public record.  I don't see any reason why that

18   shouldn't be on the public record.

19             MR. EISENSTEIN:  That's fine, Your Honor.  We've raised

20   the objection.

21             MR. FITZPATRICK:  That's fine, Your Honor.  If I just

22   may succinctly present the Government's position.

23             THE COURT:  Very succinctly.  And what I'll do is

24   indicate that I will not include that enhancement, but it's

25   immaterial to the Court's sentencing decision and the guideline

1   manual, even though -- he agreed to a stipulation in his plea

2   agreement.  Did the stipulation include...

3        MR. EISENSTEIN:  The statement of facts did not include

4   anything.

5        MR. FITZPATRICK:  There was a stipulated guidelines

6   range as well, and that did not include that six-level

7   enhancement.

8        THE COURT:  That's what I'm going to say.

9        MR. FITZPATRICK:  And the Government stands behind our

10  plea agreements.

11       THE COURT:  And I don't disagree with your desire to

12  keep it confidential, but it's a public matter.  And cooperation

13  I will keep, of course, this way.  And we'll come at the end to

14  the principal objections and concerns that you-all have, and

15  that's between Florence and some other place.

16       (END BENCH CONFERENCE.)

17       THE COURT:  The matter at the bench did not warrant

18  sealing, so you will not seal it.  In essence it relates to the

19  guidelines calculation that enhances the guideline assessment by

20  how many points?  Six levels for sexual abuse of a victim.  Yes,

21  it's a sensitive matter, but the public is entitled to know.

22  And so I am going to hear it very briefly.

23       Do you have much to say, Mr. Eisenstein?

24       MR. EISENSTEIN:  No, Your Honor.

25       THE COURT:  All right.

1          MR. EISENSTEIN:  We object to the six-level enhancement

2     for a number of reasons.  One, it's not part of the conspiracy

3     for which Mr. Kotey pleaded guilty; two, we don't believe

4     there's any factual support as it relates to Mr. Kotey; and

5     three, it's not within the statement of facts that Mr. Kotey

6     stipulated and agreed to pursuant to the plea agreement.

7          So for those reasons, we object to it.

8          THE COURT:  All right.  Mr. Fitzpatrick?

9          MR. FITZPATRICK:  Correct, Your Honor.  We're not

10    seeking that enhancement.  The stipulated guideline range in the

11    plea agreement, in the Government's view, is the correct range

12    for Mr. Kotey.

13         I would note for the Court that Mr. Elsheikh stands on

14    a different factual footing on that enhancement, and in August

15    the Government will be seeking that enhancement when it comes

16    time for substantive sentencing for Mr. Elsheikh.

17         THE COURT:  Yes, I was aware of all of that before, and

18    you reminded me of all of it at the bench, and I will proceed

19    without the six-level enhancement with respect to Mr. Kotey.

20         Mr. Kotey, in his plea agreement, agreed to guideline

21    calculations, and I think that agreed guideline calculation is

22    to what, total, Mr. Eisenstein?  It's a total of well beyond 43.

23         MR. EISENSTEIN:  I believe it's 63, Your Honor.

24         THE COURT:  Yes.  But it's well beyond 43.  What is it,

25    63?

1          MR. EISENSTEIN:  62, Your Honor.

2          THE COURT:  62.  And that's without the enhancement

3     we've been talking about.

4          MR. FITZPATRICK:  That is without the enhancement we've

5     been discussing.

6          MR. EISENSTEIN:  Yes, Your Honor.

7          THE COURT:  So I will adopt the findings and

8     conclusions of the presentence investigation report as the

9     Court's findings and conclusions in this matter, with the

10    exception that I've just noted.

11         MR. EISENSTEIN:  Thank you, Your Honor.

12         THE COURT:  So the guidelines will be well above 43.

13    And then, according to the guideline manual, it will be 43,

14    because it doesn't go any higher.

15         All right.  Now we're at the point of the victim impact

16    statements because I've adopted the findings and conclusions of

17    the presentence investigation report.

18         What we will do, ladies and gentlemen, those of you who

19    wish to be heard, one at a time I'll call your name, and if you

20    would come up here.  And following all of you, which may take a

21    long time, and we're here for as long as necessary -- you're not

22    limited in time, so don't shorten it because you think you are.

23    Say what you want to say, and you'll be given a full opportunity

24    to say what you want to say.

25         And when that's completed, then we will proceed first

1    by having Mr. Elsheikh return to his confinement because the

2    rest of it does not concern him.  But the reason we're doing it

3    with him here present today is so that the families do not have

4    to return for a second proceeding.

5         All right.  To begin with, I'll hear from -- well, I

6    should have recited, and will recite very briefly here, that

7    Mr. Kotey is before the Court for sentencing, having been found

8    guilty, on the basis of a guilty plea, of all eight counts of

9    the indictment.  Count 1 is a conspiracy to commit

10   hostage-taking resulting in death, and Counts 2 through 5 are

11   hostage-taking resulting in death for each of the persons who

12   were hostages and were killed; that is, James Wright Foley,

13   Steven Joel Sotloff, Peter Edward Kassig, and

14   Kayla Jean Mueller.  And he pled guilty to those counts,

15   Counts 1 through 5.

16        And then Count 6 was conspiracy to murder a

17   United States citizen outside the United States; Count 7 was

18   conspiracy to provide material support to terrorists, namely

19   hostage-taking and murder resulting in death; and Count 8,

20   conspiracy to provide material support to a designated Foreign

21   Terrorist Organization, resulting in death.

22        All right.  Now, he's pled guilty to all of that, and I

23   will hear first from Ms. Haines.  Would you come forward,

24   please, Ms. Haines.  And, Ms. Haines, you can stand and face in

25   whatever direction you wish and address whoever you wish.  I, of

1  course, will be listening,

2          MS. BETHANY HAINES:  That is the man that is my dad,

3  not the man in the orange jumpsuit.  I've written and rewritten

4  this statement a million times in my head.  How can I describe

5  my life without my dad?  He was a kind, caring, and generous

6  man, and yet I have to find a way to live my life without him.

7          These men didn't just take my dad, they took my

8  grandfather, my grandmother, and the chance for my son to meet

9  his granddad.  The toll that the actions of these men have taken

10 on my family is immense.  My grandparents died of grief, and

11 they could never get over the loss of their son.

12         I have since been diagnosed with complex posttraumatic

13 stress disorder, depression, and anxiety.  My whole life has

14 been turned upside down.  Simple things like going to sleep is

15 now an impossible task.  I haven't had a good night's sleep

16 since before my dad was taken.  I wake up during the night

17 hearing my dad's screams as he's being tortured by these men.  I

18 hear him begging for his life, and I can't do anything to save

19 him.

20         The guilt I have for not saving my dad is something I

21 will never get over.  I've had to hear how my dad was near death

22 after having been beaten so badly that his organs began to shut

23 down.  That's something no daughter should have to hear about

24 her father.

25         Celebrating birthdays or Christmas is not an enjoyable

1    experience for me anymore.  My dad should be celebrating with

2    me, but instead he is in a mass grave in the hills of Raqqah.

3    He hasn't been laid to rest.  He was dumped like a bag of

4    rubbish.  I've put myself in danger to bring him home by

5    venturing out to Syria, and plan to do so again.

6          I have shut myself off from the world and living my

7    life.  Instead of enjoying time with my family and friends, I'm

8    stuck in my bedroom replaying my dad's death.  How am I supposed

9    to carry on with my life when all I can picture is my father's

10   severed head laying on his back?

11         The guilt and distress caused me to self-harm, and I

12   have spent a time briefly going in and out of hospital as I've

13   struggled, wondering why monsters like these two men are on this

14   earth but my father isn't.

15         My grief has forced me to drop out of school, college,

16   and university, and I haven't been able to hold any job.  I'm at

17   a loss as to what to do with my life.  I originally had planned

18   to complete my degree at university and work my way up through

19   the police force to become a detective.  But now I think, what's

20   the point?

21         My son is six years old and is the light of my life.  I

22   gave birth to him in the year following my dad's death, but

23   things that should be fun memories, like his first birthday and

24   his first steps, are overshadowed by my dad's murder.  My dad

25   loved children and dreamed of becoming a grandfather, and

1    because of the actions of these men, he misses out on all these

2    memories.

3           And I struggle to explain to my son why Mummy is so sad

4    all the time, why Mummy has scars on her arms, why Mummy

5    sometimes can't get out of bed, and why Mummy can't be like the

6    other mummies.  How can I possibly tell him that his grandfather

7    was taken, beaten, electrocuted, threatened, waterboarded, and

8    beheaded, and that these two men had a major role in carrying

9    out these acts?

10          I feel anger towards the UK government, these men, and

11   towards other men who played a role in these horrible crimes.

12   That anger bubbles inside of me; like a volcano, it eventually

13   erupts.  It controls my actions, my thoughts, and I get stressed

14   over minor things, like being late.  And this anger gets

15   misdirected at those who are close to me.  I often wonder, will

16   I ever be happy?  Will I ever not feel guilty?  Will I ever not

17   be angry?  Will I ever be normal again?

18          I used to be a popular and bubbly person with lots of

19   friends.  I loved my horse-riding lessons and show jumping

20   competitions.  I would psych myself out before attempting a big

21   jump or after a fall, and it was my dad who would calm me down,

22   encourage me to get back on.  He would be so excited to see how

23   I did, whether I got first place or sixth place.  Now that he's

24   gone, there's no motivation for me to compete or to ride.

25          I've isolated myself from the world and my friends.

1    How can I go out for drinks or coffee with a friend, when all I

2    can see is flashbacks of my dad in his orange jumpsuit?  Instead

3    of having fun, I shut myself away and spend all my time trying

4    to find out exactly what happened to my dad, and what roles

5    these men had in his abduction, torture, and death.

6         I have had to hear how my dad and others who I care

7    about were horrifically tortured, and that these two men took

8    active roles in their cruel treatment.  No daughter should have

9    to hear the things I've heard about my father.  And I've had to

10   become desensitized to what happened to my dad and the other

11   hostages just to be able to cope with the things that I've

12   heard.  The only relief I get from the flashbacks and the

13   nightmares is when I'm out walking the dog in the countryside.

14   That's the only time I feel normal, relaxed, and free.

15        I've heard a lot of people talk about forgiveness and

16   accepting what's happened and moving on.  I've thought about

17   this a lot, and whether it's something that I could do.  But to

18   get forgiveness, you have to ask for forgiveness.  Neither of

19   these men have expressed one ounce of remorse for their actions.

20   Pleading guilty or not pleading guilty makes no difference.

21   These two men are selfish and only care about themselves.  And

22   until they accept their actions, admit to what they have done,

23   and apologize, then there's no chance they will be forgiven by

24   me.  I have no pity for them, and hope they are forced to think

25   of their actions and regret them for the rest of their lives.

1          I wake up every day thinking of my dad, and I just want

2     him home.  I dream of him walking back through the door and all

3     of this being a terrible mistake.  But I know that will never

4     happen.  He dedicated his life to helping people, and was an

5     innocent, an innocent that would have given you the shirt off

6     his back.  And now he's gone.

7          The Prophet Muhammad stated, "The worst person before

8     Allah will be the one who killed those who did not fight him."

9     No matter what you say, this was not about religion.  You

10    abducted, tortured, and even participated in the murder of good

11    and innocent people, and now you have to live with that for the

12    rest of your lives.  The only thing you could do that would help

13    the victims would be to give up the locations of the remains of

14    our loved ones.  Don't do it for me, do it for my son, who could

15    finally say good-bye to his granddad.

16         You both have lost.  You've lost your family and your

17    freedom.  You may have taken my father, but I've gained a whole

18    new family.  The families of those who have lost their loved

19    ones as well as those who were released and I were initially

20    connected by your actions and this horrific event.  I care for

21    them as much as I care for my family.  We are now connected by

22    the love and support we have for each other.  We will always

23    have each other, and you will have no one.  I hope you think

24    about that in prison, and give our big disjointed family the

25    peace and closure we all deserve.

1           Thank you.

2           THE COURT:  All right.  Mr. Michael Haines,

3    Mike Haines.  Come forward, sir.  Go ahead, sir.

4           MR. MICHAEL HAINES:  I am Michael Haines.  I'm here

5    today to speak about the brutal murder of my brother,

6    David Haines, whose life was taken by you and your cohorts in

7    Syria September 2014.  I am speaking on behalf of my late

8    parents and all of our family and our many friends, however

9    difficult it may be.

10          I hope to speak for David.  David was first taken in

11   March 2013.  His kidnap came as a horrifying shock.  He was

12   taken -- my brother was a humanitarian and he was in Syria for

13   no other reason than to help his fellow man.  He was a force for

14   good, and so to bring relief to the many refugees fleeing from

15   the ravages of war.  In this challenging environment, it was his

16   unrelenting desire to help those less fortunate than himself,

17   regardless of faith, color, culture, or politics.  That was the

18   fire in his belly.

19          You kept David in captivity for 18 months and prevented

20   him from having contact with the outside world.  Those 18 months

21   brought untold worry for my parents and our family.  The

22   uncertainty of the welfare of my brother caused countless

23   sleepless nights, and our lives were turned inside out.  We now

24   know how you and your cohort abused, brutalized, mistreated, and

25   tortured my brother and his fellow hostages and captives.

1        On the night of 13 September, 2014, you murdered my

2  brother in cold blood.  You stole a son, a husband, a father, a

3  godson, an uncle, a brother from those who loved him dearly.  My

4  brother's murder inflicted more pain on us than I can ever put

5  into words, and the after effects still are still with us today.

6  Our lives will never be the same again.

7        My mom, Mary, unable to process the brutality that had

8  been extracted on her child, gave up on life and slowly drifted

9  to her death.  My father's dementia accelerated following

10 David's murder, and eventually he passed away in 2017, although,

11 in reality, he had faded away much sooner.

12       Not only did my family lose my brother David, but I

13 believe that my mother and father were also victims of your

14 brutality.  I have always laid the blame for their deaths at

15 your feet.  Your actions have changed the lives of family

16 survivors in so many ways, and although we can't have David

17 back, for many of us it brings some relief you have faced

18 justice for your crimes.

19       My brother was and is a hero, and his name should be

20 remembered not for the barbaric acts that you inflicted on him,

21 but for the selfless life he served giving the gift of kindness

22 and helping his fellow man.  His courageous, charitable spirit

23 stands in opposition to everything that you represent, and it is

24 those acts of compassion which will survive the test of time.

25       For too long now, you and your cohort have held power

1   over my family. For all the damage you have inflicted on my

2   family and myself, I am no longer willing to let that happen.

3   Since my brother's death, I have tried to commemorate my

4   brother's spirit through Global Acts of Unity. We champion key

5   beliefs in others, which are the rejection of hatred, embracing

6   difference, promoting the values of tolerance, understanding,

7   and unity, the very antithesis of what you and your

8   co-conspirators live by. We reach out to people to help build

9   bridges and to reject those who seek to divide or destroy our

10  open and tolerant society.

11          To find peace, I must overcome the emotions I have felt

12  since that life-changing day in March 2013, the day that you

13  took my brother. Terrorism has claimed many lives, and it is

14  the reason that we are here today. But I will not let it claim

15  my soul as well. Today, for the first time, I can say to you,

16  you no longer have power over me and mine. I forgive you.

17          Thank you.

18          THE COURT: Ms. Haines, Dragana Haines.

19          MS. DRAGANA HAINES: My name is Dragana Haines. I was

20  the wife of the late David Haines. I remember when I received a

21  phone call from David's brother, Michael. He told me David was

22  kidnapped in Syria. For 18 months, I woke up every morning

23  hoping today will be the day he will call me and tell me he is

24  free, but also terrified of receiving the worst possible news.

25          It has been months before I told my mother and David's

1    best man from our wedding what has happened.  I had to lie to

2    our daughter about why Daddy is not calling us on Skype, as he

3    always used to when he was away.  I lied to all of our friends

4    when they asked me about David, and I did that until the killing

5    started before the whole world, and everybody found out what

6    actually happened to David.  The media started to besiege our

7    house and my daughter and I could not even look out the window.

8    She couldn't go out to play with her friends.  We were under

9    24 hours police protection for two months.  They escorted us

10   wherever we would go.

11        I will never forget the moment Michael called me and

12   said they killed my husband.  All my hopes were drowned with

13   that one sentence.  I felt I was drowning, but I had to stay

14   strong for my daughter, who was four years old at the time.  I

15   did not want to tell her about what happened to her daddy until

16   I was able to get hold of my grief and be composed while talking

17   to her.  I tried to make her life as normal as possible under

18   the circumstances.

19        Everything that happened ever since David was kidnapped

20   has already affected my health seriously.  In October 2016 I was

21   diagnosed with progressive breast cancer, which was inoperable.

22   There was no history of cancers in my family on either side.  My

23   oncologist told me that it was most probably caused by all the

24   stress I was going through, since there were no other factors

25   that would cause it.

1          I had to explain everything to my daughter, even tell

2    her that there was a chance therapy might not be successful.

3    But we agreed to fight and win the battle, as we did.  I have

4    been in remission since 2017, after 16 chemotherapies, 25

5    radiation therapies, and three surgeries.  But I still have to

6    go for therapies every four weeks.  Unfortunately, I could not

7    handle the work while going through therapies, and I could not

8    save the company I owned.

9          David's executors, his executors did not only take my

10   husband's life, because then I lost my business and my health.

11   They stole my daughter's happy childhood, all those

12   father-daughter happy moments she will never be able to cherish.

13   I don't wish for much in life, I just hope I will get the chance

14   stay in remission long enough to see my daughter grow up and

15   have a safe and secure future.  But my nightmares will never

16   end.

17         I really hope both of you will live to at least

18   200 years and you will get to hear about the death of every

19   single person you have ever loved and cared about, just so you

20   can feel at least a little bit of pain you have inflicted on all

21   of us and your victims.  For all I care, you can live long and

22   suffer.

23         THE COURT:  Athea Haines.

24         MS. ATHEA HAINES:  I lost my father when I was

25   four years old.  It affected my life in so many ways...

```
 1              THE COURT:  It's all right.  Take your time.
 2              MS. ATHEA HAINES:  It affected my life in so many ways.
 3   My mom is trying to help, but I can often see that she is sad.
 4   I only have a few memories of my dad because I wasn't even
 5   three years old the last time I saw him.  I miss him so much.
 6              Sometimes I feel sad when I see my friends run sport
 7   and they're all laughing and playing with their love -- or with
 8   their fathers.  This is something I will never have a chance to
 9   do again.  It is not easy to be that kid in school whose dad was
10   killed by terrorists.
11              THE COURT:  Lucy Henning.
12              MS. LUCY HENNING:  Before December 2013, my life was an
13   ordinary, normal life.  I lived at home with my mom, dad,
14   brother, and our dog.  I was 16 years old and had just started
15   college.  My only struggle in life at the time was my anxiety.
16   It completely controlled all aspects of my life.  Doing daily
17   tasks alone seemed nearly impossible because it felt like
18   someone was constantly sitting on my chest and I couldn't
19   breathe.  I became so tired from trying to keep calm and get
20   through every terrifying day in college, that at home I became
21   moody and difficult to live with.
22              My dad had been on a few aid convoys to Syria.  The
23   experience as a whole changed him and changed his attitude.  He
24   became patient and a lot more understanding.  He felt like he
25   had found his purpose in life, and that he was making some
```

1  difference in the lives of those he traveled to help.  I often

2  wonder if my teenage attitude at home made going to Syria that

3  much more appealing to him.

4       One day in 2013, Dad asked if we would be okay with him

5  going on an aid convoy over Christmas.  Christmas Day was a day

6  we had always spent together, and even though we would have

7  preferred to have our usual family Christmas, we had to let him

8  do what he wanted to do.  He gave up his Christmas with his

9  family to help those in need.

10       The time soon came for him to leave on what would be

11  his last ever aid convoy to Syria.  He kept in contact with us

12  to keep us updated on his travels.  A couple of days passed and

13  we didn't get our usual update or "I love you" text message.  It

14  wasn't until New Year's Eve we received the phone call to tell

15  us Dad had been kidnapped.  Our lives from that moment changed

16  forever.

17       At 16 and 14 years of age, me and my brother, along

18  with my mom, were told to prepare for possible negotiations to

19  come through to help get Dad home.  We were provided with a tape

20  recorder to keep near the house phone in case the hostage-takers

21  rang to offer us a way to get Dad home.  The instant fear we

22  would all feel every time the house phone rang still haunts me.

23       I had never heard of adults being kidnapped, and I

24  decided to start doing research.  Through all of the horrific

25  things I had learned that had been happening to people in Syria,

1    I still expected Dad to come home.  I had just prepared for him

2    to have been hurt in some way, or be thinner.

3              It wasn't until the video of David Haines having his

4    life taken from him was released, and my dad's life threatened,

5    that it started to set in.  David and those before him did not

6    deserve what happened to them, and neither did their families.

7    Waiting for news on Dad after this seemed to take forever.

8    Something in me, though, still thought that Dad was coming home.

9    I had so much I needed to tell him.  I, at the time, agreed with

10   him not being around even though he was still alive to really

11   appreciate the dad that he was.

12             No amount of hope helped, though, as on the 3rd of

13   October, 2014, I was scrolling through Instagram and came across

14   a picture of my dad's body lying in the desert alone.  The image

15   is scratched so deep into my memory, and I shouldn't have to see

16   my dad like that.  My dad shouldn't have been treated like that.

17   He was just trying to help.  He wasn't a religious man or into

18   politics.  He was just a dad.  He was my dad.

19             I was left with hundreds of questions.  Did he want to

20   send us a message?  Did he cry?  Was he angry at us because we

21   couldn't get him out?  Did he know we were trying to get him

22   home and missing him like mad?  Was he buried or cremated, or

23   just left alone to lie in the desert?  I don't know if I'll

24   ever...

25             THE COURT:  Take your time.

1          MS. LUCY HENNING:  I had the opportunity of having a

2     relationship with my dad as an adult ripped away from me.  He

3     has missed out on so much.  In total, we have missed 34 family

4     birthdays together.  He has missed me getting my first job,

5     passing my driving test, meeting my partner, and the birth of my

6     baby, and all of my brother's achievements and special moments.

7          I have held guilt for so many years, and felt it was

8     all my fault.  If I wasn't a moody teenager, maybe he wouldn't

9     have gone and this wouldn't have ever happened.

10          I was blessed with my beautiful daughter, who taught me

11     to love being a parent.  The blame no longer lies at my feet.  I

12     had over six years of feeling overwhelming anger and hatred at

13     myself.  In my eyes, I was just as much to blame as anyone else.

14     That burden has weighed so heavy on my shoulders that at times I

15     wasn't sure how much more I could carry.

16          Today I hope that when I hear the sentence, the guilt I

17     feel will go and never return.  I hope one day all the families

18     involved can live in peace knowing justice has at least been

19     served, even if we will not have our loved ones home.  And I we

20     can heal with our lives fully free.

21          THE COURT:  Shirley Sotloff.  And there's also

22     Art Sotloff.  Would it be helpful if you took the microphone

23     down and you can hold it?  Would that help them?

24          MS. SHIRLEY SOTLOFF:  I would like the defendants to

25     please look at me.

26

1          THE COURT:  If you would like to walk a little bit this

2    way, you may do so.

3          MS. SHIRLEY SOTLOFF:  Yes, that would be wonderful.

4    Thank you.

5          Elsheikh, please do not close your eyes.  Leave them

6    open and look at me.  Yes, you have to do that.

7          How do I begin?  How do you begin to describe the

8    unimaginable impact of the loss of a child, taken in the prime

9    of his life, adult life, and how it affects you as a parent,

10   sibling, nephew, cousin, friend?  The pain is beyond words, no

11   matter how we lost him.  But the circumstances of this loss,

12   Steven's life taken so publicly and violently in the course of

13   doing his job as a journalist, is beyond the comprehension of

14   most people.

15         Look at me.  Thank you.

16         It's something you see in the movies, not in real life.

17   Steven's death was like a global worldwide horror movie that was

18   witnessed live, and continues to be replayed with the click of a

19   button for millions to see.

20         But this is not on a screen for our family.  This

21   replays in our family's heads every single day.  The orange

22   jumpsuit, shaved head, sickening vision of our son being held at

23   knifepoint was the first we had seen his image in a year and a

24   half; the brutal execution that followed of our innocent son,

25   and the children of the families here today, used for political

1  leverage by people they never knew, never heard, a pawn in a war

2  of terror.  They were not soldiers or a threat to anyone in any

3  way, and died in the most incomprehensible way.

4        But beyond the moment of death, what pains us the most

5  is the torture that he endured in 13 months of captivity at the

6  hands of the defendants and conspirators.  One can mourn,

7  eventually somewhat heal from a death in the family, but the

8  pain of knowing what was done to him in captivity, this pain

9  does not stop.  It gets worse as we hear more testimony and

10  learn more from others held captive with him.

11        The psychological impact has such a profound effect on

12  our family, we are now defined by it.  We are "those" parents.

13  Lauren is "that" sister.  Lauren, while she lives and breathes,

14  has been changed forever mentally, physically, emotionally, and

15  we struggle to this day to find treatment that will begin to

16  heal her broken soul.

17        We moved from our home trying to start a new life, but

18  the whispers follow.  Sleep is never undisturbed, even

19  eight years later.  The sickness in our stomachs the minute we

20  wake up, and the psychological trauma that we relive over and

21  over and over, we are forever broken by the loss of our beloved

22  son and defined as the people from the horror movie.

23        You and your war of terror have taken everything from

24  us; not just our son, but a healthy daughter, the place that we

25  call home, our identity.  There is nothing that we can rewind

1   time -- there is nothing that can rewind time and make our lives

2   normal again.  The fact is that innocent journalists, aid

3   workers, people in the wrong place at the wrong time continue to

4   this day to be kidnapped, tortured, and killed, in the name of

5   religion, religious efforts by people like you.

6          We pray that it stops.  No god, no religion, no

7   righteous human being can ever justify these actions.  We want

8   you to think of yourself - or worse, those you love - enduring

9   what our son was put through at your hand.  Imagine your

10  innocent loved ones - your mother, perhaps - being tortured and

11  executed in this way.  What would you ask of the people

12  responsible upon their sentencing?

13         The only thing we can do is hope and pray that this

14  never happens to another family ever again, and that you develop

15  deep remorse for the rest of your life.  And whatever you

16  believe God will deliver, think about his true judgment of the

17  life you have lived, for the torture and murder of innocents

18  that you leave as your legacy.

19         Open your eyes, please, and look at me.

20         You destroyed our lives, and we hope that for the rest

21  of your lives, you will think about what you have done, and to

22  your families as well.

23         THE COURT:  Mr. Sotloff, did you also wish to say

24  something?

25         MR. ART SOTLOFF:  Not at this time.  Thank you, Judge.

         1          THE COURT:  We'll take a moment if you need a moment.

         2          MR. ART SOTLOFF:  I'm fine.  Thank you.  Thank you for

         3     the opportunity.

         4          THE COURT:  All right.  Mr. Kassig, Ed Kassig.  And is

         5     that Paula Kassig with you?  You may both come forward.

         6          MS. PAULA KASSIG:  Ed, being the gentleman that he is,

         7     is permitting me to go first.

         8          Your Honor, good morning.

         9          THE COURT:  Good morning.

        10          MS. PAULA KASSIG:  Thank you for letting me address the

        11     Court.  If I may, I would like a quick word with Mr. Kotey and

        12     Mr. Elsheikh at the end of my remarks.

        13          THE COURT:  You may do so.

        14          MS. PAULA KASSIG:  Thank you.  Alexanda Kotey and

        15     El Shafee Elsheikh have both had a profound and irreversible

        16     effect on my life.  Before Peter, who later converted to Islam

        17     and then went by the name Abdul-Rahman, before he was taken and

        18     held by ISIS in barbarous conditions, I had considered myself

        19     unflappable, able to think clearly, and to maintain calm no

        20     matter what emotions were surging in people around me.

        21          Now I struggle to maintain focus when emotions rise,

        22     when I am the center of attention, or even when there's just a

        23     complex problem for me to try to figure out.  I am much more

        24     anxious in general than I was before Peter's captivity and

        25     death, and I often have insomnia, forgetfulness, and

 1    palpitations.

 2          Knowing that the man I rocked to sleep when he was an

 3    infant, and whose hand I held when he was fearful as a child,

 4    was being starved, beaten, tortured, and threatened with death

 5    every day for over a year, while I was not able to help him at

 6    all, was beyond my ability to cope.  Ed and I could not reassure

 7    him of our undying love and pride.  Yes, pride.  We could not

 8    help ease his pain.  We could not help him as he drew his last

 9    breaths.  We don't even know what his last minutes were like or

10    where his remains lie.

11          Due to the actions of the ISIS cell nicknamed

12    "The Beatles," my husband and I were both forced to retire early

13    from professions we loved, teaching and nursing.  We have

14    witnessed and shared in the pain our friends and family have

15    endured since Peter's ordeal and its aftermath.  We have been

16    deprived of the joy of knowing our only child as he found the

17    purpose of his life.  Most of what we know of who he became and

18    the good he was doing in his last years came from friends he

19    made while he was in Lebanon, Turkey, or Syria.  It is also a

20    deep hurt that we will never have the joy of being grandparents

21    or even hearing his laugh again.  Our house is far too quiet.

22          These men's actions didn't just harm us and our loved

23    ones.  By their massively misguided actions based on their

24    version of Allah's will for his people, they intensified

25    conflict and hate between Muslims and others, including other

1    people of the Book.

2          Yet despite their heinous actions, good has come from

3    them.  We have been shown the large heartedness of many people.

4    We met and worked with generous souls both in and out of the

5    government.  Some of Peter's friends flew in from Europe and the

6    Middle East, and worked with some of our dear friends, all

7    putting their lives on hold for over a month and sacrificing

8    much to try to help us save his life.

9          We were blessed with the help of a private citizen who

10   gave us succor, made numerous contacts with government officials

11   on our behalf, and had dozens of volunteers looking for any

12   angles which might help save him.  We are proud of our

13   government rising above the ancient eye-for-an-eye mentality by

14   providing these two men fair judicial proceedings.  The tireless

15   work of a vast crowd of people resulted in the trials of these

16   men.

17         Other good has also come from their evil actions.  Many

18   people from around the world have told us their lives have been

19   forever energized to help others by hearing what

20   Abdul-Rahman Peter did with his short time.  We heard from a

21   national TV news personality who told us our son's example

22   enabled her to find the courage to live her faith more boldly.

23   And yes, her faith is Islam.  She is currently in Poland helping

24   refugees from Ukraine.

25         Because of Peter's conversion, our mainline Christian

1   congregation had the distinct privilege of joining a nearby

2   Muslim worshipping community to increase understanding of each

3   other's faith, to share our grief at the loss of one of God's

4   servants, and to experience hospitality, transcending both

5   religion and culture.

6           A group of college students and faculty modeled a

7   not-for-profit nongovernmental aid agency after SERA, the group

8   that Peter founded.  There are teachers who include a unit every

9   year in which their students learn about our son risking his

10  life to help people who he had never met, but who he knew he

11  could help.

12          Our son's alma mater has a scholarship in his name to

13  educate more agents of hope and change.  Ed and I could not have

14  been more proud when we learned that there were posters and

15  fliers encouraging people in war-torn Syria to participate in

16  workshops about nonviolent peace.  The posters featured photos

17  of Mahatma Gandhi, Dr. Martin Luther King, Jr., and

18  Abdul-Rahman Peter Kassig.

19          The hate Mr. Kotey and Mr. Elsheikh tried to spread was

20  transmuted into the far stronger force of love.  Alexanda Kotey,

21  El Shafee Elsheikh, I will not hate you.  It would give sadness,

22  pain, and bitterness too much power over me.  I choose to let my

23  heart be broken open, not broken apart.

24          Thank you, Your Honor.

25          THE COURT:  Mr. Kassig?

1        MR. ED KASSIG:  It's hard when you've got to follow an

2    angel.

3        Your Honor, I wish to thank you for allowing me time to

4    speak for my son and others like him who no longer have heard

5    their voices.

6        Our world was changed forever on October 1st, 2013,

7    when we learned that while on a humanitarian aid mission to

8    Syria, our son Peter had been captured by Islamic militants and

9    taken as their guest.  There's simply no words to describe the

10   changes wrought upon the survivors.  For over a year, my wife

11   and I were forced into acting roles, pretending that everything

12   was okay.  We got in front of our congregation and lied.  They

13   would say:  Is Peter in Syria?

14       No, not in Syria.

15       Oh, good.

16       We knew that he was being held in what was to be called

17   the Caliphate.

18       For over a year, we kept our end of the bargain.  We

19   kept our silence.  Somebody else broke that.  We dealt with

20   scammers, monetizers, false alarms, and those who claimed

21   haughtily "the people want to know."  When told by various

22   officials at the highest levels that our son was the first thing

23   on their minds when they woke in the morning, we just nodded,

24   knowing full well that they were clueless.

25       I was told to speak about the cost.  The cost.  They

1    say time heals all.  They lied.  And closure?  I'm sorry, but

2    that's just a word to make the bystanders feel better.  We and

3    our fellow victimized families bear scarred hearts and souls.

4    For us, the operating word is "forever."

5         I do waken every morning and look into the eyes of my

6    beautiful wife knowing that they can not unsee unspeakable

7    horror.  I do know that at random times, totally unpredictable,

8    the enormity of it all will catch me off guard like a rogue

9    wave, just dash me on the rocks.  How does one price out the

10   cost of losing a lifetime's worth of watching one's child grow

11   and have children of their own?  He was the last Kassig in his

12   generation, and the last male.  The name dies.

13        How do you value the treasure of being Grammy and

14   Grampy, of teaching one's grandchild how to fish, throw a curve

15   ball - maybe even a spitter - play a musical instrument, and,

16   most important of all, to care for others; of having to comfort

17   well-meaning friends who just can't help but stick their feet in

18   their mouths, sometimes up to the knee, trying to find the right

19   thing to say; of trying to cool the hatred of those wishing

20   vengeance on the now convicted, and lastly, though a small

21   measure of irony, the emotional cost of keeping them alive.  For

22   yes, it was we, the victims, that lobbied long and hard to keep

23   your hides out of Gitmo and to remove the death penalty.

24        It's fitting that we leave to the Court the matter of

25   disposition, for any judgment it renders satisfies the law and

1    the law alone.  It cannot make right what's been taken forever

2    from the victims, their families, their friends, even the

3    guilty.  Know that any restitution will go in its entirety to

4    further Peter's word.

5          Alexanda Amon Kotey and El Shafee Elsheikh, for

6    13 months you held Peter and us to your demands.  We had

7    absolutely no control.  Now it is you who no longer have control

8    of your life.  I can't hate you, for such emotion would still

9    give you a shred of that control.  And by refusing to hate, I

10   free myself from you forever.

11         And, as I said in our first public words so very, very

12   long ago, I must forgive you as well.  Far easier said than

13   done.  I will tell you, it's a work in progress.  But failure on

14   my part to honor that pledge would keep me on the path of hurt

15   that you chose.  You will now walk that path alone.

16         And in spite of your efforts, at one of his funerals, I

17   stood with a Christian pastor, a Jewish rabbi, and a Muslim

18   imam, watching an interfaith group of kids just being kids.  All

19   of them chose to know the Book.  Together they played and

20   together we stood, and in that moment I saw the promise that

21   Peter sought.  It was the imam who said, "You know, Peter is

22   looking down on us and he's smiling."  I must have faith that

23   this was and shall eternally be so.

24         Thank you.

25         THE COURT:  Marsha and Carl Mueller.

```
 1              MS. MARSHA MUELLER:  Your Honor, we miss our beautiful
 2    daughter --
 3              THE COURT:  I'm sorry, the microphone.  Also, I want to
 4    be sure that you're standing where you can see, and,
 5    importantly, where the two defendants can see you and look at
 6    you.
 7              MS. MARSHA MUELLER:  Actually, I want to look at you.
 8              THE COURT:  That's entirely all right.  Proceed.
 9              MS. MARSHA MUELLER:  We miss our beautiful daughter
10    Kayla, who was full of love and life.  Kayla had a courageous
11    passion and compassion for people.  All life was precious in
12    Kayla's eyes, and she loved anyone in her path.
13              I go to bed every night thinking of her.  I wake up
14    several times a night thinking of her and what she might have
15    endured, and, of course, what we imagine she endured, what she
16    did endure.  Many nights after a dream or nightmare Carl or I
17    have had, our thoughts go to what we don't know but can only
18    imagine what we have heard from others released, those who have
19    told us what happened to them and those around them.  We need to
20    find Kayla and how she died.  It is heart wrenching.  At times
21    we feel helpless and hopeless and just want to stop.  But I
22    cannot.
23              Our son and daughter-in-law have also endured so much.
24    They too have been devastated.  They were all so very close.
25    The pain of losing Kayla, but not being able to be with her
```

 1    through her pain and suffering, not being able to hold her, talk

 2    with her, and look in her eyes while she was dying is almost too

 3    much for us to bear.  And yet we do, for Kayla.  We do not want

 4    her to be forgotten.  Kayla should be here.

 5         It is hard to imagine the 18 months of Kayla's life

 6    held against her will, completely terrified and mostly kept

 7    alone in cold or hot, dark and filthy places, having to listen

 8    to the horror all around her.  I know from the letters brought

 9    out with the released hostages that she only wanted to come

10    home, and her greatest pain was in knowing the pain she felt we

11    were going through.  I can only imagine how terrifying and

12    painful it was, and yet she continued to do her best to survive

13    and do the work she was called to do.

14         We were told of her kindness and her goodness and her

15    perseverance.  We were told she helped those with her.  Often

16    they were only with her for a short time, but whoever was with

17    her, she did what she could.  Kayla did her best to defend

18    others.  She shared her food, she encouraged, and she helped.

19    She stood up for and tried to protect the young girls she was

20    held with, as well as those older.  She did what she was told as

21    a prisoner of ISIS, with the goal of coming home.

22         I pray with all my heart she knew how much we have

23    always loved her.  I pray she knew how hard we were working to

24    find a way to free her.  I hope she knows how proud we are of

25    her for her God-given gift to help all those put in her path.

1    Even though she had already suffered for over eight months in

2    horrific conditions, she wrote us a positive, uplifting letter

3    to give us strength and hope.  Just like our Kayla to worry

4    about us while she was suffering.

5         We heard of some of the terror; her head shaved,

6    solitary confinement, physical and psychological abuse, being

7    screamed at for all the wrong they believed America had done,

8    being told we didn't care about her, to forget her family

9    because she would never see us again, and being told America

10   didn't care about her.  We heard of long periods of being held

11   in a very small closet or a container where she could barely

12   move, hearing screams of the torture.

13        We heard of a woman placed with Kayla who was tortured

14   so severely, including having her fingernails pulled out.  We

15   were first told it was Kayla who had her nails pulled out.  Now,

16   the more we've learned, we believe, or at least hope, this was

17   not true.  And yet, I look at my own hands and think of this

18   often.  Even if it was not Kayla, she saw how horrifically this

19   woman was treated, and then never saw her again.  From what we

20   understand, she most likely died.

21        I can only imagine Kayla hearing the screams of those

22   tortured and mutilated, and fearing if she would be next,

23   fearing what was coming as she was moved from one location to

24   the next.  During the trial, we all heard from the men - Carl

25   and I for the first time - they heard Kayla crying out, "Please

1    don't hurt me."

2         There is not a day, and sometimes barely an hour, where

3    I do not think of Kayla.  I also think of Louisa and the very

4    young and terrified Yazidi girls she was held with.  Kayla and

5    these young Yazidi girls were repeatedly raped, brutally beaten,

6    enslaved, and terrorized.  In addition to being raped by the

7    leader of ISIS, repeatedly raped and tortured until her death,

8    we have no idea how many others, both male and female ISIS

9    members, also beat, terrorized, tortured, and raped our

10   daughter.  These are some of the things that keep us up at

11   night, that keeps us on edge and completely unsettled.

12        When, after more than nine months of desperate worry,

13   we finally received a letter from Kayla that she had brought

14   out -- she had others bring out, we were so hopeful.  Kayla

15   sounded strong, but she knew she was also -- we knew she was

16   also wanting to reassure us.  She signed that letter, "All my

17   everything."  I believe this was one more way of her telling us

18   she was doing and enduring all she possibly could so she could

19   come home.  I believe she gave her everything, until her final

20   breath, in an effort to get home.

21        As we tried to do all our everything to gain Kayla's

22   release, we were so frightened that somehow news would get out

23   about Kayla and she would be killed.  We lived in fear and

24   desperation each and every day.  We painfully learned that even

25   if we could somehow miraculously raise the ransom while keeping

1    Kayla's situation out of the media, there was no way to even get

2    it to ISIS, given our own country's policies about ransom for

3    hostages, even hostages being brutally and endlessly tortured

4    simply for being American, that was known.  It was a

5    never-ending cycle of stress, distress, and always terrifying

6    fear for Kayla.

7            Our helplessness and fear were overwhelming.  As the

8    deadline approached in early August, just days before Kayla's

9    25th birthday, we were frantically sending emails to ISIS.  I

10   remember that night, the eve of the deadline, wondering if our

11   daughter was being killed at that very moment.  Was the deadline

12   Arizona time or Syria time?  The midnight of or the midnight

13   after the deadline?  Was there still hope or not?

14           There are no words adequate to describe those moments

15   of helplessly wondering if our daughter was about to be

16   murdered, and unable, despite all we were trying to do, to spare

17   her of that terror, the pain, and finally death.

18           The deadline passed.  We heard nothing.  Was Kayla

19   killed?  Then, one by one, the American and UK hostages were

20   viciously beheaded; first James, then Steven, David, Alan, and

21   finally Peter.  Our hearts and lives were shattered in pieces,

22   and each day we became more and more aware of the suffering and

23   desperation of so many others.  We still had no idea where Kayla

24   was, and there was no more communication with ISIS.

25           I have over 20 notebooks of journaling and notes and

1    prayers for Kayla.  I continued to write to Kayla and for Kayla

2    every day, telling her everything we were doing to free her and

3    everything I knew was happening.  I read every book I could find

4    that would help me better understand the political and religious

5    history of the region and people, to better understand the

6    reason for all of the suffering and violence in order to help

7    our daughter.  And I continue to read all I can.

8            Finally, two months from the original deadline, having

9    sent ISIS many emails, ISIS emailed us that Kayla's release was

10   still obtainable, but added more demands about the U.S. stopping

11   the bombing in Syria, which they knew we had no control over.

12   It was one more exercise in cruelty to dangle our daughter's

13   life and death in front of us, knowing we were desperate but

14   absolutely helpless.

15           Our hearts were continually breaking, and yet we

16   continued to quietly try to find people to help us, always

17   worried that our efforts would get Kayla killed, not freed.  But

18   we had to keep trying so finally we could get her home.

19           Then, February 6th, 2015, 18 months after Kayla was

20   first taken, we received a call that ISIS had tweeted that Kayla

21   had been killed.  ISIS also tweeted out our address,

22   phone number to the world.  After 18 months of searching,

23   praying, and hoping for Kayla to come home, we were shattered

24   and numb.  And yet we were not sure.  All along, we had been

25   told ISIS would not harm a woman.  At this time we did not know

1     what others knew about all that Kayla and the young Yazidi girls

2     were enduring at that time.

3          ISIS told us that Kayla was killed in a Jordanian air

4     strike, our government told us that Kayla was killed by ISIS,

5     and others told us she was not killed at all.  We were so

6     uncertain.  We still do not know what happened to Kayla.  We

7     have learned some things, and while there are stories of rape,

8     beatings, terror, and horror, I am thankful for each shred of

9     truth, no matter how painful it is to hear.  As Kayla's mom, I

10    need to somehow walk this horror with her.  I want it known so

11    it never happens again.  Kayla would want it known so it would

12    never happen again.

13         We will continue on our search to locate Kayla's

14    remains.  We need to bring her home, and we are open to any and

15    all help we are given by anyone who has knowledge of Kayla, of

16    where she may be, of what truly happened to her.  I believe this

17    will help ease our pain, the pain inflicted on our family and

18    those who loved Kayla.

19         I would like to thank this court, our justice system,

20    and all the men and women who have worked tirelessly to help us,

21    including former hostages, negotiated out, for their willingness

22    to come and relive what happened during their horrific

23    captivity.  I'm grateful for the jury and their diligence and

24    attentiveness for our laws, and the right to a free trial that

25    was given to these men.

1        I ask that those who have been a part of this horrific

2   terror and torture and suffering will help us move closer to the

3   truth, closer to finding Kayla and properly laying her and all

4   her suffering to rest.  I am not seeking revenge.  I simply want

5   the truth.  I believe that is the best way forward for us and

6   our family.  It is also the most righteous path forward for

7   those who were involved, directly or indirectly, in our

8   daughter's suffering and death.

9        No one should suffer the agonizing pain and grief we

10  families have endured, and no human being should be subjected to

11  the treatment, torture, and terror that ISIS inflicted on so

12  very many people, not never, not ever, not for any reason.

13       Thank you.

14       THE COURT:  Mr. Mueller, go ahead, sir.

15       MR. CARL MUELLER:  Your Honor, I've tried many times to

16  compose a speech, and failed.  My intent is to speak from the

17  heart today.

18       As you've witnessed with all the other families, most

19  of what they've said pertains to me and my family as well.

20  You've heard the horrors that we lived through from Marsha just

21  now, but I would like to address the defendants, if I may.

22       Who takes a young woman, an aid worker, whose life's

23  work is to help people, to heal people?  Who takes that person

24  and keeps them like an animal in a cage, intimidates and

25  tortures, rapes?  Cowards.  That's who does that stuff, cowards.

1            Bravery is what you're witnessing here today.  The

2     families of the victims, the ones you victimized, tortured,

3     intimidated, that's bravery; not taking a young woman and

4     scaring her to the point where...it's unbelievable that you

5     would do these things.

6            You not only took our daughter, you took a young woman

7     whose life was dedicated to helping people.  She would have

8     helped hundreds, maybe thousands of people during her lifetime,

9     and you took her away from the world, as well as us.

10           Your Honor, I've always been a religious man and have

11    always considered myself a patriot.  But throughout this whole

12    ordeal, I have lost my faith in God and I've lost my faith in my

13    government, because my government left our daughter there

14    18 months to endure what these two men put her through.  They

15    would not allow us to negotiate.  All we ever did was

16    communicate.

17           One question that's always bothered me, for nine years

18    now, is when Kayla gave up hope.  When did that reality come

19    crashing down on her that she was not going to be rescued,

20    ransomed out?  Just yesterday, Your Honor, I got the answer to

21    that question in a meeting here in this building.  She told one

22    of the Yazidi girls that she was being held with late in her

23    captivity that she knew she was not coming home.  She knew that

24    her government was not going to save her, and that her parents

25    couldn't.

1           I, as well, want to thank Your Honor for presiding over

2    this.  This trial, being witness to this trial, was an honor for

3    me, Your Honor.  Witnessing this has restored my faith in my

4    government, and I appreciate that.  The jury was amazing in

5    their diligence and how they paid attention.  It was -- the

6    whole thing has restored my faith in my government, this

7    prosecution team as well as the defense.  As I told the defense

8    attorneys, without them, our system doesn't work.

9           So thank you for the time, Your Honor.

10          THE COURT:  Mr. Foley.  You are Michael Foley?

11          MR. MICHAEL FOLEY:  Yes.

12          THE COURT:  And with you is?

13          MR. MICHAEL FOLEY:  I'll explain that, Your Honor.

14          THE COURT:  All right.

15          MR. MICHAEL FOLEY:  So for Jim, Honorable Judge Ellis,

16   my name is Michael Foley.  I'm Jim's brother.  This is my wife,

17   Jim's sister-in-law, Kristie Foley.

18          As I said, I'm Jim's brother.  I'm here on behalf of

19   our family and the many victims that were impacted irreparably.

20   Our family who is not able to join us today is listening by

21   phone.

22          You know, I was at the other end of those emails.  You

23   held Jim for over 600 days, and, as was mentioned, with no

24   communication.  You may know that we did receive a letter from

25   Jim and he shared his thoughts, some of which we have here.

1           Jim would want the entire world to know about the

2    horrific human rights crimes committed by ISIS, by individuals

3    like Alexanda Kotey, El Shafee Elsheikh.  These are weak

4    individuals who are proven to have harmed and killed peaceful

5    and unarmed people.  Their crimes of kidnapping, starvation,

6    waterboarding, torture, and rape have been heard by all of us in

7    this courtroom.  In these instances, hatred truly overtook

8    humanity.

9           Jim would want us to know about the Syrian people's

10   yearning for freedom that drew journalists like Steven Sotloff

11   and Jim to bear witness to their struggle, and to the immense

12   suffering acutely felt by compassionate aid workers like

13   Kayla Mueller and Peter Kassig.

14          Jim would have wanted Alexanda and El Shafee held

15   accountable in the United States, where they have been afforded

16   a fair and just trial with all of the evidence and eyewitness

17   testimony.  Accountability is essential to deter hostage-taking

18   and murder.  This includes applying the maximum sentences bound

19   by statute, which do not include a possibility of parole.  Jim

20   would want these two to spend the rest of their lives

21   incarcerated, with time to reflect and attempt to make amends

22   for their horrific deeds.  I ask for and seek isolation during

23   their sentences to facilitate this, Your Honor.  It's worth

24   noting, Alexanda has admitted to the crimes and accepted

25   responsibility.

1          I know that Jim's deepest pain was knowing how much his

2   family and friends would suffer because of our loss of his

3   loving, joy-filled presence in our lives.  We have suffered

4   greatly and irrevocably.  However, Jim would also want Alexanda

5   and El Shafee to know that their hate-filled crimes did not win.

6   James Wright Foley lives on.

7          Jim would say:  You did not kill me.  I am alive in my

8   family and friends and supporters.  I am alive in the mercy and

9   justice of this trial.  I am alive in the brave testimonies that

10  have been told on the witness stand to Judge Ellis and the jury.

11  I am alive in all who have dared to share their truth of what

12  occurred in Syrian from 2012 to 2015.

13         I am alive in journalists, reporters, and photographers

14  who have shared details and images of your trial and judicial

15  hearings around the world.  I am alive in the stories of those I

16  have told, those heard here in this courtroom, and of the

17  stories yet to be told.  I am alive in all who aspire to a moral

18  courage in whatever they choose to do.

19         I am alive in Steven Sotloff's 2LIVES Foundation, in

20  the James W. Foley Legacy Foundation.  I am alive in all who

21  promote journalist safety and the return of wrongful detainees

22  and hostages around the world.  I am alive in the families who

23  yearn for the return of their loved ones and accountability for

24  their captors.  And I am alive through all the future students

25  who will attend and graduate from Marquette University through a

1    scholarship that bears Jim's name.

2          In many ways I'm more alive than ever.  My name, and

3    the names of Steven, Kayla, Peter, David, Alan, and let's not

4    forget John Cantlie, are known around the world and inspire

5    moral coverage in journalists, government officials, and

6    compassionate people to put an end to the terror and

7    international hostage-taking, and to strengthen the armor of

8    those who work in areas of conflict.

9          I too would like to thank the prosecution team for

10   their efforts, and this court for seeing this through.  Jim

11   continues to inspire others to live a life of purpose and

12   compassion.  In your last email to the family you stated, "You

13   do not spare people so we will not spare you."  This too has

14   proven wrong.  Love is much stronger than hatred.  I pity you

15   both for choosing hate and for succumbing to a false theology.

16   Because Islam is a religion of peace and mercy.

17         I hope your time in prison will give you the space to

18   reflect, repent, and perhaps even seek to make amends for the

19   suffering you have inflicted on fellow human beings.  The god I

20   believe in may even forgive you both.  It's up to you.

21         Thank you.

22         THE COURT:  All right.  Mr. Safarjalani, come forward,

23   sir.

24         MR. RADWAN SAFARJALANI:  Yes, sir.  My friend

25   Mohammad Almahmoud would also like to speak.

```
 1                    THE COURT:  All right.

 2                    MR. RADWAN SAFARJALANI:  Nothing much to say --

 3                    THE COURT:  What is your name, sir?

 4                    MR. RADWAN SAFARJALANI:  Radwan Safarjalani.

 5                    THE COURT:  No, your name.

 6                    MR. MOHAMMAD ALMAHMOUD:  My name is Mohammad Almahmoud,

 7          and I'm one of the victims as well, Your Honor.

 8                    THE COURT:  All right.  Go ahead, sir.

 9                    MR. RADWAN SAFARJALANI:  Nothing too much to say,

10          really.  But I hope you both have time to think about what you

11          did, and, like, the most important is to feel regret out about

12          what you did.  And, like, I want you not to connect these things

13          to Islam, speaking from Muslim to Muslim, because this, like, is

14          way against the Islam that I know.

15                    Do you recognize my face?  Because, like, back in 2013,

16          I begged you both for my life in the factory in Aleppo.  But all

17          the horrible crimes that happened at that place are gone;

18          al-Adnani, the guy you know, is gone; Abu Idris, gone.  But the

19          memory remains.  Maybe, like, they want us to stop breathing,

20          but it's not happening.  Like, we are not the victim here.  You

21          are the victim after what happened.  We might forgive, but not

22          excuse.

23                    Thank you, Your Honor.

24                    MR. MOHAMMAD ALMAHMOUD:  My name is Mohammad Almahmoud,

25          again, and I was taken with Peter Kassig on October 1st.  I only
```

1    want to tell -- wanted to tell you that the actions you did by

2    killing and torturing people of Syria, and the other American

3    hostages and other foreigners, they're exactly as the regime of

4    Bashar al-Assad's actions and there are no difference.

5            You learned -- I've listened to the European hostages;

6    the way that you tortured people, it's exactly as the regime.

7    Don't you ever think that you were fighting against the regime

8    of Bashar al-Assad, because you weren't.  You were cooperating

9    with them, exchanging oil with electricity with them.

10           You destroyed my country.  You killed many thousands of

11   people of my country.  I won't forgive you for destroying my

12   country and for killing my friends, Peter Kassig, and all the

13   Syrians.  None of the Syrians will forgive you or your

14   organization.

15           Thank you, Your Honor.

16           THE COURT:  Is there anyone else who wishes to be

17   heard.  Let me recognize others who are here.  I believe

18   Harry Savill is here, Mike Haines' best friend.  Are you here,

19   sir?  You may stand.

20           MR. HARRY SAVILL:  I would rather not, sir.

21           THE COURT:  All right.  That's fine.  Aliesje Motka, I

22   want to recognize you as well.  Lara Symons?

23           MS. LARA SYMONS:  I'm here, Your Honor, simply to

24   support the family.

25           THE COURT:  All right.  We have all witnessed the

1    exceptionally moving and heart-rending statements of these

2    victims' families.  And it should be a reminder to us, if we

3    review what we know about the hostages, especially James Foley,

4    Kayla Mueller, Steven Sotloff, Peter Kassig, and others, the two

5    Japanese hostages and the other British hostages, countries

6    celebrate heroes, and we should celebrate these individuals who

7    demonstrated courage, purpose, and compassion under the most

8    difficult circumstances.

9         I am pleased to hear that there are foundations and

10    colleges recognizing these individuals by setting up

11    scholarships.  The victims of the hostage-taking by ISIS are

12    undeniably heroes in what they had to endure and the courage and

13    the purpose they showed, and the reasons they were there.

14         James Foley was there because he was a journalist, and

15    he viewed journalism as an act of moral courage, which it is, a

16    search for the truth, and to report to people what's actually

17    happening.  He endeavored to shine a light in the darkness.  He

18    reported bravely on stories from conflict zones around the

19    world, including Iraq, Afghanistan, and Libya.  In 2012 he had

20    traveled to Syria in order to report on the suffering of the

21    Syrian people during the ongoing civil war.

22         And Kayla Mueller, she was guided, as her parents

23    noted, by a courageous compassion for people.  And it was an

24    unyielding compassion that led her to devote her life - and she

25    gave her life - to supporting work of humanitarian organizations

1    around the world.  She had traveled to the region at that time

2    in order to work for relief organization Support To Life, which

3    had focused on providing aid to Syrian refugees.

4         Steven Sotloff, journalist, reporting stories from

5    war-torn countries in North Africa and the Middle East, he

6    demonstrated excellence and bravery in journalism that ought to

7    be an example to all young people ambitious to be excellent,

8    brave journalists.  He should be an inspiration, and is an

9    inspiration to all of them, and indeed to all of us.  He

10   provided on-the-ground important reporting regarding the 2012

11   attack on the consulate in Benghazi, and like James Foley prior

12   to his abduction, Steven had traveled to Syria to give a voice

13   to the people suffering in Syria.

14        And Peter Kassig, in his young life, demonstrated

15   remarkable commitment to service that ought to be an inspiration

16   to all of us, especially to young people.  There's so much

17   dispute now, and anger in our society about what's taught to

18   young people.  Teach them about these hostages, and how they

19   suffered and what courage they showed.

20        Peter, following time as a U.S. Ranger, devoted himself

21   to humanitarian work in the Middle East.  When he was only 24 he

22   founded an organization called Special Emergency Response and

23   Assistance, SERA, which I'm sure will survive and endure,

24   inspired by his example, providing medical assistance to Syrian

25   refugees.

1          Again, no one who has been involved in this process can

2    fail to take inspiration from the purpose, the courage, and the

3    dedication, not only of the victims, but of their families.  And

4    it is important that you appeared today and spoke.  The law

5    requires that you be given that opportunity, and it does so

6    wisely.

7          The prosecution of Mr. Kotey and Mr. Elsheikh is not

8    revenge.  It is the search for the truth through a trial, a fair

9    trial, in which the prosecutors have worked very hard to present

10   a complete picture, thorough picture.  And it's a fair trial.

11         Our government has provided a defense for the

12   defendants, a very substantial defense.  These defense lawyers

13   are not inexperienced.  I know we hear a lot of things on

14   television about public defenders and the like.  And some of the

15   individuals are public defenders, but they're experienced and

16   very good attorneys.  And others appointed are very experienced

17   and very competent.  They have been provided not just marginal,

18   but the best people.  Just like they're the best prosecutors,

19   these are the best defense lawyers.  And I'm proud, and you

20   should be too, that our country provides that.

21         I would also be remiss if I didn't mention, before

22   going on in this thing, I don't comment - it's not my job to do

23   so, and I don't - about what the government does.  But I'm

24   pleased that our government did attempt to rescue the hostages.

25   Whether they did so in time or whether -- however they did it, I

1    don't know.  But you should also know that very courageous

2    people -- there were at least two efforts made to rescue.

3             Am I right, Mr. Fitzpatrick?  At least one, but I

4    thought there might have been two.

5             MR. FITZPATRICK:  Well, there was one very prominent

6    effort, yes.

7             THE COURT:  Yes.  About which we heard testimony.  And

8    I'm glad of that.  We should not forget our people, and they are

9    our people.

10            I'm going to recess now.  Mr. Elsheikh will be returned

11   to his place of confinement and I will proceed with the

12   sentencing process for Mr. Kotey.  I will take a recess until --

13   it's now 5 minutes to 11:00.  I do hope you will return for the

14   rest of the sentencing process, but I'm going to give you a half

15   an hour because there are limited facilities around here and

16   everyone should have an opportunity to relax.  Thank you for

17   your attention.

18            Court stands in recess until 11:30.

19            (Recess taken at 10:56 a.m.)

20            THE COURT:  The record will reflect that we're

21   proceeding after a recess, and the other defendant who went to

22   trial is not present.  El Shafee Elsheikh has been removed and

23   Mr. Kotey remains with his counsel.

24            We'll proceed now with the remainder of the sentencing.

25   We've heard from the victims and I've done the work to clarify

1    the PSR.  And so we're proceeding now on the basis of the PSR,

2    and the offense level by the manual is at 43 and a Category 1.

3    No, Category 6, I'm sorry.

4              MR. FITZPATRICK:  Thank you, Your Honor.

5              THE COURT:  Category 6.  Again, that's really

6    irrelevant to the -- whether it's 1 or 6 doesn't make any

7    difference for the guidelines, but it's important to get it

8    accurate.  You're quite right, Mr. Fitzpatrick, it's 6.

9              I have your briefs, and I've read your briefs and

10   reflected on them, as I typically do.  The main issue, as I see

11   it - Mr. Eisenstein, correct me if I'm wrong - is whether I

12   should make a recommendation to the Bureau of Prisons that

13   Mr. Kotey be designated to serve his sentence at one of the two

14   or three locations that you mentioned in your brief.  I've

15   forgotten what they're called.  What are they?

16             MR. EISENSTEIN:  CMUs, Communications Management Units.

17             THE COURT:  Right.  Instead of Florence.  I've actually

18   been to Florence, but I've never been inside Florence.  But I do

19   know that Florence is a more severe regime.

20             I think that's the main issue.  Am I correct,

21   Mr. Eisenstein?

22             MR. EISENSTEIN:  That is correct, Your Honor.  That's

23   the main issue.

24             THE COURT:  All right.  Well, I'll hear from you first

25   and then I'll ask Mr. Fitzpatrick what the Government's view --

```
1    it's really -- the Bureau of Prisons, of course, is under the

2    Department of Justice.

3            MR. EISENSTEIN:  Correct.

4            THE COURT:  And the Department of Justice, the head of

5    that is the Attorney General, below the President.  Right?

6            MR. EISENSTEIN:  Yes.

7            THE COURT:  So it's really the executive branch that

8    makes that determination.  Of course, to begin with, you should

9    know - as I'm sure you do - that I typically recommend, in much,

10   much different cases, where there is a relatively shorter period

11   of time in which a defendant has to serve a prison sentence, and

12   the defendant has family, that in order to enhance the prospect

13   for rehabilitation and readjustment to a law-abiding life, I

14   typically tell the Bureau of Prisons that I recommend that the

15   prisoner be housed in a suitable facility near his family.  But

16   that only happens in circumstances different from this one.

17           Why don't you summarize briefly why you think I should

18   make a recommendation in this case, which is not something I

19   typically do, and then I'll have Mr. Fitzpatrick respond.

20           MR. EISENSTEIN:  Yes, Your Honor.  With your

21   permission, I would also make some brief general remarks.

22           THE COURT:  Yes, of course you may do so.

23           MR. EISENSTEIN:  Thank you, Your Honor.  The conduct

24   before the Court in this sentencing involves some of the worst

25   acts the world has ever seen, and hopefully will ever see.  The
```

1    released hostages have physical and emotional scars that will

2    never heal.  The family of the victims have endured everyone's

3    worst nightmare for any parent, sibling, relative, or friend.

4            The conduct that brings Mr. Kotey before the Court, and

5    for which he's accepted responsibility, has been covered

6    extensively in the media and details of the trial of

7    El Shafee Elsheikh.  We don't seek to minimize Mr. Kotey's

8    actions.  I will not address any of the underlying conduct.

9    There's no dispute about the horrific acts the Islamic State

10   carried out in Syria.

11           Our hope is the focus will remain on the memories and

12   legacies of the victims.  They will live on through the

13   foundations that have been set up and the work that has been

14   done by groups.

15           Information about Mr. Kotey's background and personal

16   circumstances are included in our memorandum, and also

17   Mr. Kotey's submission to Your Honor, which I'm sure all the

18   parties have reviewed.

19           THE COURT:  And it's also, of course, a large part of

20   the presentence investigation report.

21           MR. EISENSTEIN:  Correct.  What we hope is the victims

22   be able to tell their stories and explain how the crime affected

23   them, which occurred this morning.  We want them to know that

24   Mr. Kotey listened to every word they said.  He's read every

25   letter and taken it to heart, and it's something that he has

1    continued to think about.

2           This case involves a mandatory life sentence.  There's

3    no argument from us for any other sentence.  This is something

4    that Mr. Kotey knew when he agreed to plead guilty.  Nothing in

5    our submissions and nothing I'm going to say today seeks to gain

6    sympathy or pity for Mr. Kotey.  He does not seek that from

7    anyone.  His letter reflects that he is here because of the

8    actions he made.

9           One thing that became clear after Mr. Kotey was

10   transferred to the U.S. to face charges is the victims and the

11   hostages have a lot of questions and want information.  Knowing

12   this, Mr. Kotey himself was the one who offered to make his plea

13   agreement public, and offered to meet with released hostages and

14   also meet with the victims' families.  This directly came from

15   him.  We submit this is a glimpse into who Mr. Kotey is, and the

16   fact that he is not defined by his actions that were carried out

17   in Syria.

18          Again, we're not seeking praise for Mr. Kotey, but I

19   think it's noteworthy that this was his idea, to be able to

20   offer to meet with the victims, something that couldn't be

21   ordered if he went to trial and he was convicted.

22          Also, the statement of facts that were submitted in

23   this case, they described the conspiracy generally but they

24   don't explain in detail Mr. Kotey's specific role.

25          The meetings that I just referenced have already

1    started.  One meeting with a victim family has already taken

2    place, and there are additional meetings scheduled in the next

3    few days.  Mr. Kotey hopes that this information could be

4    helpful to the victims.  This is his way to try to make amends

5    and bring any amount of small good from this horrible situation.

6         What we seek at sentencing is to put mechanisms in

7    place to allow Mr. Kotey to finish the work that has started.

8    He has met with families.  His plea agreement outlines his

9    requirements or his obligations with respect to the Government,

10   and he has started on that process.  And we seek measures to

11   allow him to continue to do that.  That is why we ask the Court

12   to make that recommendation.

13        Your Honor mentioned the Bureau of Prisons and the

14   hierarchy.  One issue that's directly impacting this is SAMs,

15   the Special Administrative Measures that Mr. Kotey has been

16   placed on since he arrived in the United States.  Information

17   about SAMs is hard to come by, but what we understand is that

18   there are about between 50 and 75 people on SAMs in the

19   United States, 24 of them charged with terror offenses.

20        The SAMs are extremely restrictive, and restrict

21   Mr. Kotey's ability to communicate with anybody at the place

22   where he's being incarcerated.  He's not allowed to interact or

23   speak to any other inmate.  We submitted a letter from the ADC

24   that shows that Mr. Kotey has been a model inmate at ADC.  He

25   has incurred no infractions and has been compliant with all of

1     the jail rules.  There's also no allegations of violating these

2     restrictive SAMs.

3            Mr. Kotey has a strong incentive to continue to comply

4     with the Government -- excuse me, continue to comply with his

5     requirements in BOP custody.  As is reflected in our plea

6     agreement, he is hoping to be transferred to the UK after

7     15 years of serving his sentence.  This is the one thing that he

8     wants.  Your Honor mentioned that typically somebody has family

9     in the United States and the BOP attempts to place them

10    somewhere close to their family.  Mr. Kotey has no connection --

11           THE COURT:  No, the BOP doesn't.  I don't know what

12    they do.  I make recommendations, and they do -- they're the

13    ones -- that is, the Bureau of Prisons makes the decision.  I

14    don't have the power over that decision.

15           MR. EISENSTEIN:  Agreed, Your Honor.  But that's all

16    part of our request, is to ultimately have Mr. Kotey transferred

17    to the UK and be close to his family.

18           What we understand is, because of the nature of --

19           THE COURT:  Let me be clear.  Although that's part of

20    his plea agreement, that isn't part of the Court's

21    responsibility.  All I do is recognize that.

22           Now, if the Government doesn't use its best efforts,

23    after 15 years of incarceration, to transfer him to the

24    United Kingdom, then it could be a breach of the agreement.  But

25    it has nothing to do with the sentence I impose today.

1          MR. EISENSTEIN:  Correct, Your Honor.  I agree.

2          THE COURT:  All right.  Let's go on.

3          MR. EISENSTEIN:  Because of the SAMs and because of the

4    nature of the offense, it's our understanding that the BOP is

5    going to reflexively send Mr. Kotey to Florence ADMAX, and that

6    is what we hope to prevent.  Our submission is that sending

7    Mr. Kotey to ADMAX reflexively would be inconsistent with the

8    BOP regulations, and, more importantly, it would frustrate his

9    efforts to meet his obligations under the plea agreement.

10         THE COURT:  Well, you say reflexively.  But, you know,

11   they don't do things reflexively.  They go through a process.

12   They have criteria.  And they're not going to do it reflexively.

13         I think what you hope is that if you can persuade me to

14   make a recommendation, that that will weigh against their usual

15   determination.  Because they will look at the PSR, the Bureau of

16   Prisons will look at the PSR, they'll look at the violations,

17   they'll look at all of the information, and make a determination

18   as to whether Florence is necessary or appropriate.  They don't

19   do it reflexively.  I don't know what you mean by reflexively.

20         MR. EISENSTEIN:  Based on the information and

21   investigation we were able to do, that is our understanding;

22   that the existence of the SAMs will cause them to not go through

23   the usual process, and to send him to ADMAX because there are

24   limited places that could adhere to the SAMs.

25         And putting aside the question, from our perspective,

 1    of whether ADMAX -- which, as Your Honor noted, the information

 2    is limited, but we did submit a declaration from an expert

 3    witness about what the conditions of ADMAX look like:

 4    75-square-foot cells, and not solitary confinement but complete

 5    isolation.  Putting aside whether those conditions comply with

 6    the Eighth Amendment, we submit that it would be

 7    inappropriate -- or it would be appropriate to try to put

 8    measures in place to avoid sending somebody like Mr. Kotey, who

 9    has pleaded guilty and who has agreed to start working with the

10    Government and meeting with families, sending him to ADMAX.

11    Plus, his track record of good conduct.

12          Despite the nature of the offense, we included detail

13    about security level classification and also custody level

14    classification, which we think why we're asking the Court to

15    make the recommendation is to make sure that all those processes

16    are played out.

17          With respect to the question about the Court's

18    authority -- excuse me, the Court's ability, we did cite to

19    18 U.S.C. 3621, which says that BOP will consider judicial

20    statements in making designation decisions.  And also, we

21    included in our declaration the fact that the Court can inquire

22    if their designation request is refuted -- excuse me, not

23    followed through on.

24          We ask this court to make the judicial recommendation

25    set forth in our proposed order that was submitted, that, as I

1    said, in order to allow Mr. Kotey to continue the process of

2    cooperating, meeting with families, and fulfilling his

3    obligations as his way of attempting to make amends.

4         Mr. Kotey wrote directly to the Court in lieu of

5    speaking today, and he remains committed to meeting with the

6    families, and abiding by his plea agreement and providing any

7    information that could be helpful to the Government or to the

8    victims.

9         Thank you.

10        THE COURT:  All right.  Thank you.  Mr. Fitzpatrick?

11        MR. FITZPATRICK:  Thank you.  Your Honor, just before I

12   address the BOP issue, on the issue of the transparent and

13   public nature of the plea agreement, it's always been a

14   condition, an unbreakable condition of the Government, that

15   everything in this plea agreement be transparent and open.  So

16   this is the first we're hearing that this was Mr. Kotey's idea.

17   That was a condition set early on by the Government.

18        THE COURT:  Well, the plea agreement is in the public

19   record.

20        MR. FITZPATRICK:  Correct.  In its entirety.

21        THE COURT:  In its entirety.  All right.  I'm glad

22   you've confirmed that.  I thought that was the case.  Let's

23   proceed.

24        MR. FITZPATRICK:  On the BOP issue, Your Honor, the

25   Government doesn't dispute that the Court has discretion to make

1    a recommendation to BOP.  As the Court noted, that happens

2    routinely in this court and in other courts in this building.

3              THE COURT:  It happened today at 8 o'clock.

4              MR. FITZPATRICK:  I'm sure it did, Your Honor.  We

5    weren't able to attend that.

6              However, Your Honor, the order submitted by the defense

7    that they are asking the Court to enter is wholly inappropriate.

8    It's not a lawful order.  There's references in there that make

9    argument regarding the effect of the conditions at ADX Florence;

10   that's not a judicial order, that's an argument packed into a

11   judicial order.  There are other elements of their proposed

12   order that are objectionable.

13             THE COURT:  Put aside their order for a moment.

14   Typically, in a very different case, not in this case, but in a

15   case, for example, that I had this morning which was a

16   relatively modest drug-trafficking case, I recommended that he

17   be designated to serve his sentence - I believe his sentence was

18   less than two years - in a facility near his family.  He even

19   has a newborn child that he's never seen.  Not that that made

20   any difference to me.  It didn't.

21             But the point is that I did recommend it.  All I did

22   was recommend it.  They go through a process.

23             MR. FITZPATRICK:  Correct.  Right.

24             THE COURT:  So suppose I -- putting aside their order,

25   I agree with you it's argumentative and it makes certain

1    assertions I'm not sure I would make.  But tell me whether the

2    Government is in favor -- I mean, after all, it's the government

3    that controls where he goes.  The executive branch controls

4    which facility he goes to through the Bureau of Prisons.

5            MR. FITZPATRICK:  Correct.

6            THE COURT:  So what is your position, as the

7    government's representative, on whether he should have a

8    recommendation that he should go to some place other than

9    Florence?

10           MR. FITZPATRICK:  Judge, our recommendation to the

11   Court is that you remain free from this dispute.  And you are

12   correct that it is the Bureau of Prisons, under the law, that

13   determines where he is appropriately placed.

14           The comment from the defense that they don't want the

15   Bureau of Prisons to act reflexively is incorrect.  The

16   government has an obligation, under the law, to avoid arbitrary

17   and capricious action.  That is why, under the law and under the

18   regulations, the authority to designate prisons, or the

19   responsibility to designate prisons, falls within the

20   Bureau of Prisons.  And the guidelines are implemented, pursuant

21   to law and to regulation, to avoid arbitrary and capricious

22   decision-making.  We would be back in here if we did anything

23   else.

24           With respect to the Court's ability to make a

25   recommendation, we do not dispute that you have the ability to

1    make a recommendation.  That recommendation would be forwarded

2    to the BOP, and I am sure that they would consider it, under all

3    of the circumstances that they use in their decision-making

4    process, to make sure that they are making the correct decision,

5    and not making an arbitrary and capricious decision.

6         With respect to whether or not the Court should make a

7    recommendation in this case, we think this is an appropriate

8    case for the Court to remain neutral.  However, the Court does

9    have the discretion to make a recommendation, but, at bottom, I

10   think the Court is correct, all that the Bureau of Prisons would

11   do would be to take your consideration as one factor among a

12   whole host of others when they make their determination of

13   whether or not he should go to Facility A as opposed to

14   Facility B.

15        THE COURT:  Let's move down the line just a bit.  Let's

16   assume that I do as you suggest.  But I do certainly have the

17   authority, the power, to facilitate this process that

18   Mr. Eisenstein has talked about that has already started;

19   namely, meeting with the Government and meeting with families.

20   Why shouldn't he stay, let's say, in Alexandria, at least until

21   that process has run its course and he's met with the families

22   and with the Government?

23        MR. FITZPATRICK:  Well, Your Honor, I think, you know,

24   lawyers and government actors work best on defined schedules.

25   We're going to ask the Court that you delay his transfer to the

1    Bureau of Prisons until June 3rd of 2022.  We would also ask the

2    Court for leave to come back to the Court if there are

3    extraordinary circumstances that would warrant further delay of

4    that transfer to BOP, into the summer months.

5        But we are asking the Court to delay his transfer at

6    the outset --

7        THE COURT:  That's what I was getting at.

8        MR. FITZPATRICK:  Yes.

9        THE COURT:  That's a sensible thing to do if this

10   process Mr. Eisenstein has referred to has commenced, and not

11   everyone has had an opportunity, including the Government -- and

12   it's all public.  Typically cooperation agreements are not

13   public.

14       All right.  So that's resolved, and we're back to

15   whether or not I should do as Mr. Eisenstein suggests.  And

16   you've indicated why that's inappropriate -- well, you've

17   indicated that I have the authority, the power to make

18   recommendations, but you don't think in these circumstances that

19   I should.

20       Let me point out one other factor that you can enlarge

21   on, Mr. Fitzpatrick.  Things change over time.  Mr. Kotey is

22   going to be in jail in this country, at least, for a very long

23   time, and maybe for his life.  So circumstances will change, and

24   that includes whether or not he remains under SAMs - and I want

25   you to expand on SAMs in a minute - or goes to Florence or goes

68

1    to one of these other locations, or goes to a completely

2    different location.

3         He could, for example, become ill and require medical

4    treatment, in which case the Bureau of Prisons would have to do

5    that.  And while we sentence people to prison - I do, every

6    week, and some for a very long time - I've been doing it for

7    35 years, so these people have had all kinds of problems, from

8    kidney dialysis to heart transplants, and the Bureau of Prisons

9    does all that.  Now, they don't do it.  The heart transplant was

10   done at the University of Texas and the kidney dialysis has been

11   done in a number of places.  But the Bureau of Prisons must

12   respond to that.  If it doesn't, it violates the law.

13        MR. FITZPATRICK:  Correct.

14        THE COURT:  And I hear a lot of those cases too.

15   Because, of course, medical care in the Bureau of Prisons is not

16   a Mayo Clinic or Johns Hopkins.

17        I've been here so long, everything triggers memories.

18   I actually had a medical procedure at Johns Hopkins where they

19   did everything but the one thing they were supposed to do, and

20   they didn't do that.  So no one is perfect.  And I even got a

21   letter today from a litigant who is concerned that his case

22   hasn't been resolved, and he said even federal judges make

23   mistakes.  True.  And I have.  I try not to.

24        Anyway, the point is, things change over time.  And who

25   knows, even if he's designated to Florence, where he would be a

1    year from now or two years from now.  Mr. Eisenstein would say

2    very quickly that if he goes to Florence, that that's very

3    restrictive, very inhumane.  And he said putting aside the

4    Eighth Amendment issue; well, Mr. Eisenstein, you always, of

5    course, can attack that and make that case, that Florence is

6    cruel and unusual under the Eighth Amendment.  I haven't had

7    that case.  I think I've only had two or three people go to

8    Florence.  And, as I say, I've never been inside Florence, I've

9    only been by it.  So I don't have full knowledge of what happens

10   in Florence.  Mr. Eisenstein can tell me.

11        Let's go back, Mr. Fitzpatrick.  What are SAMs, so

12   everyone knows what they are.  And Mr. Kotey is currently under

13   those conditions.  Am I correct?

14        MR. FITZPATRICK:  Correct, Your Honor.  SAMs are

15   Special Administrative Measures.  They are imposed under the

16   authority of the Attorney General for unique defendants, such as

17   this defendant and Mr. Elsheikh, who are brought into the

18   marshals' custody or the Bureau of Prisons.  They are heightened

19   restrictions on their ability to communicate with others,

20   communicate with the outside world, and also receive

21   information.

22        Since Mr. Kotey and Mr. Elsheikh were incarcerated here

23   in October of 2020, they have been operating under SAMs.  They

24   come under yearly review.  They were reviewed last fall and

25   extended for another year, until November of 2022.  There are

1    processes in place that frankly are a bit opaque that allow for

2    modification or relaxation of SAMs, and the Department --

3              THE COURT:  What does SAMs stand for again?

4              MR. FITZPATRICK:  Special Administrative Measures.

5              THE COURT:  And really their focus, as I recall, is to

6    limit a defendant's ability to communicate with the outside

7    world.

8              MR. FITZPATRICK:  And receive information from the

9    outside world.

10             THE COURT:  And receive information.

11             MR. FITZPATRICK:  But I should be clear, Your Honor,

12   that, for instance, the defendant is able to communicate with

13   his family in the United Kingdom.  It's just under certain

14   conditions.  It has to be monitored.

15             THE COURT:  Well, everything is monitored.  At the

16   Alexandria Detention Center, if you are there because of a

17   firearms or drug conviction, you make a call, it's all recorded.

18   They know that.  They know that in advance.

19             MR. FITZPATRICK:  Correct, Your Honor.

20             So, Your Honor, the process for evaluating Mr. Kotey's

21   SAMs, Special Administrative Measures, are under way.  It takes

22   numerous conversations within different components of the

23   executive branch.  There are different stakeholders in that

24   process within the executive branch, and all have to be

25   consulted and all have to reach a degree of unanimity before

1    SAMs are removed or relaxed.

2          THE COURT:  And Mr. Eisenstein said that if you're on

3    SAMs, you automatically go to Florence.

4          MR. FITZPATRICK:  I don't believe that to be the case.

5          THE COURT:  I think they must go through a process

6    where they consider other things.

7          MR. FITZPATRICK:  I think an automatic referral under

8    SAMs to Florence would be contrary to the law.  It has to go

9    through a process.

10          THE COURT:  Yes.  Their expert argues otherwise, but

11    it's an argument.  He doesn't know any more than those of us

12    here whether or not people are going to ignore what their duty

13    is to look at things.

14          But anyway, do you have anything else?  I think what

15    you've told me is helpful, that you agree that Mr. Kotey should

16    remain here for the process.  Now, you've argued until June 3rd.

17    I wonder whether the end of June wouldn't be more reasonable in

18    order to ensure not only that the families, if they want -- they

19    may not want.  I mean, I don't know whether I would want or not.

20    But the Government also may want to have conversations with him,

21    all of which may inure to his benefit.

22          Because you can come back to court, Mr. Eisenstein, and

23    say, look, we've now gone through these two weeks; now try to

24    convince Mr. Fitzpatrick and the executive branch, don't send

25    him to Florence.  Also, I'm not sure that your representation of

1    what happens in Florence is entirely accurate.  I see a lot of

2    advocacy pieces by experts who tell me what things are like in

3    certain facilities.  Some have been accurate when plumped;

4    others have not been.  But I take your point, Mr. Eisenstein,

5    that it's a very restrictive environment.

6              All right.  Anything else, Mr. Fitzpatrick?

7              MR. FITZPATRICK:  On those issues, no, Your Honor.  I

8    would like the opportunity to address the 3553(a) factors on

9    Counts 6 through 8, and then also some substantive comments,

10   closing comments, on sentencing.

11             THE COURT:  All right.  Let's do that now.

12             MR. FITZPATRICK:  Your Honor, first, addressing

13   Counts 6, 7, and 8, those counts do not carry mandatory minimum

14   counts [sic].  We would ask Your Honor to impose life terms of

15   imprisonment on the conspiracy to kill U.S. citizens abroad,

16   Count 6, as well as the two variations of the material support

17   statutes that's Counts 7 and 8.

18             Your Honor, I'm not going to rehash or relitigate all

19   of the facts.  The Court has a very robust record in this case.

20   The public has a very robust record.  Given the nature and

21   circumstances of the offense, this defendant's central role in

22   the central conduct here, which is the hostage-taking and

23   captivity and ultimate murder of U.S. citizens and

24   British citizens and Japanese citizens, given those

25   circumstances of this case, as well as the factors in 3553(a),

1    the seriousness of the offense, the respect for the law, and to

2    limit or prohibit further crimes of the defendant, we do submit

3    that of any case this court has heard in recent history, this

4    case warrants life terms of imprisonment on Counts 6, 7, and 8.

5          We would ask the Court to impose those sentences on

6    those three counts because they are the appropriate lawful

7    sentences --

8          THE COURT:  They're also been the guidelines.

9          MR. FITZPATRICK:  Well, well within the guidelines,

10   Your Honor.  The guidelines for 6, 7, and 8 also recommend life

11   terms of imprisonment.

12         So, Your Honor, for those reasons, we would ask the

13   Court to impose life terms of imprisonment on those three

14   counts.

15         We also, Your Honor, have no objection, then, to all

16   eight counts merging, and running them concurrently.  It is a

17   life sentence that the Government seeks, and it is a life

18   sentence that is supported by the law.

19         THE COURT:  All right.

20         MR. FITZPATRICK:  Your Honor, with respect to just some

21   closing arguments measuring or reflecting upon why this case

22   deserves a life sentence, the conduct that you've heard and that

23   was engaged in in this case is absolutely horrific.  There is

24   little crime that has been committed that has come before this

25   court or other courts that compares.  Every crime at some level

1    is different and is horrific in its own way, but this crime,

2    committed by the defendant and his co-conspirators,

3    El Shafee Elsheikh, Mohammed Emwazi, also Mohammad al-Adnani and

4    also Abu Bakr Baghdadi, and the whole range of depraved --

5            THE COURT:  So that I'm clear, the last name that you

6    mentioned, and Mohammed Emwazi, are no longer with us, are they?

7            MR. FITZPATRICK:  No, Your Honor.  Mohammed Emwazi was

8    killed in November of 2015.

9            THE COURT:  A drone strike?

10           MR. FITZPATRICK:  Correct.

11           THE COURT:  And Baghdadi?

12           MR. FITZPATRICK:  Baghdadi was killed in a military

13   operation in early 2019, I think.

14           THE COURT:  And I think it's also worth pointing out

15   that in the rescue attempt that we mentioned earlier, there were

16   three ISIS people killed there, too.

17           MR. FITZPATRICK:  Correct.  Yes, Your Honor.  And in

18   the May 15, 2015 operation addressing the Abu Sayyaf house where

19   Kayla Mueller was kept, Abu Sayyaf, who was a very senior member

20   of ISIS, he was killed in that military operation.

21           THE COURT:  And his wife was captured?

22           MR. FITZPATRICK:  His wife was captured.

23           THE COURT:  And she's in this country facing

24   prosecution?

25           MR. FITZPATRICK:  No, Your Honor.  She's currently

1    detained in the Kurdistan region of Northern Iraq.  She is

2    subject to a life sentence within the Iraqi criminal system.

3    There is a pending criminal complaint, which is public, that has

4    been lodged against her, and there are warrants --

5              THE COURT:  Criminal complaint from this country?

6              MR. FITZPATRICK:  Yes, from the Eastern District of

7    Virginia.

8              THE COURT:  In other words, if they don't give her the

9    sentence there, the United States will seek her extradition?

10             MR. FITZPATRICK:  That is correct, Your Honor.

11             THE COURT:  All right.  Thank you.

12             MR. FITZPATRICK:  So, Your Honor, the conduct here

13   is -- as we state in our position papers, it's depraved, it's

14   egregious, it is some of the most heinous conduct that this

15   court has ever seen.  And mindful of the fact that this court

16   has seen the sentencing -- the conviction and sentencing

17   proceedings of Zacarias Moussaoui in the 9/11 proceedings,

18   Your Honor has provided over terrorism matters,

19   John Walker Lindh, among others.  This case and the harm created

20   by this defendant and the Islamic State does not take a back

21   seat to any other crime that has been committed by terrorist

22   organizations.  It is on par with the worst conduct that this

23   court has ever seen.  Not only this court, but the United States

24   has ever seen.

25             But, Your Honor, the focus today, as you can imagine,

 1    from the Government's pleading in this case for the sentencing

 2    hearing, and the victim impact portion of our hearing today, as

 3    well as the Court's concluding remarks at that victim impact

 4    session, the conduct here appropriately belongs on the victims.

 5    If we can put up photographs that were in evidence in the

 6    Elsheikh trial.

 7             And I would also be remiss in ignoring the fact that,

 8    fortuitously, this sentencing hearing comes on the last day of

 9    the National Crime Victims' Rights week.  As the Court noted in

10    your remarks, the law appropriately recognizes that in the

11    determination of that sometimes elusive quest to find justice,

12    we ignore the rights of victims.  And that is wrong.  As the

13    Court stated in your remarks, the Congress wisely notes that

14    victim rights are appropriate in that quest for justice, and

15    they need to be heard.  That factors into the way in which

16    courts should be guided and make their final determinations.

17             We exist in a fair process.  We exist in a process that

18    is driven by due process, and, rightly so, the due process

19    rights belong to the defendant.  We would not have it any other

20    way.  But it is folly and it is a mistake to suggest that

21    victims are not part of -- an integral part of this quest for

22    justice.  And the four individuals that you see on the screen,

23    Your Honor, are central to this argument today.

24             It is the nature and quality of these individuals that

25    supports the life sentence in this case.  As we noted,

1    Your Honor, in our position paper - and I want to quote from it

2    directly - on page 3, "The victims' heroic, selfless, and

3    peaceful commitment to others and the pursuit of truth are

4    reasons why their murders are so intensely felt by their

5    families, their community, and the world at large."

6         Your Honor, that is not hyperbole.  This case is

7    intensely felt by the world at large and by their communities.

8    And the reason why there is such an intensity about this

9    prosecution and about the circumstances of this case is that

10   these people were pure good.  They were the light that exists

11   within human nature.  As you note -- as we noted in our papers,

12   there is a sad reality and a sad truth to human nature, the

13   human condition, that there is a dark side.  And throughout this

14   trial and throughout the compelling victim testimony that we

15   heard, we heard the dark side.  The conduct here was atrocious,

16   it was depraved.

17        What is ignored and what we should put a spotlight on

18   is the good conduct of these people, the heroic conduct.  The

19   last witness from the Government was Daniel Rye Ottosen, and he

20   alluded to the statement I'll make --

21        THE COURT:  Let me just note, I've been very cautious

22   in this proceeding not to rely at all on anything that happened

23   in the Elsheikh trial, because, as you correctly pointed out in

24   your pleadings, that is not a factual determination that I'm

25   making, that this defendant has had -- I beg your pardon.  Has

1    had an opportunity to object to.  So I think you and I are in

2    agreement that it isn't really appropriate to rely on the

3    evidence in the Elsheikh trial.

4          Now, I have a great deal of evidence from the

5    presentence report and in other things that have been filed with

6    respect to Mr. Kotey, and I think it's prudent that we should

7    focus on that, and not on anything adduced or presented in the

8    Elsheikh trial.

9          MR. FITZPATRICK:  Understood, Your Honor.  So I'll put

10   it another way.  It has been said of these victims from a

11   released hostage, having gotten to know these victims, that what

12   existed in these people was pure good.  And that is in sharp

13   contrast to the misguided, depraved criminal activity that was

14   exhibited by the Islamic State.

15         You heard the final two witnesses in the victim impact

16   portion of our hearing describe, you know, that they were

17   members of the Islamic faith.  What the defendant and his

18   co-defendants and the rest of the Islamic State were engaged in

19   was not based in any form of religious doctrine, it was criminal

20   activity masquerading under religion.  It was not religion, it

21   was pure and simple egregious, depraved criminal activity.

22         These individuals went into the world because they

23   thought big thoughts, and helping others and making the world a

24   better place step by step, action by action, is a big thought.

25   And these four individuals were humble people.  We've gotten to

1    know them through their family members.  And it's no mistake why

2    these people are the way they are, and their memories are.  It's

3    because they came from remarkable families.  That's not an

4    accident.

5           Their families are humble.  They miss their loved ones

6    dearly.  What they should know is that these four individuals

7    were remarkable people, and that's why this case is felt so

8    intensely across the world.  What the world is missing from

9    these people is greatness.

10          Every single one of these people would have continued

11   on to do great things in their lives because it was within them.

12   It was innate.  It was in the fiber of their DNA to do good

13   things, and good things lead to great things.  And these

14   individuals were on the way to doing great things.

15   Individually, they each had their own motivations, but

16   collectively, they shared what is best in the spirit of,

17   frankly, our country.

18          Your Honor, lawyers -- I'm sure the Court is aware of a

19   Latin phrase, *Non sibi sed patriae*.  Lawyers unfortunately dip

20   into Latin, but it's very appropriate for this case.  And that

21   phrase means "Not for oneself, but for country."  These four

22   individuals may not have realized it, but they embodied that

23   spirit.  They didn't do things for themselves, they did things

24   for their country, they did things for the world, they did

25   things because it was the right thing to do.

1          The true test of character, the absolute truest test of

2   character is doing the right thing when no one else is looking.

3   No one was looking at these four individuals.  No one was

4   looking at Peter Kassig when he established a humanitarian

5   ambulance service called SERA.  He did it because it was the

6   right thing to do and it was a true test of character.

7          The same thing for Steven Sotloff and James Foley.  You

8   do not become heroes by doing that type of journalism.  They

9   were not self-aggrandizing, self-absorbed people.  They did

10  things for others.

11         And then finally, Your Honor, with Kayla Mueller, she,

12  again, did things for the right reasons in the right way.  And

13  the truest test of a person's character is doing the right thing

14  when no one else is looking, and she embodied that.  Right up

15  through her captivity, she did not want to burden her parents.

16  I am hard pressed to think of a more selfless act than that.

17         And that is the legacy of Kayla Mueller, that is the

18  legacy of James Foley, that is the legacy of Steven Sotloff, and

19  that is the legacy of Peter Kassig.  There's a lot of disunity

20  in this country at the moment.  It's unfortunate.  But the

21  lasting collective legacy of these four individuals was for this

22  country and this world to have more unity and less disharmony.

23  That was their enduring goal.  That is their enduring message.

24         And I would echo what the Court said in your remarks,

25  that younger people, the next generation and the generation

1    after that, needs to learn the lessons of these four individuals

2    and have a renewed spirit in this country.

3           And finally, Your Honor, *Non sibi sed patriae*, not for

4    oneself, but for country.

5           THE COURT:  All right.  Mr. Eisenstein?

6           MR. EISENSTEIN:  Thank you, Your Honor.  Briefly.  With

7    respect to the issue about the justification provided in our

8    proposed order, that was the result of a conversation defense

9    counsel had with BOP classification.  We've been doing a lot of

10   work on this issue, and hopefully it's reflected as demonstrated

11   in our memo.  So that's why those justifications were in there.

12   That was the request of the BOP, or the suggestion of the BOP

13   classification unit, that when they are making these

14   determinations and looking at this, that the BOP has a full

15   picture.

16          The issue regarding the SAMs, hopefully I didn't say --

17   it's not the SAMs themselves that would require somebody to go

18   to ADMAX.  Of course, there's 75 people, I think, at the time on

19   SAMs.  It's the existence of the SAMs plus the nature of the

20   offense, the counterterrorism offense, that's what we believe

21   would result in the reflexive measure of sending him to

22   Florence.

23          With respect to our specific request, it's laid out in

24   the second "Further Ordered" section of the proposed order, that

25   we ask the BOP to evaluate Mr. Kotey for placement in a CMU.

1    It's not asking for a specific designation, it's asking BOP to

2    make that evaluation or conduct that evaluation.

3          And hopefully I'm wrong.  Hopefully I'm wrong and the

4    reflexive nature will not be that he goes to Florence.  But

5    that's why the second-to-last proposed order is in there; that

6    if he does go to ADMAX, just to ensure that Mr. Kotey is treated

7    the way the American justice system and the Congress wanted

8    somebody in these circumstances, somebody who is going before

9    the court for sentencing, that they're given a fair process.

10   And that's why that measure is in there, to make sure that he is

11   treated fairly under the law.

12         THE COURT:  Anything further, Mr. Eisenstein?

13         MR. EISENSTEIN:  Nothing further, Your Honor.

14         THE COURT:  Any reason why the Court should not now

15   impose sentence, Mr. Fitzpatrick?

16         MR. FITZPATRICK:  No, Your Honor.

17         THE COURT:  Mr. Eisenstein?

18         MR. EISENSTEIN:  No, Your Honor.

19         THE COURT:  Mr. Kotey, you have the absolute right to

20   address the Court, sir.  You're not required to address the

21   Court.  You don't have to say anything if you don't wish to.

22   But you do have this opportunity to say something if you do want

23   to say something.

24         I'll give you a moment now to discuss that with your

25   attorneys there, and you can tell me whether you want to say

83

1    anything.  Because you don't have to say anything, but you do

2    have this opportunity to do so.

3              Now, you have submitted a letter, which I will make a

4    part of the presentence report.

5              THE DEFENDANT:  Yes, sir, thank you.

6              THE COURT:  Discuss it with your lawyer.

7              THE DEFENDANT:  There's nothing further I have to say

8    other than what I have submitted in the letter.

9              THE COURT:  And what's in the letter, it will be in the

10   public record.

11             THE DEFENDANT:  Yeah.

12             THE COURT:  So everyone will have an opportunity, if

13   you haven't already, to see that letter.  In fact, what I will

14   do -- let me have the deputy clerk, Ms. Randall, would you make

15   copies of that letter and give it to the families who are here

16   today?

17             MR. EISENSTEIN:  It's also attached to our sentencing

18   memo on the public docket.

19             THE COURT:  But these folks are here.  I don't want

20   them standing in line in the clerk's office and having some

21   clerk who doesn't know anything about it want $0.25 or $0.50 a

22   page for it.  Ms. Randall will give it to them.

23             COURTROOM CLERK:  Yes, Judge.

24             MR. FITZPATRICK:  We can help with that as well,

25   Your Honor.

1            THE COURT:  All right.  Good.  Do that.

2            Mr. Kotey, come to the podium, sir.  Mr. Kotey, you

3    stand convicted, by your plea, of eight serious crimes; in fact,

4    about the most serious crimes that can be committed.  And the

5    law requires that I consider a variety of factors in imposing an

6    appropriate sentence.  Congress, of course, prescribes a

7    maximum, and the maximum sentence for all of these is life.

8            And then the sentencing commission makes a more refined

9    assessment and gives guidance to judges.  It isn't mandatory,

10   but the sentencing guidelines are advisory.  But finally, this

11   court has to make an individual judgment about an individual

12   defendant in an individual case, which this is.

13           There is no way that I can accurately or more

14   compellingly describe the offense conduct in this case than has

15   already been described by the victims' families and by counsel

16   in this case.  It's egregious, violent, and inhumane conduct.

17   These weren't prisoners of war, these weren't soldiers in the

18   field.  They were soldiers, but soldiers for good, soldiers for

19   selfless giving or for reporting facts.  So it's egregious

20   conduct.

21           And the first factor I must take into account is the

22   need to impose a sentence that reflects the seriousness of the

23   offense, and that promotes respect for the law, and that

24   provides just punishment for the offense or offenses.  That's

25   the first factors.

1     The next factor I have to take into account and give

2     effect to is that I have to afford adequate deterrence.  Now,

3     there are two kinds of deterrence.  One is to deter you

4     personally.  Of course, you will be incarcerated for some time.

5     But that's not the point.  The bigger point is that there has to

6     be general deterrence.  That is, the sentence I impose has to

7     stand as a beacon, as a warning to others not to engage in this

8     conduct.  And I'll come back to that in a moment.

9     I also must consider the guidelines.  They're not

10    mandatory, but I do consider them.  And I have to, as I said,

11    consider the sentencing range.  But in the end, my determination

12    is a determination as to a specific case and a specific

13    defendant.

14    And it is the judgment of this court that you be

15    committed to the custody of the Bureau of Prisons -- with

16    respect to Count 1, Counts 2 through 5, Counts 6, 7, and 8, each

17    of those counts I commit you to the custody of the Bureau of

18    Prisons for the period of your natural life.

19    Now, I make those sentences run concurrently.  There

20    are arguments that lawyers make about consecutive, but the

21    Government hasn't made that argument here and I wouldn't

22    countenance that.  I think consecutive life sentences are silly.

23    No such thing.  But you get a life sentence for all six, and

24    each of those -- I mean all eight.  And for each of those, it's

25    to run concurrently.

1          Now, in your plea agreement the Government has

2    obligated itself, after 15 years, to use their best efforts, if

3    all other arrangements are met, all other conditions are met, to

4    facilitate your transfer to the United Kingdom.  But in any

5    event, I think the plea agreement does not erase the fact that

6    you will have to serve your life in prison, whether here or in

7    the United Kingdom.  And that's my view, too, although I play no

8    role at all in whether you're transferred to the United Kingdom.

9          Now, if 15 years come and pass and the Government does

10   not use its best efforts to transfer you to the United Kingdom,

11   well, your counsel can seek to bring a case for a breach of the

12   plea agreement.  I won't preside over that.  I won't be in this

13   veil of tears unless there's some fountain of youth or miracle

14   drug that enables me to live more than the nine decades I've

15   already lived.

16         So you are sentenced to life imprisonment for each of

17   the counts, for all eight counts.  But that term is to run

18   concurrently, that life term.

19         You are to pay a $100 special assessment, which is

20   required by law, for a total of $800, due and payable

21   immediately.  And there is no provision in the law for excusing

22   that if you do not have the wherewithal to pay it.  But I have

23   to impose it.  I do not impose any punitive fine or any fine to

24   cover the costs of incarceration or supervised release, in view

25   of your modest assets and in view of the sentence I have

1    imposed.

2           Now we come to -- since it's a life sentence, I impose

3    no supervised release.  It's inappropriate and unnecessary.

4           So we come now to the request by the defendant's

5    counsel for me to recommend -- and I will say, Mr. Eisenstein,

6    that I compliment you and your colleagues.  I think you've done

7    a thorough job on this.  And you make, I think, the best case

8    that can be made.  I don't agree with your expert or with anyone

9    else that it's reflexive.  I think they do consider every case.

10   I've had a lot of experience working with the Bureau of Prisons

11   on these things.

12          But in the end, I think it is inappropriate in this

13   case for me to make a recommendation because I don't have as

14   clear an idea as the Bureau of Prisons should have.  I know what

15   Mr. Kotey did, he and his Beatle colleagues; I know how

16   horrendous it was.  I know that he's subject to SAMs, I know

17   that Florence is very restrictive.  But I'm not prepared to say

18   that it's inappropriate.

19          I am prepared to say in this Judgment & Commitment

20   order that the Court makes no recommendation, but calls to the

21   attention of the Bureau of Prisons what his counsel has argued

22   about placement.  And I'll put that in the J&C, so they'll know

23   that.  But I don't think it's appropriate for me to do that

24   based on what I know.  There may be lots of factors that I'm not

25   aware of.

1          And importantly - and your counsel should know this,

2     and Mr. Fitzpatrick clearly does - the Bureau of Prisons works

3     for the Attorney General, and the Attorney General is who

4     Mr. Fitzpatrick works for.  That's the executive branch.  And if

5     there may come a time when the executive branch decides that if

6     you're at some location, Florence or some other location, that

7     you should be moved, they'll do it.  In fact, after 15 years, if

8     everything is satisfied, the executive branch will be the one -

9     not the judicial branch - that transfers you to the

10    United Kingdom, where you will nonetheless have to serve a life

11    in prison.

12          I think it is appropriate, Mr. Kotey, that you've

13    agreed to meet with families, and that you seem to have some

14    remorse.  I don't know how much.  You elected not to allocute,

15    and that's perfectly appropriate.  Nothing inappropriate about

16    that at all.  I have had other cases involving the animosity

17    that elements of the Islamic community feel towards the

18    United States, and of course I don't agree with that and I don't

19    agree with their -- I don't know anything about Islam other than

20    what I've learned here.  I'm certainly not an expert.  And I'm

21    not a religious person.  My mother said to me four months before

22    she died that there was no evidence of an after life, but she

23    was prepared to be pleasantly surprised.  I don't know why she

24    expected to be pleasantly surprised, but she did.  And she's

25    gone.  I don't have any knowledge or belief that any such thing

89

1    exists like an after life.  But if there is, maybe you can make

2    recompense there.

3           Anyway, you have an absolute right, Mr. Kotey, to

4    appeal your sentence, and to -- you may have a right to appeal

5    your conviction.  It's waived, I think, in the plea agreement,

6    but I don't sit to determine that.  I sit only to determine your

7    sentence, and I'm required by law to tell you that you may

8    appeal your sentence if you note the appeal now or 10 days from

9    now.

10          Ms. Mertz and Mr. Eisenstein, you can discuss that with

11   your client and do as you will be advised to do.

12          Now, have I omitted anything from the sentence,

13   Mr. Fitzpatrick?

14          MR. FITZPATRICK:  No, Your Honor.

15          THE COURT:  Ms. Mertz or Mr. Eisenstein?

16          MS. MERTZ:  May we have a moment to confer, Your Honor?

17          THE COURT:  Or Ms. Rupert, I didn't see you as well.

18          Let me point that out.  I want to say this.  I've been

19   doing this now, sitting on this bench - not in this courtroom

20   and in this building, because I've been here so long - this

21   courthouse was a grassy field when I first began sitting.  The

22   courthouse was in Old Town, on Washington Street.  But when I

23   first began sitting, there was no Public Defender Office and

24   there was no -- none of these other protections that a defendant

25   now has.  And the U.S. Attorney's Office was a mere shadow in

1    terms of the size that it is now.

2         But I think this case, I can safely say, has

3    demonstrated, on the part of the U.S. Attorney's Office,

4    exemplary ability, service, and you've done a very good job.

5         And on the defense side, I regret that I ever opposed

6    the public defenders, because I was wrong.  Defendants have been

7    much better represented in the past 10 or 12 or 15 years that

8    the Public Defender's Office has been here, and has done a fine

9    job, and in this case, I think a very creditable job.  And I

10   applaud you all for doing it.  I think it's a very difficult

11   job, and you're to be commended for doing it.

12        And, Mr. Kotey, you have the prospect, maybe, of going

13   home to the United Kingdom after 15 years, if everything works

14   for you and your counsel.  That's a pretty major plus for you.

15   And whether it comes about or not is not my determination.

16   You've bargained for it with the executive branch, and we'll

17   see -- well, you-all will see if it comes about.  I won't be

18   here.

19        All right.  Anything further in this matter today?  I

20   want to remind Ms. Randall to be sure to give the family a copy

21   of Mr. Kotey's letter.

22        Is there anything else, Mr. Fitzpatrick?

23        MR. FITZPATRICK:  Judge, we brought up delaying

24   transfer to BOP.  We suggested June 3rd; Your Honor referred to

25   later in June.  We'll defer to the Court.

1          THE COURT:  I'm going to give it a little longer

2   because I want the process to be completed.  Because once he's

3   designated, whether it's to Florence or to some other place, it

4   isn't going to be likely or feasible to do it.

5          And that goes for you-all as well; that is, for the

6   United States.  If you want to talk to him and he's willing to

7   talk to you -- he doesn't have to, but if he's willing to, you

8   need to get it done as well.  And his counsel need to use all of

9   that cooperation to bring all of that -- I will remember to put

10  it in the J&C, the arguments you've made, and to indicate that

11  I'm not giving a recommendation, but I am doing what I can to

12  ensure that the Bureau of Prisons has everything it needs to

13  make its decision.

14         Anything further on behalf of the Government today?

15         MR. FITZPATRICK:  No, Your Honor.

16         THE COURT:  Mr. Eisenstein, Ms. Mertz?

17         MR. EISENSTEIN:  No, Your Honor.

18         THE COURT:  Or Ms. Rupert?

19         MS. RUPERT:  No, Your Honor.  Thank you.

20         THE COURT:  What I've said about you and the efforts

21  you've made is sincerely felt, and I don't say it lightly.

22         MR. EISENSTEIN:  Thank you.

23         MS. RUPERT:  Thank you, Your Honor.

24         THE COURT:  And for the families, if the legal system

25  in our country has operated properly, it's because you-all came

1    and you-all expressed your views.  That's so important, and I

2    commend you for doing it.

3         Of course, there's nothing I can say that can possibly

4    do anything to lessen your loss and the experience that you all

5    have gone through.  But let us hope that what happened here, to

6    the extent that the sentence I imposed will have any general

7    deterrent effect, that the next time some religious group seeks

8    to take hostages to persuade or to get a ransom or coerce

9    government conduct, they won't do it.  Because the one thing

10   this case shows, we don't give up.  We will look for you, we

11   will find you, we will prosecute you, we will sentence you.

12   Keep that in -- I hope they will keep that in mind.

13        Thank you for coming.  Good luck to you, Mr. Kotey.  I

14   hope that what you hope for, to go home to the United Kingdom, I

15   hope you earn it.  I hope it happens.  But you'll have to serve

16   a life sentence.

17             THE DEFENDANT:  I understand.

18             THE COURT:  Court stands in recess.  July 5th is the

19   date.

20             (Recess taken at 12:37 p.m.)

21

22

23

24

25

```
 1                 CERTIFICATE OF OFFICIAL COURT REPORTER

 2

 3          I, Rebecca Stonestreet, certify that the foregoing is a

 4    correct transcript from the record of proceedings in the

 5    above-entitled matter.

 6

 7

 8

 9    ____//Rebecca Stonestreet//____          __5/17/22___

10    SIGNATURE OF COURT REPORTER                       DATE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```